1    GLYNN & FINLEY, LLP
     CLEMENT L. GLYNN, Bar No. 57117
2    ADAM FRIEDENBERG, Bar No. 205778
     One Walnut Creek Center
3    100 Pringle Avenue, Suite 500
     Walnut Creek, CA 94596
4    Telephone: (925) 210-2800
     Facsimile: (925) 945-1975

5

     Attorneys for Plaintiff
6    ConocoPhillips Company

7

8               UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10

11    CONOCOPHILLIPS COMPANY, a )
     Delaware corporation,            )
12                         )
              Plaintiff,     )
13                         )
     vs.                         )
14                         )
     MILESTONE PACIFIC PROPERTIES, )
15    LLC, a California Limited Liability   )
     Company, BPG PACIFIC, LLC, a California )
16    Limited Liability Company, COPELAND )
     CREEK APARTMENTS, LLC, a California )
17    Limited Liability Company, SAEED )
     GHAFOORI a/k/a PAUL GHAFOORI, an )
18    individual, JAGDEEP SIDHU, an individual, )
     and FIRST AMERICAN TITLE )
19    INSURANCE COMPANY, a California )
     Corporation,            )
20                         )
              Defendants.    )
21    _____ )

Case No.

**CV 08 2695**

**COMPLAINT FOR BREACH OF
CONTRACT, FORECLOSURE OF
DEED OF TRUST AND RECOVERY OF
PERSONAL PROPERTY**

**JURY TRIAL DEMANDED**

22

23        Plaintiff ConocoPhillips Company ("ConocoPhillips") sues Defendants Milestone Pacific

24   Properties, LLC ("Milestone"), BPG Pacific, LLC ("BPG"), Copeland Creek Apartments, LLC

25   ("Copeland"), Saeed Ghafoori a/k/a Paul Ghafoori ("Ghafoori"), Jagdeep Sidhu ("Sidhu") and

26   First American Title Insurance Company ("First American") and alleges as follows.  (Milestone,

27   BPG, Copeland Ghafoori and Sidhu and are referred to collectively herein as "Defendants.")

28   ///

## THE PARTIES

1.     ConocoPhillips is a Delaware corporation with its principal place of business in Texas.

2.     ConocoPhillips is informed and believes and thereon alleges that Milestone is a California limited liability company with its principal place of business in California. ConocoPhillips is informed and believes and thereon alleges that the members of Milestone are Ghafoori and Sidhu.

3.     ConocoPhillips is informed and believes and thereon alleges that Ghafoori is a citizen of California and resides in Mill Valley, California.

4.     ConocoPhillips is informed and believes and thereon alleges that Sidhu is a citizen of California and resides in Concord, California.

5.     ConocoPhillips is informed and believes and thereon alleges that BPG is a California limited liability company with its principal place of business in California, and that the members of BPG are Ghafoori, Glenn Larsen ("Larsen") and GHK Pacific, Inc. ("GHK Pacific"). ConocoPhillips is further informed and believes and thereon alleges that Larsen is a citizen of California and resides in Tiburon, California, and that GHK Pacific is a California corporation with its principal place of business in California.

6.     ConocoPhillips is informed and believes and thereon alleges that Copeland is a California limited liability company with its principal place of business in California, and that the members of Copeland are Larsen and Jack Yanoff, who is a citizen of California and resides in Greenbrae, California.  As discussed more fully below, ConocoPhillips is informed and believes and thereon alleges that Copeland is the current owner of real property that is the subject of this action, and is made a party for the purpose of having all interested parties before the Court.

7.     ConocoPhillips is informed and believes and thereon alleges that First American is a California corporation with its principal place of business in California.  As discussed more fully below, First American is the current trustee for a deed of trust that is the subject of this action and is made a party only for the purpose of having all interested parties before the Court.

COMPLAINT

1 **JURISDICTION**

2      8.     Under 28 U.S.C. § 1332, this Court has jurisdiction over this action because

3 complete diversity of citizenship exists and the amount in controversy is more than $75,000,

4 exclusive of interest and costs.

5      9.     This Court has personal jurisdiction over defendants because they all are

6 domiciled within California.

7 **VENUE**

8      10.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a)(1) as

9 jurisdiction is founded only on diversity of citizenship, all defendants reside in California and at

10 least one defendant resides within this judicial district.

11 **INTRADISTRICT ASSIGNMENT**

12      11.     Pursuant to Northern District of California, Civil Local Rule 3-2, assignment of

13 this action to the San Francisco Division or the Oakland Division of this Court is appropriate as a

14 substantial part of the events which give rise to this action occurred in the counties of Marin and

15 Contra Costa.

16 **GENERAL ALLEGATIONS**

17      12.     For more than 75 years, ConocoPhillips and its predecessors have engaged

18 directly and though licensees in the manufacture, marketing, distribution and sale of high quality

19 motor fuels and lubricants, and other related products, under the Union 76 brand.  During that

20 time, ConocoPhillips and its predecessors have developed an extensive multi-state network of

21 licensees which market, distribute and sell petroleum products under the Union 76 brand,

22 including throughout California.  ConocoPhillips and its predecessors have enforced strict

23 specifications and quality standards for gasoline manufactured, marketed, distributed and sold

24 under the Union 76 brand.  As a result of these standards, as well as the longtime use and

25 significant advertising of the Union 76 brand by ConocoPhillips and its predecessors, the Union

26 76 brand is well known to the public in California and throughout the United States, and has

27 thereby acquired a substantial value to ConocoPhillips and its licensees.

28 */ / /*

1    13.    In an effort to capitalize on the Union 76 brand, Milestone approached

2   ConocoPhillips about building and operating a Union 76 gasoline service station near Interstate

3   80 in Vallejo, California.  Milestone proposed building a station on real property that it owned at

4   199 Lincoln Road West, Vallejo, California, 94590 (the "Real Property").

5    14.    In 2004, Milestone began plans to construct the station at the Real Property (the

6   "Station"), and construction was completed in approximately September 2006.  ConocoPhillips

7   is informed and believes and thereon alleges that Milestone and/or its assignee(s) and

8   transferee(s) currently own the Real Property and the Station, as well as equipment,

9   improvements and other personal property located thereon.

10    **The Supply Agreement And The Facility Allowance Agreement**

11    15.    During the construction stage, ConocoPhillips and Milestone discussed the

12   parties' execution of a Union 76 Branded Reseller Agreement (the "Supply Agreement") in

13   connection with Milestone's operation of the Station.  The Supply Agreement ultimately was

14   signed by Milestone on or about May 31, 2006, and by ConocoPhillips on or about June 30,

15   2006.  (A true and correct copy of the Supply Agreement is attached hereto as Exhibit A.)  The

16   term of the Supply Agreement commenced on April 1, 2006, and was set to expire on March 31,

17   2016.  (Ex. A at § 2(a).)

18    16.    ConocoPhillips and Milestone thereafter executed an Amendment to Addendum

19   to the Supply Agreement ("Amendment").  (A true and correct copy of the Amendment is

20   attached hereto as Exhibit B.)  The Amendment modified the term of the Supply Agreement,

21   providing that it would commence on September 2, 2006, and expire on September 30, 2016, and

22   also modified certain other specified provisions of the Supply Agreement.  (Ex. B at ¶ 1.)

23   Except as specifically provided in the Amendment, all other terms, conditions and provisions of

24   the Supply Agreement continued in full force and effect.  (*Id.* at ¶ 2.)

25    17.    Under the Supply Agreement, ConocoPhillips granted Milestone, among other

26   things, a non-exclusive license to operate the Station under the Union 76 brand, and to use Union

27   76 trademarks and other intellectual property owned by ConocoPhillips.  (Ex. A at §§ 1, 10.)

28   / / /

1    18.    In addition, ConocoPhillips and Milestone entered a 76 Branded Facility

2    Allowance Agreement (the "Facility Allowance Agreement"), whereby ConocoPhillips made

3    substantial incentive payments to Milestone for operating under the Union 76 brand. (Ex. A at p.

4    45.) In effect, the facility allowance provided cash rebates to Milestone during the effective

5    period of the Supply Agreement and Facility Allowance Agreement.

6    19.    The Supply Agreement required that Milestone "shall continuously stock and

7    offer for sale sufficient quantities of each grade and type of Union 76 branded motor fuels,

8    generally offered by CONOCOPHILLIPS in the geographic area of [Milestone's] Station" for

9    the duration of the Supply Agreement. (*Id.* at § 11(a).) Milestone agreed to purchase from

10    ConocoPhillips an annual minimum of 3,000,000 gallons of gasoline and 240,000 gallons of

11    diesel fuel (including quarterly minimums of 750,000 gallons of gasoline and 60,000 gallons of

12    diesel). (*Id.* at § 11(b) and Ex. D thereto.)

13    20.    The Supply Agreement and the Facility Allowance Agreement conferred

14    significant value on Milestone, particularly in light of the ten-year term of the agreements,

15    Milestone's license to use the Union 76 brand and trademarks and its ability to purchase

16    ConocoPhillips' fuel, and the rebates provided by the Facility Allowance Agreement.

17    21.    In addition, ConocoPhillips made a considerable investment in the Station by

18    extending Milestone a $500,000 self-amortizing loan for use in Station operations.

19    ConocoPhillips advanced the loan funds in conjunction with the station opening. ConocoPhillips

20    also invested significant capital for brand support generally and, more specifically, at the Station

21    to assist Milestone in developing a loyal customer base.

22    22.    The parties thus recognized and agreed that ConocoPhillips would suffer

23    considerable damage in the event of Milestone's failure to perform its obligations under the

24    Supply Agreement. (Ex. A at § 30.) When a reseller debrands, ConocoPhillips suffers

25    significant immediate harm. First, and the most immediate impact on ConocoPhillips, is the lost

26    revenue experienced from losing the site. ConocoPhillips also loses potential revenue resulting

27    from foregone opportunities with other resellers. In addition, ConocoPhillips loses the value of

28    money spent on brand support and other efforts to develop the Station. Debranding also causes

1    ConocoPhillips to lose goodwill with its customers, resulting in significant lost revenues not

2    only at the debranded station but also at other stations operating under the Union 76 brand.

3        23.    Consequently, the parties agreed that if Milestone failed to purchase the required

4    minimum fuel volumes or terminated the Supply Agreement before the end of its term,

5    ConocoPhillips would be entitled to liquidated damages totaling "**$.03** times the minimum

6    monthly gallons . . . specified in this Agreement, times the number of months remaining in the

7    Term of this Agreement, including any fraction of a month, commencing as of the time of the

8    breach, refusal to perform, or termination whichever is earlier." (*Id.* at § 30(a)(1) (original

9    emphasis).) The parties expressly agreed that such damages "are a reasonable estimation of the

10    amount of [ConocoPhillips'] damages as of the date of [the Supply] Agreement and are not a

11    penalty." (*Id.* at § 30(a).)

12        24.    The Supply Agreement provided that such liquidated damages would be "due and

13    payable as of the date of said breach, termination, or failure to perform whichever date is

14    earlier." (*Id.* at § 30(a)(1).) Moreover, the Supply Agreement expressly provided that

15    ConocoPhillips' right to such damages is "in addition to any other damages or equitable relief

16    available to CONOCOPHILLIPS, for breach of [Milestone's] obligations under this Agreement,

17    and shall not bar CONOCOPHILLIPS from seeking damages under any other agreements with

18    [Milestone] including, but not limited to, promissory notes or amortization agreements." (*Id.* at

19    § 30(a).)

20        25.    The Supply Agreement was not freely assignable, but rather expressly provided

21    that, except with the prior written consent of ConocoPhillips, Milestone was not permitted to:

22        (1) assign, mortgage, encumber, or otherwise transfer this Agreement or the
         interest hereby created; (2) permit any lien or encumbrance to be place [sic] on
23        the Equipment; (3) become associated with any other person as a partner or
         otherwise with respect to this Agreement, or (4) permit any other person, firm or
24        corporation to occupy the Station or any part thereof; except as may otherwise be
         required by law.
25

26    (*Id.* at § 27(d).)

27    / / /

28    / / /

## The Promissory Note

26.    As alleged above, ConocoPhillips agreed to loan Milestone a principal amount of $500,000.  The loan was made in consideration of the Supply Agreement, and was expressly for use in the construction of improvements at the Station and to assist with Milestone's financial security.  (Ex. C at § IX.).  As part of the loan transaction, on or about December 8, 2005, Milestone executed and delivered to ConocoPhillips a Promissory Note (the "Promissory Note"). A true and correct copy of the Promissory Note is attached hereto as Exhibit C.

27.    Pursuant to the Promissory Note, Milestone agreed to pay ConocoPhillips the $500,000 principal amount, together with interest.  (*Id.* at § I.)  Milestone was obligated to make regular quarterly payments of principal and interest in the amount of $19,918.12, beginning on April 1, 2006, and on the first day of every January, April, July and October thereafter until the principal balance and all accrued interest is paid in full, with any remaining balance due as of December 31, 2015 to be paid in full on or before that date.  (*Id.*)

28.    Because of construction delays, the station opening likewise was delayed. Accordingly, Milestone and ConocoPhillips pushed back the effective date of the Supply Agreement and, in turn, also pushed back Milestone's repayment obligations under the Promissory Note.

29.    On or about September 16, 2006, the parties executed a Modification of Promissory Note (the "Modification").  A true and correct copy of the Modification is attached hereto as Exhibit D.  The Modification deferred the date of first payment to January 1, 2007, and the Maturity Date to September 30, 2016.  (Ex. D at §§ 3, 4.)  All other terms of the Promissory Note remained in full force and effect.  (*Id.* at § 5.)

30.    The Promissory Note provides that "[t]he unpaid principal balance of the Loan shall immediately become due and payable" upon any of several "Events of Default."  (*Id.* at § II.)  Such "Events of Default" include:

1.    Borrower for any reason ceases to operate the Site pursuant to the terms of the Supply Agreement;

2.    The Supply Agreement is terminated for any reason;

- 7 -

1    3.    Borrower leases or sells or otherwise transfers any interest in the Site to another, unless ConocoPhillips consents to the transfer in advance in writing.

2    4.    Borrower fails to perform any covenant or observe any condition contained in any of the Loan Documents or becomes in default under any of the
3    Loan documents (as defined herein); or . . .

4    6.    Borrower defaults under any covenants, condition, restriction, reservation, easements, license, liens, agreements and other matters, whether or not of record,
5    negatively affecting the condition of title or Borrower's interest in the Site.

6    (*Id.*)

7         31.    The Promissory Note further provides that upon "an Event of Default . . .

8    ConocoPhillips may declare the unpaid principal balance of the Note immediately due and

9    payable, and ConocoPhillips shall be entitled to enforce any security for this Note" and further

10   that "the unpaid portion of the Note shall accrue interest at the Default Rate from the date the

11   Event of Default occurred." (*Id.* at § II(B).)

12                                    **The Deed of Trust**

13        32.    To secure payment of the principal sum and interest on the Promissory Note and

14   amounts due under the Supply Agreement, on or about December 8, 2005, Milestone executed

15   and delivered to ConocoPhillips a deed of trust by which Milestone as Grantor conveyed to First

16   American, as trustee, all Milestone's rights, interests, estates and other claims in and to, *inter*

17   *alia*, the Real Property, including all buildings, improvements, equipment, inventory and other

18   tangible personal property thereon (the "Deed of Trust"). A true and correct copy of the Deed of

19   Trust is attached hereto as Exhibit E.

20        33.    The Deed of Trust was recorded on January 17, 2006, as Document No.

21   200600006344 in the Official Records of Solano County, California. First American is the

22   current trustee for the Deed of Trust.

23        34.    In the Deed of Trust, Milestone expressly covenanted and agreed not to sell,

24   convey or otherwise transfer any interest in the Real Property without ConocoPhillips' prior

25   written consent. (*Id.* at § VI(P); *see also, Id.* at § VIII.) The Deed of Trust specified, and

26   Milestone thereby contractually agreed, that "[a]ny such sale or transfer shall constitute an Event

27   of Default without any grace or cure period." (*Id.*)

28   / / /

1    35.    The Deed of Trust provides that "[u]pon the occurrence of an Event of Default all

2    sums secured [by the Deed of Trust] shall immediately become due and payable at the option of"

3    ConocoPhillips.  (*Id.* at § IX.) The Deed of Trust also provides that ConocoPhillips may, at its

4    option, pursue any of a number of additional remedies, including without limitation to "cause

5    this Deed of Trust to be foreclosed as a mortgage and start a court action which will result in a

6    sale of the Collateral Property to reduce the Indebtedness. . . ." (*Id.* at § IX(D).)

7                                   **The Security Agreement**

8    36.    On or about August 4, 2005, Milestone and ConocoPhillips entered a security

9    agreement (the "Security Agreement").  A true and correct copy of the Security Agreement is

10    attached hereto as Exhibit F.

11    37.    Pursuant to the Security Agreement, Milestone granted ConocoPhillips a security

12    interest in property described therein, including without limitation

13        personal property acquired by [Milestone] with funds advanced by
    CONOCOPHILLIPS . . . all personal and fixture property . . . any other contract
14        rights or rights to the payment of money . . . and all General Intangibles
    including, without limitation, all payment intangibles . . . agreements of any kind
15        or nature pursuant to which . . . others possess, use or have authority to use
    property (whether tangible or intangible) of [Milestone]. . . . [and] all personal
16        property of [Milestone] wherever located, whether owned now or acquired later.

17    (Ex. F at § 2.)

18    38.    The Security Agreement expressly secured Milestone's obligations to

19    ConocoPhillips under the Promissory Note and Supply Agreement, as well as all other debts,

20    obligations and liabilities of Milestone to ConocoPhillips. Accordingly, the Security Agreement

21    required that Milestone maintain ownership of the security, free of liens (*Id.* at § 9(b)), and

22        not sell or otherwise dispose, or offer to sell or otherwise dispose, of the
    Collateral or any interest therein except for (i) sales and lease of Inventory and
23        licenses of General Intangibles in the ordinary course of business and (ii) so long
    as no Event of Default has occurred and is continuing, sales or other dispositions
24        of obsolescent items of Equipment in the ordinary course of business consistent
    with past practices dispositions permitted by the Credit Agreement.
25

26    (*Id.* at § 9(h).)

27    / / /

28    / / /

39.     Pursuant to the Security Agreement, upon default or breach by Milestone of its

obligations under the Supply Agreement or the Promissory Note, ConocoPhillips may, *inter alia*,

immediately take possession of the subject property.  (*Id.* at § 15.)  It provides:

> **15.    Remedies.**  If an Event of Default shall have occurred and be
> continuing, CONOCOPHILLIPS may, without notice to or demand upon
> DEBTOR, declare this Agreement to be in default, and CONOCOPHILLIPS shall
> thereafter have in any jurisdiction in which enforcement hereof is sought, in
> addition to all other rights and remedies, the rights and remedies of a secured
> party under the Uniform Commercial Code of the State or of any jurisdiction in
> which Collateral is located, including, without limitation, the right to take
> possession of the Collateral, and for that purpose CONOCOPHILLIPS may, so
> far as DEBTOR can give authority therefore, enter upon any premises on which
> the Collateral may be situated and remove the same therefrom. . . .  In addition,
> DEBTOR waives any and all rights that it may have to a judicial hearing in
> advance of the enforcement of any of CONOCOPHILLIPS' rights hereunder,
> including, without limitation, its right following an Event of Default to take
> immediate possession of the Collateral and to exercise its rights with respect
> thereto.

(*Id.* (original emphasis).)

### The Personal Guaranty

40.     On or about August 4, 2005, Ghafoori and Sidhu entered a Personal Guaranty in

favor, and for the benefit, of ConocoPhillips (the "Personal Guaranty").  A true and correct copy

of the Personal Guaranty is attached hereto as Exhibit G.

41.     Pursuant to the Personal Guaranty, Ghafoori and Sidhu each individually

"absolutely and unconditionally guarantee[d] the prompt payment of any and all indebtedness

hereafter incurred by [Milestone] to ConocoPhillips. . . ."  (Ex. G at § 1.)

42.     The Personal Guaranty "is a general guaranty and is assignable, and when so

assigned [Ghafoori and Sidhu] shall be bound as above to the assignees without in any manner

affecting [their] liability hereunder on any part of [Milestone's] obligations to ConocoPhillips."

(*Id.* at § 12.)

### Milestone Sells The Station And Associated Agreements To BPG And Copeland

43.     The Supply Agreement specifically prohibited Milestone from assigning the

Supply Agreement or Milestone's rights thereunder without ConocoPhillips' prior written

consent.  (Ex. A at § 27(a).)  The Promissory Note provided that if Milestone ceased operating

1    the Station pursuant to the Supply Agreement or leased, sold or otherwise transferred the Station

2    without ConocoPhillips' prior written consent, an "Event of Default" would occur, causing the

3    unpaid principal balance to become immediately due and payable.  (Ex. C at § II(A).)  The Deed

4    of Trust prohibited a sale or other transfer by Milestone of the subject property (including the

5    Real Property, and various personal property) without ConocoPhillips' prior written consent.

6    (Ex. E at § VI(P).)

7         44.    ConocoPhillips is informed and believes and thereon alleges that, in 2006,

8    Milestone nevertheless sold the Real Property to Copeland, and sold all inventory, equipment,

9    fixtures, and other personal property at the Real Property (i.e., property pledged to

10    ConocoPhillips as security pursuant to the Deed of Trust and the Security Agreement) to BPG.

11    Upon information and belief, ConocoPhillips alleges that Copeland thereafter leased the Real

12    Property to BPG.  (A true and correct copy of the contracts pursuant to which Milestone, BPG

13    and Copeland consummated these transactions are attached hereto, respectively, as Exhibit H

14    (the October 14, 2006 Purchase and Sale Agreement of Real Property (the "Sale Agreement")),

15    Exhibit I (the December 14, 2006 Bill of Sale (the "Bill of Sale") and Exhibit J (the December

16    14, 2006 Commercial Lease with Option to Purchase (the "Lease Agreement")).  Milestone did

17    not obtain ConocoPhillips' written consent prior to completing these transactions, and has never

18    obtained such consent.

19         45.    ConocoPhillips is informed and believes and thereon alleges that on or about

20    December 14, 2006, Milestone also assigned its interest in the Supply Agreement to Copeland.

21    Attached hereto as Exhibit K is the December 14, 2006 Assignment and Assumption of Service

22    Contracts, Warranties, Guaranties, Permits and Other Intangible Property (the "Assignment"),

23    pursuant to which Milestone assigned to Copeland, *inter alia*, all "service contracts" related to

24    the Real Property.  Milestone did not obtain ConocoPhillips' written consent prior to making this

25    assignment, and has never obtained such consent.

26              **Milestone Unilaterally Terminates The Supply Agreement**

27         46.    On or about January 17, 2008, Ghafoori wrote ConocoPhillips to advise that

28    Milestone was terminating the Supply Agreement, effective immediately.  A true and correct

1    copy of Ghafoori's letter is attached hereto as Exhibit L.

2        47.    As of the effective date of termination, 104 months remained of the term of the

3    Supply Agreement.  Accordingly, pursuant to the terms of the Supply Agreement,

4    ConocoPhillips immediately became entitled to liquidated damages in the amount of

5    $676,405.48.  ConocoPhillips also became entitled to immediate repayment of $456,683.64, the

6    outstanding balance of principal and accrued interest under the Promissory Note.  Defendants

7    have refused to pay these amounts to ConocoPhillips.

8                            **FIRST CLAIM FOR RELIEF**

9          **(Breach of Contract (the Supply Agreement) by Milestone and Copeland)**

10        48.    ConocoPhillips repleads and incorporates the allegations of paragraphs 1 through

11    47 as though fully set forth herein.

12        49.    The conduct of Milestone and Copeland alleged above, including but not limited

13    to, the assignment of the Supply Agreement without first obtaining ConocoPhillips' written

14    consent and the failure to pay contractually required liquidated damages upon request by

15    ConocoPhillips breached the Supply Agreement.

16        50.    ConocoPhillips has fully performed all conditions, covenants and promises

17    required of it under the Supply Agreement.

18        51.    As Copeland has voluntarily accepted the benefit of the Supply Agreement, it is

19    responsible for all obligations arising therefrom.

20        52.    As a result of the breaches of Milestone and Copeland, ConocoPhillips has been

21    damaged in an amount to be proven at trial.

22                            **SECOND CLAIM FOR RELIEF**

23          **(Breach of Contract (the Promissory Note) by Milestone and Copeland)**

24        53.    ConocoPhillips repleads and incorporates the allegations of paragraphs 1 through

25    52 as though fully set forth herein.

26        54.    Milestone and Copeland have breached the Promissory Note as alleged above by,

27    *inter alia*, failing to pay amounts due thereunder to ConocoPhillips.

28    / / /

COMPLAINT

1       55.    ConocoPhillips has fully performed all conditions, covenants and promises

2  required of it under the Promissory Note.

3       56.    As Copeland has voluntarily accepted the benefit of the Promissory Note, it is

4  responsible for all obligations arising therefrom.

5       57.    As a result of said breaches, ConocoPhillips has been damaged in an amount to be

6  proven at trial.

7                         **THIRD CLAIM FOR RELIEF**

8        **(Breach of Contract (the Security Agreement) by Milestone and BPG)**

9       58.    ConocoPhillips repleads and incorporates the allegations of paragraphs 1 through

10  57 as though fully set forth herein.

11       59.    Milestone and BPG have breached the Security Agreement by, *inter alia*, selling

12  and/or assigning the property pledged therein as security without prior written consent of

13  ConocoPhillips and failing to deliver the property to ConocoPhillips as required upon default.

14       60.    ConocoPhillips has fully performed all conditions, covenants and promises

15  required of it under the Security Agreement.

16       61.    As BPG has voluntarily accepted the benefit of the Supply Agreement, and is the

17  current owner and possessor of the property that is the subject of the Security Agreement, it is

18  responsible for all obligations arising from the Security Agreement.

19       62.    As a result of said breaches, ConocoPhillips has been damaged in an amount to be

20  proven at trial.

21       63.    The Security Agreement provides ConocoPhillips a security interest in and to the

22  property described therein, and such property was pledged as security for Milestone's

23  performance under the Supply Agreement and the Promissory Note.  By virtue of Defendants'

24  default, and in accordance with the terms of the Security Agreement and under the California

25  Commercial Code, ConocoPhillips is entitled to the immediate possession of said property, the

26  value of which is currently unknown to ConocoPhillips.

27  / / /

28  / / /

COMPLAINT

**FOURTH CLAIM FOR RELIEF**

**(Breach of Contract (the Personal Guaranty) by Ghafoori and Sidhu)**

64.     ConocoPhillips repleads and incorporates the allegations of paragraphs 1 through 63 as though fully set forth herein.

65.     Ghafoori and Sidhu have breached the Personal Guaranty as alleged above by, *inter alia*, failing to pay amounts due thereunder to ConocoPhillips.

66.     As a result of said breach, ConocoPhillips has been damaged in an amount to be proven at trial.

**FIFTH CLAIM FOR RELIEF**

**(Foreclosure and Specific Performance of Deed of Trust)**

67.     ConocoPhillips repleads and incorporates the allegations of paragraphs 1 through 66 as though fully set forth herein.

68.     ConocoPhillips is now, and at all times relevant to this action was, the lawful owner and holder of the Promissory Note and Supply Agreement and the beneficial interest under the Deed of Trust.

69.     As a result of Milestone's breaches and defaults as alleged above, including without limitation under the Supply Agreement and Promissory Note, ConocoPhillips is entitled to foreclosure of the Deed of Trust, and sale of the subject property, with the proceeds of the sale to be applied in payment of the amounts due to ConocoPhillips, and for such other relief as may be just and proper.

70.     In addition to the foregoing provision, the Deed of Trust provides, among other things, that ConocoPhillips may have a receiver appointed to receive rents and other income realized by Copeland and/or BPG from the Real Property and the personal property pledged as security, and to apply such rents and other income to the indebtedness owed to ConocoPhillips, pending foreclosure of the Deed of Trust and sale of the Real Property and personal property pledged as security.

71.     Accordingly, ConocoPhillips seeks specific performance of this provision and appointment of a receiver pending foreclosure and sale.

COMPLAINT

## PRAYER FOR RELIEF

WHEREFORE, ConocoPhillips prays for judgment as follows:

1.      For compensatory damages according to proof, together with prejudgment and postjudgment interest under the Supply Agreement, Promissory Note, Deed of Trust, Security Agreement and Personal Guaranty, and to the extent otherwise permitted by law;

2.      For a preliminary injunction and writs of possession and attachment, appointment of a receiver to take possession of and protect and preserve the Real Property and personal property pledged as security, and such other provisional remedies as may be appropriate;

3.      For recovery of the possession of the personal property described in the Security Agreement;

4.      For foreclosure of the Deed of Trust, sale of the subject property, and use of the sale proceeds to satisfy the obligations of Defendants to ConocoPhillips;

5.      For an award of ConocoPhillips' costs of suit and reasonable attorneys' fees under the Supply Agreement, Promissory Note, Deed of Trust, Security Agreement and Personal Guaranty, and to the extent otherwise permitted by law; and

7.      For such other and further relief as the court may deem just and proper.

Dated: May 28, 2008

GLYNN & FINLEY, LLP
CLEMENT L. GLYNN
ADAM FRIEDENBERG
One Walnut Creek Center
100 Pringle Avenue, Suite 500
Walnut Creek, CA  94596


By _____
Attorneys for Plaintiff
ConocoPhillips Company

- 15 -

COMPLAINT

# EXHIBIT A

**76 BRANDED - LEASE/CONTRACT COVER SHEET**

LESSEE........................,.................... Milestone Pacific Properties, LLC
SOLD TO NUMBER...............~............ ~~0010070275~~ 0010078275
SHIP TO NUMBER................................ 837120
CLASS OF TRADE.................................. 0045
EFFECTIVE DATE.................................. April 1, 2006
EXPIRATION DATE.................................. March 31, 2016

*RECEIVED*
*JUN 2 9 2006*

After execution return to: Wayne Power, Contract Administration TR-1034B,
P.O. Box 2197, Houston, TX 77252-2197

ENCLOSED ARE THE FOLLOWING:

| | |
|---|---|
| | Union 76 Dealer Station Lease and Motor Fuel Supply Agreement w/PMPA |
| X | Union 76 Branded Reseller Agreement w/PMPA |
| | Union 76 Dealer Station Lease/Lease Back-Motor Fuel Supply Agmt. w/PMPA |
| | Underground Storage Tanks/Owner/Operating Agreement (addendum 2 of Lease/Supply Agreement) |
| | Car Wash Addendum to Union 76 Dealer Station Lease and Motor Fuel Supply Agreement |
| | Car Wash Addendum to Union 76 Dealer Station Lease/Lease Back and Motor Fuel Supply Agreement |
| | C-Store Addendum to Union 76 Dealer Station Lease-Motor Fuel Supply Agmt. |
| | Snack Shop Addendum to Union 76 Dealer Station Lease and Motor Fuel Supply Agreement |
| X | Facility Allowance Agreement |
| X | 76 Branded Dealer or Reseller EPOS Equipment Amendment |
| X | 76 Branded Temperature Adjustment Agreement |
| | Federal Tire Registration-Dealer |
| | ConocoPhillips San Diego A.P.C.D. Definition of Responsibility |
| | LPG Agreement |
| | Workers Compensation Insurance Waiver of Subrogation-NEVADA |
| X | Tax Exemption Certificate |
| | |
| | |
| | |
| | |
| | |
| | |
| | |



## UNION 76 BRANDED RESELLER AGREEMENT
### 000045 / 837120

## **TABLE OF CONTENTS**

| SUBJECT | SECTION |
|---|---|
| LICENSE AND STATION | 1 |
| TERM | 2 |
| EQUIPMENT | 3 |
| ELECTRONIC POINT OF SALE EQUIPMENT | 4 |
| SERVICES, OPERATIONS AND IMAGE OF STATION | 5 |
| | |
| PROHIBITED USES | 6 |
| IMAGE AND OPERATIONS STANDARDS PROGRAM | 7 |
| RIGHT TO OCCUPY STATION | 8 |
| TAXES | 9 |
| TRADEMARKS | 10 |
| | |
| MOTOR FUELS BRANDS, GRADES AND QUANTITY | 11 |
| DELIVERY | 12 |
| TITLE TO MOTOR FUEL AND STOCK LOSSES | 13 |
| ALLOCATION | 14 |
| PURCHASE PRICE | 15 |
| | |
| TERMS OF PAYMENT AND CREDIT REQUIREMENTS | 16 |
| CREDIT CARD SALES | 17 |
| SIGNS | 18 |
| NO EXCLUSIVE AREA | 19 |
| MAINTENANCE AND REPAIR | 20 |
| | |
| TELECOMMUNICATIONS | 21 |
| COMPLIANCE WITH LAWS | 22 |
| ENVIRONMENTAL COMPLIANCE | 23 |
| RECORDS AND AUDITS | 24 |
| INDEMNIFICATION | 25 |
| | |
| INSURANCE | 26 |
| TRANSFERS, SUBLETTING AND SALES | 27 |
| TERMINATION BY CONOCOPHILLIPS | 28 |
| TERMINATION BY RESELLER/ CONOCOPHILLIPS' PURCHASE OPTION | 29 |
| LIQUIDATED DAMAGES | 30 |
| | |
| INDEPENDENT CONTRACTOR | 31 |
| NOTICE | 32 |
| FORCE MAJEURE | 33 |
| REVIEW OF AGREEMENT | 34 |
| SECTION TITLES | 35 |

WAIVER
WARRANTY AND REPRESENTATIONS                              36
CONFIDENTIALITY                                          37
SEVERABILITY                                             38
SECURITY INTEREST                                        39
                                                         40

LEGAL FEES
ASSIGNMENT AND MODIFICATION                              41
CHOICE OF LAW AND VENUE                                  42
CONTRACTING ENTITY                                       43
EXHIBITS AND PREAMBLE                                    44
                                                         45

ENTIRETY
                                                         46

**EXHIBITS**

Station Location                                    Exhibit A
Equipment Schedule/Signs                            Exhibit B
Hours of Operation                                  Exhibit C
Quarterly /Annual Minimum Volume Schedule           Exhibit D
Petroleum Marketing Practices Act (PMPA)            Exhibit E
Image Improvement Addendum                          Exhibit F




## UNION 76 BRANDED RESELLER AGREEMENT
### 000045 / 837120

This UNION 76 Branded Reseller Agreement ("Agreement") dated <u>December 8, 2005</u> ("Contract Date") is by and between ConocoPhillips Company, successor to Tosco Corporation by merger ("CONOCOPHILLIPS"), and the individual(s) and/or entity named below ("RESELLER"):

### Milestone Pacific Properties, LLC

### <u>*RECITALS*</u>

A.   WHEREAS, CONOCOPHILLIPS owns and has the right to use and grant licenses and petroleum marketing franchises for the use of certain Union 76 trade name(s), trademark(s) and service mark(s) ("Mark(s)");

B.   WHEREAS, CONOCOPHILLIPS owns, licenses, and franchises independent operators, dealers, resellers, and branded marketers to use the Mark(s) in connection with the resale of motor fuels, automotive services, lubrication services and oil changes, car washes, convenience stores, and related services to the consuming public through Union 76 branded service stations, which stations include the use of Union 76 proprietary credit card payment system, trade secrets, specialized equipment, stylized station premises, trade dress, slogans, and identification schemes, all of which may be changed, improved, and further developed by CONOCOPHILLIPS from time to time (Union 76 Format(s)");

C.   WHEREAS, RESELLER desires to be assisted, trained, authorized and licensed to use the Mark(s) and Format(s) owned by CONOCOPHILLIPS, and recognizes and acknowledges the benefits to be derived from being identified with the Union 76 brand and being assisted, trained, and licensed by CONOCOPHILLIPS for the use thereof; and

D.   WHEREAS, RESELLER understands and acknowledges the importance of CONOCOPHILLIPS' uniform standards of quality, appearance, and service and the necessity of RESELLER to conform to the Union 76 Format(s).

NOW, THEREFORE, in consideration of the mutual undertakings contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.   <u>LICENSE AND STATION.</u>
   (a)   Subject to the terms and conditions of this Agreement and RESELLER's continuing good faith performance, CONOCOPHILLIPS hereby grants to RESELLER a non-exclusive license and franchise (hereinafter used as such term is defined under the Federal Petroleum Marketing Practices Act, 15 U.S.C. §2801 <u>et seq.</u>, ["PMPA"]) to establish and operate a Union 76 Service Station utilizing the Mark(s) and Union 76 Format(s) only at the <u>Station Location</u> set forth in **Exhibit A** ("Station").

   (b)   The franchise granted herein is for the Station only and nothing herein shall be construed as or shall be a grant of any area, market, or territorial rights; provided, however, RESELLER shall be and hereby is permitted to advertise and solicit business for the Station within any area, market or territory, it being acknowledged and agreed to by RESELLER that other Union 76 branded service station resellers, dealers, car washes, branded marketers, and CONOCOPHILLIPS itself may also advertise and solicit business within any area, market or territory inclusive of, but not necessarily limited to, the vicinity of the Station.

   (c)   Pursuant to CONOCOPHILLIPS' prior written consent, RESELLER may be authorized to own and operate additional service station premises under the Mark(s); provided, however, that said



service station premises shall meet or comply with CONOCOPHILLIPS' then current standards for the resale of motor fuels, and if applicable, automotive services, lubrication services, oil changes, and other related services through Union 76 branded service stations to the consuming public.

2.    **TERM.**

(a)    The term of this Agreement commences on <u>April 1, 2006</u> and expires on <u>March 31, 2016</u> ("Term"), subject to the early termination provisions set forth herein.

(b)    CONOCOPHILLIPS shall have the right, but not the obligation to offer to renew the franchise granted herein for one (1) additional term.   RESELLER may accept CONOCOPHILLIPS' renewal provided:

(1)    RESELLER shall not have been previously nonrenewed or terminated as provided under applicable law or other terms of this Agreement;

(2)    RESELLER shall, prior to the commencement of such renewal term, execute CONOCOPHILLIPS' then current Union 76 branded reseller agreement which shall set forth such renewal terms and conditions;

(3)    RESELLER shall not be in default of any of the terms and provisions of this Agreement, and RESELLER shall have fully and faithfully complied with and performed all RESELLER's obligations hereunder; and

(4)    RESELLER shall, at RESELLER's sole expense, renovate, improve or upgrade the Station so as to conform with CONOCOPHILLIPS' then current Mark(s) and Union 76 Formats standards and specifications.

3.    **EQUIPMENT.**

(a)    CONOCOPHILLIPS hereby provides to RESELLER the equipment and signage set forth on the <u>Equipment Schedule</u> attached hereto as **Exhibit B** ("Equipment") for use at the Station, now installed or to be delivered and installed by CONOCOPHILLIPS to the Station. Such Equipment and any additions, replacements, or substitutions hereafter made (which may be evidenced by Supplemental Schedules) are also referred to collectively herein as the Equipment.  RESELLER agrees that the Equipment shall remain the personal property of CONOCOPHILLIPS and shall not be encumbered, changed, modified, relocated, or removed without the prior written consent of CONOCOPHILLIPS. CONOCOPHILLIPS reserves the right at any time to remove from the Station without replacement any item of Equipment deemed by CONOCOPHILLIPS as not essential to the operation thereof and, upon expiration, termination and/or nonrenewal of this Agreement, CONOCOPHILLIPS shall have the right to enter upon the Station and remove all of the Equipment.

(b)    RESELLER will, at RESELLER's sole expense, make all minor repairs and provide all ordinary maintenance required to keep the Equipment in good operating condition. CONOCOPHILLIPS may, but is not obligated to, make major repairs required to keep the Equipment in good operating condition or replace Equipment, provided that if such repairs are necessitated by the negligence or misuse of RESELLER, of any employee of RESELLER, or of any third party, RESELLER shall be obligated to reimburse CONOCOPHILLIPS for the cost of such repairs or replacements. RESELLER acknowledges and agrees that CONOCOPHILLIPS has no obligation to repair or replace under ground storage tanks or lines.  RESELLER agrees that in no event shall CONOCOPHILLIPS incur any liability to RESELLER for damages, consequential or otherwise, by reason of the condition of the Equipment or RESELLER's negligence, failure, or delay, regardless of cause, in repairing any of the Equipment, and RESELLER waives all claims for damages resulting therefore or in connection therewith.   Upon termination, expiration and/or nonrenewal of this Agreement, RESELLER agrees to surrender and return



the Equipment to CONOCOPHILLIPS in as good order and condition as when supplied to RESELLER hereunder, ordinary wear and tear excepted.

**4.    ELECTRONIC POINT OF SALE EQUIPMENT.**

RESELLER acknowledges and agrees that CONOCOPHILLIPS shall require the installation of electronic point of sale ("EPOS") equipment for the processing of credit card and debit card transactions from a source or by a manufacturer that is authorized by CONOCOPHILLIPS. At it's discretion, CONOCOPHILLIPS may elect to own the equipment and install it at its expense, or CONOCOPHILLIPS may require for RESELLER to purchase or lease the CONOCOPHILLIPS' approved EPOS equipment and have it installed, at RESELLER'S expense.  RESELLER shall pay to CONOCOPHILLIPS all reasonable charges for the operation and use of said EPOS equipment, and access to the CONOCOPHILLIPS EPOS system as may be required by CONOCOPHILLIPS, which shall be set forth in an EPOS Equipment Rental Agreement to be executed by RESELLER upon request by CONOCOPHILLIPS.

**5.    SERVICES, OPERATIONS AND IMAGE OF STATION.**

(a)    RESELLER recognizes that the Union 76 Mark(s) unique color combinations, Station design and appearance represents an image of high standards of product quality, Station appearance (inside and out) and customer service. Therefore, RESELLER agrees to manage, operate and maintain the Station in a manner which will maintain and enhance the image and which shall in no event detract from or disparage the image and will comply with CONOCOPHILLIPS' visual and operational standards as updated from time to time by CONOCOPHILLIPS.    In particular, without limiting the foregoing obligation, RESELLER shall do the following at RESELLER's sole cost and expense:

(1)    Operate the Station for the promotion and sale of the branded motor fuels and motor oils and other merchandise, products and services licensed under this Agreement and customarily sold at such facilities, keeping the Station open for continuous operation not less than the hours set forth in the Hours of Operation schedule attached hereto as **Exhibit C;**

(2)    Keep the Station including, but not limited to, the premises, buildings (interior and exterior), restrooms, sidewalks, approaches and driveways in good condition, properly lighted, clean, safe, sanitary and free of trash, rubbish and other debris;

(3)    Keep the approaches, driveways and services areas uncluttered and free of parked vehicles, trailers, and other obstructions, including ice or snow, at all times;

(4)    Render courteous, prompt, efficient and diligent service to customers and provide satisfactory resolution of any customer complaints;

(5)    Maintain sufficiently trained and qualified employees (including RESELLER) who must at all times, while on duty at the Station, be dressed in approved uniforms.  In addition, each employee who, in the course of their employment might be called upon shall communicate with customers, law enforcement officials, fire officials, government officials and other persons who may have business dealings with the Station have the ability to personally understand, write and speak the English language.  RESELLER shall maintain a sufficient number of trained, courteous and neat appearing personnel at the Station required to consistently operate the Station in an efficient and organized manner. RESELLER shall, at CONOCOPHILLIPS' request, participate in subsequent training programs as may be offered by CONOCOPHILLIPS from time to time;

(6)    Maintain an environmentally compliant and safe place to work for RESELLER's employees and customers, and maintain and operate the Station in compliance with all applicable laws, regulations and rules concerning environmental compliance and safety of the workplace. RESELLER shall provide all employees with adequate training concerning workplace environmentally compliance,





safety and safe work practices. CONOCOPHILLIPS makes no assurances that despite RESELLER's proper maintenance of any and all environmentally compliance and safety practices, use of the environmental compliance and/or safety information or any additional environmental compliance and/or safety measures offered or suggested by CONOCOPHILLIPS or RESELLER, that the Station is guaranteed to be an environmentally compliant or safe place. RESELLER acknowledges that environmental compliance and safety of the workplace is primarily RESELLER's responsibility and not CONOCOPHILLIPS';

(7)    If permitted by law, upon the request of CONOCOPHILLIPS, operate at least one (1) of the fuel islands (or one (1) of the dispensers if the Station has only one (1) fuel island) on a self-serve basis;

(8)    Comply with all laws, ordinances, rules and regulations of constituted public authority governing the use and occupancy of the Station and the conduct of RESELLER's business at the Station; and

(9)    Devote sufficient time to the personal management of the Station so that it is operated consistently in conformance with the requirements of this Agreement.

(b)    <u>Brand Image Requirements.</u>

(1)    Without limiting any other obligation of RESELLER under this Agreement or any related or supplemental agreements, RESELLER, at its expense, shall comply with the minimum image requirements established by CONOCOPHILLIPS ("Image Requirements"). Such Image Requirements may be communicated through CONOCOPHILLIPS' website or in such manner as CONOCOPHILLIPS may designate from time to time. CONOCOPHILLIPS may revise the Image Requirements at any time or from time to time, but no more frequently than annually, by furnishing written notice to RESELLER. If a revision requires RESELLER to make expenditures or investments in the Station, RESELLER shall comply with the revision within 180 days after the date of CONOCOPHILLIPS' notice. If an Image Requirement conflicts with any Union 76 service station format or CONOCOPHILLIPS visual standard, the more stringent provision will control unless CONOCOPHILLIPS expressly states otherwise in writing.

(2)    RESELLER, at its expense, shall make all renovations, improvements and investments in the Station necessary or appropriate from time to time (including facelifts, equipment upgrades, replacements, additions and other expenditures) to comply with the Image Requirements as in effect from time to time, and to ensure the Station's viability, customer appeal, competitiveness and consistency with the Union 76 branded stations in RESELLER's trade area.

(3)    Within one year following the Contract Date and without limiting RESELLER's obligations under Section 5(b)(1), RESELLER shall cause the Station to be in compliance with CONOCOPHILLIPS' Image Requirements. RESELLER shall be responsible for all costs and expenses of complying with such requirements including all materials, permitting, construction, maintenance, improvements and equipment costs. RESELLER shall follow the guidelines in the Image Requirements, or as otherwise specified by CONOCOPHILLIPS in writing.

6.    <u>PROHIBITED USES.</u>

(a)    RESELLER shall not use the Station or any part thereof, without CONOCOPHILLIPS' prior written consent, for any of the following:

(1)    An automobile, truck or equipment rental business;

(2)    A vehicle towing business consisting or two (2) or more tow trucks;

(3)    A business of selling vehicles of any kind;



(4)     A parking lot; or a place for the storage of junked, disabled vehicles or used tires or batteries;

(5)     A business that involves major engine overhauls, auto body repair, welding, or any other operation that involves an open flame; or

(6)     A franchise or franchise business operated on or from the Station other than any franchise or franchise business approved by CONOCOPHILLIPS or offered by CONOCOPHILLIPS to RESELLER;

(b)     RESELLER shall not, without the prior written consent of CONOCOPHILLIPS:

(1)     Obstruct any entrance, exit, pin corner, or pump island or otherwise restrict access to the Station, or any part thereof, or block delivery carrier's access to storage tank fill pipes;

(2)     Store or sell any intoxicating beverage unless RESELLER has secured CONOCOPHILLIPS' prior written approval and all necessary permits and licenses and liquor liability insurance have been obtained, and RESELLER and RESELLER's employees are trained in the proper procedures of selling intoxicating beverages.  Further, no intoxicating beverage shall be consumed by anyone at the Station; and no one shall be permitted to work at the Station while under the influence of an intoxicating beverage;

(3)     Store, sell or consume any illegal drugs, or permit drug paraphernalia to be present, used, distributed, or tolerated at the Station. In addition, RESELLER agrees that no one shall be permitted to work at the Station while under the influence of an illegal drug;

(4)     Conduct any illegal, pornographic, sexually explicit, offensive, noisy or dangerous activities, including, but not limited to, the sale, distribution, or display of any illegal, immoral, pornographic or sexually explicit materials;

(5)     Discharge, or permit the discharge of, petroleum products or other products or materials onto the Station, or adjacent properties;

(6)     Maintain or permit animals to be present or condition to exist which may endanger the health, safety or well being of persons at or in the vicinity of the Station;

(7)     Restrict the use of the Station facilities by the installation of coin-operated devices in the restrooms, on restroom doors or on air and water dispensers.  Install or operate any pinball or amusement games of any type without the prior written consent of CONOCOPHILLIPS;

(8)     Create or permit waste at the Station, or any part thereof, or allow, or condone, any activity on the Station, or any part thereof, that shall constitute a nuisance;

(9)     Permit the Station to be used as housing, sleeping, or living quarters. RESELLER agrees that the Station is to be used for business purposes only; and

(10)     Attach or place anything anywhere which could diminish, interfere with, infringe upon or otherwise dilute the image and reputation of the Marks, or confuse or deceive the public.

7.     **IMAGE AND OPERATIONS STANDARDS PROGRAM.**
(a)     CONOCOPHILLIPS has developed and manages a customer service and service station operations quality assurance and image consistency program, as described in the Brand and Image Standards materials, to be provided by CONOCOPHILLIPS to RESELLER from time to time via



CONOCOPHILLIPS website, which is incorporated into and made a part of this Agreement by this reference. RESELLER hereby agrees that compliance with the Brand and Image Standards materials is of material significance to the business relationship created by this Agreement, and that such compliance is intended to ensure that all CONOCOPHILLIPS dealers and resellers meet and/or exceed the expectations of their customers. RESELLER shall employ such personnel and other resources so as to consistently comply with the Brand and Image Standards materials. CONOCOPHILLIPS shall have the right, from time to time, in its sole discretion to amend, add to or delete any standard, procedure, policy or restriction set forth in such Brand and Image Standards materials.

(b)    RESELLER acknowledges that providing superior customer service and high quality in the operations of the marketing premises at the Station are essential not only to the success of RESELLER's business but also to the reputation and integrity of CONOCOPHILLIPS and the Union 76 Marks. RESELLER therefore agrees that RESELLER shall:

(1)    Strive to obtain and maintain compliance at all times with the Brand and Image Standards;

(2)    Develop customer responsiveness programs designed to respond to and resolve customer inquiries or complaints within a maximum of fourteen (14) days from the date any inquiry or complaint was directly received by RESELLER or referred to RESELLER for response from CONOCOPHILLIPS;

(3)    Monitor the quality of service, image, and cleanliness at the Station; and

(4)    Participate on the same basis as other dealers and resellers, and at RESELLER's expense, in CONOCOPHILLIPS' Mystery Shopper Program, or such similar programs as CONOCOPHILLIPS may from time to time require of its RESELLERS, and promptly take actions to correct or improve any operations at the Station which scores lower than the baseline score as established from time to time by CONOCOPHILLIPS. CONOCOPHILLIPS and RESELLER acknowledge and agree that CONOCOPHILLIPS shall not be obligated to develop and implement a Mystery Shopper Program, or other similar program, on a continuous basis throughout the Term hereof.

## 8.    RIGHT TO OCCUPY STATION.

RESELLER warrants and represents that RESELLER has the right to occupy the Station, either pursuant to a leasehold or by way of RESELLER's fee interest in the real property underlying the Station, for the entire Term of this Agreement. RESELLER recognizes that CONOCOPHILLIPS enters into this Agreement in reliance upon RESELLER's right to occupy real property and the Station.

## 9.    TAXES.

RESELLER shall promptly pay when due all taxes levied or assessed by reason of RESELLER's operation and performance under this Agreement. RESELLER further agrees to pay State unemployment tax, State sales tax (including any sales or use tax on equipment purchased or leased), and all other taxes and expenses of operating the Station. In the event of any bona fide dispute as to the liability for taxes assessed against RESELLER, RESELLER may contest the validity or the amount of the tax in accordance with procedures of the taxing authority. In no event, however, shall RESELLER permit a tax sale or seizure by levy of execution of similar writ or warrant to occur against the Station or any of the inventory, supplies, or equipment located thereon.

## 10.    TRADEMARKS.

Pursuant to the terms of this Agreement, CONOCOPHILLIPS hereby grants to RESELLER a non-exclusive license to use CONOCOPHILLIPS' Trademarks (as defined below) for the limited purpose of marketing, promoting, advertising and selling CONOCOPHILLIPS motor fuels. RESELLER and CONOCOPHILLIPS agree that the authorized use of CONOCOPHILLIPS' Trademarks is material to the

petroleum marketing franchise relationship. "CONOCOPHILLIPS' Trademarks" shall mean CONOCOPHILLIPS' trademarks, service marks, trade names, trade dress, brand names, logos, symbols, and any other indicia of origin, and the goodwill of the business in connection therewith. This license shall be subject to the following:

(a)    When using CONOCOPHILLIPS' Trademarks under this Agreement, RESELLER shall (i) use CONOCOPHILLIPS' Trademarks solely within the scope of the license set forth herein, (ii) use reasonable commercial efforts to enhance the goodwill value of CONOCOPHILLIPS' Trademarks and refrain from taking any action that could be detrimental to the goodwill value of CONOCOPHILLIPS' Trademarks, (iii) comply with all applicable laws in force at any time and (iv) use CONOCOPHILLIPS' Trademarks consistent with the usual CONOCOPHILLIPS' Trademark guidelines. CONOCOPHILLIPS may review, from time to time, samples of how RESELLER is using CONOCOPHILLIPS' Trademarks in commerce. CONOCOPHILLIPS acknowledges that RESELLER's use of its Trademarks in connection with its business is consistent with the standards required by this Agreement. RESELLER's violation of the provisions of this Paragraph and RESELLER's failure to cure such breach within fifteen (15) days of written notice thereof, shall be proper grounds for termination or non-renewal of the franchise relationship and this Agreement.

(b)    RESELLER shall not use any trademark, service mark, trade name, brand name, logo, symbol, or other indicia of origin (each, a "Trademark") which is confusing or substantially similar to any of CONOCOPHILLIPS' Trademarks, or authorize any person or entity to engage in such use. RESELLER's violation of the provisions of this Paragraph and RESELLER's failure to cure such breach within fifteen (15) days of written notice thereof, shall be proper grounds for termination or non-renewal of the franchise relationship and this Agreement.

(c)    RESELLER shall not use any Trademark in combination with any of CONOCOPHILLIPS' Trademarks such that the combination reasonably may be perceived as a composite Trademark or is otherwise understood to be jointly held or used by RESELLER and CONOCOPHILLIPS or another person or entity; and RESELLER shall not use CONOCOPHILLIPS' Trademarks (or any Trademark similar thereto) in its name or in the name of any affiliate or of any operating entity formed by it. RESELLER's violation of the provisions of this Paragraph and RESELLER's failure to cure such breach within fifteen (15) days of written notice thereof, shall be proper grounds for termination or non-renewal of the franchise relationship and this Agreement.

(d)    Nothing in this Agreement shall give RESELLER any right, title or interest in CONOCOPHILLIPS' Trademarks other than its right to use CONOCOPHILLIPS' Trademarks in accordance with this Agreement. RESELLER shall not challenge CONOCOPHILLIPS' right, title and interest in and to CONOCOPHILLIPS' Trademarks; challenge, contest or deny the validity of this trademark license or CONOCOPHILLIPS' Trademarks; register or attempt to register CONOCOPHILLIPS' Trademarks or any other trademark that may be confusingly similar to any of them; oppose or seek to cancel registration of CONOCOPHILLIPS' Trademark; or register or maintain any internet domain name containing or similar to CONOCOPHILLIPS' Trademarks, or in any way assist others in so doing.

(e)    RESELLER agrees to notify CONOCOPHILLIPS in writing of any unauthorized use of CONOCOPHILLIPS' Trademarks promptly as such use comes to RESELLER's attention. CONOCOPHILLIPS shall have the sole right and discretion to bring infringement or unfair competition proceedings involving the unauthorized use of CONOCOPHILLIPS' Trademarks; and at the request of CONOCOPHILLIPS, RESELLER will cooperate (at CONOCOPHILLIPS' expense) in connection with any such proceedings.

(f)    RESELLER shall resell all motor fuels purchased from CONOCOPHILLIPS, or purchased from other parties with CONOCOPHILLIPS' prior written consent if certified to be CONOCOPHILLIPS motor fuels, under CONOCOPHILLIPS' Trademarks. RESELLER shall not repackage (whether in

drums or otherwise) for resale any CONOCOPHILLIPS motor fuels without first (i) obtaining CONOCOPHILLIPS' prior written consent and (ii) signing a separate agreement or addendum supplied by CONOCOPHILLIPS setting forth CONOCOPHILLIPS' repackaging terms and conditions. RESELLER's violation of the provisions of this Paragraph and RESELLER's failure to cure such breach within fifteen (15) days of written notice thereof, shall be proper grounds for termination or non-renewal of the franchise relationship and this Agreement.

(g)     RESELLER shall not sell or permit the sale of motor fuels purchased or acquired by RESELLER, or by any customer of RESELLER, under CONOCOPHILLIPS' Trademarks, unless such motor fuels are purchased from CONOCOPHILLIPS; or if such products are certified by the supplier to be CONOCOPHILLIPS motor fuels, and such certification is approved in writing by CONOCOPHILLIPS. RESELLER shall not commingle products purchased from others with CONOCOPHILLIPS motor fuels, or sell, or permit the sale of, such commingled CONOCOPHILLIPS motor fuels under CONOCOPHILLIPS' Trademarks. RESELLER shall not adulterate CONOCOPHILLIPS motor fuels, sold under CONOCOPHILLIPS' Trademarks, with any substance.   RESELLER may not sell any CONOCOPHILLIPS motor fuels under CONOCOPHILLIPS' Trademarks that have been mixed, blended or commingled with another product of different quality, specifications or use, unless such mixing, blending or commingling is approved in advance by CONOCOPHILLIPS in writing. CONOCOPHILLIPS shall have the right from time to time to take samples of motor fuels from the Station for testing purposes, at CONOCOPHILLIPS' option, to ensure compliance. RESELLER's violation of the provisions of this Paragraph and RESELLER's failure to cure such breach within fifteen (15) days of written notice thereof, shall be proper grounds for termination or non-renewal of the franchise relationship and this Agreement.

(h)     RESELLER shall not use, or allow the use of, any signage or other marketing, advertising, or promotional materials which use CONOCOPHILLIPS' Trademarks at any location operated or supplied by RESELLER, without the prior written consent of CONOCOPHILLIPS, which CONOCOPHILLIPS may rescind if circumstances relevant to its prior approval change. Each sign or other marketing, advertising, or promotional materials approved for use and the location at which it is to be used shall be listed on Exhibit "B" attached hereto and made a part hereof. Marketing, advertising or promotional materials shall neither be transmitted over the Internet, nor through any electronic, digital, or any other medium now or hereinafter adopted, invented or known, unless prior written approval is first obtained from CONOCOPHILLIPS. RESELLER shall not register any domain names or other electronic identifiers, now or hereinafter adopted, which include CONOCOPHILLIPS' Trademarks without the prior written consent of CONOCOPHILLIPS, which CONOCOPHILLIPS may rescind if circumstances relevant to its prior approval change. RESELLER shall return each sign and all other marketing, advertising, or promotional materials, when they are no longer required at the location shown on **Exhibit A**, unless CONOCOPHILLIPS approves the transfer of the sign or other marketing, advertising, or promotional materials to another location and **Exhibit A** is amended to show the new location. RESELLER's violation of the provisions of this Paragraph and RESELLER's failure to cure such breach within fifteen (15) days of written notice thereof, shall be proper grounds for termination or non-renewal of the franchise relationship and this Agreement.

(i)     The Station and the dispensing equipment used for licensed products shall be painted and kept clean and legible in accordance with CONOCOPHILLIPS' visual standards. CONOCOPHILLIPS (or CONOCOPHILLIPS' designated agent) shall erect appropriate signs and other identification materials indicating the Station is a Union 76 branded facility licensed for the sale of Union 76 products, which RESELLER shall keep clean and legible, and shall not modify, alter, obstruct or move in any way, except as previously approved of by CONOCOPHILLIPS in writing. CONOCOPHILLIPS (and or CONOCOPHILLIPS' designated agent) shall have the right, but not the obligation, to enter upon the Station from time to time to adjust, exchange, remove or add to CONOCOPHILLIPS' signs and other identification materials.

(j)    Upon any termination or non-renewal of the Agreement, RESELLER shall at its sole cost and expense immediately discontinue the use of CONOCOPHILLIPS' Trademarks on buildings, equipment, tanks, trucks, automobiles, letterheads, stationery, other marketing, advertising, or promotional materials, and in any other manner; and shall refrain from in any way or manner, holding itself out as offering for sale or otherwise handling CONOCOPHILLIPS' motor fuels.

(k)    Upon termination or non-renewal of the Agreement for any reason, RESELLER shall at its sole cost and expense immediately return to CONOCOPHILLIPS all signs, equipment or marketing, advertising, or promotional materials provided by CONOCOPHILLIPS, in the condition received, subject to ordinary wear and tear.

## 11.    MOTOR FUELS BRANDS, GRADES AND QUANTITY.

(a)    During the Term of this Agreement, RESELLER shall continuously stock and offer for sale sufficient quantities of each grade and type of Union 76 branded motor fuels, generally offered by CONOCOPHILLIPS in the geographic area of RESELLER's Station, as will satisfy consumer purchase requirements on a prompt basis. CONOCOPHILLIPS shall have the right to change or discontinue, from time to time, such brands or grades of motor fuels without RESELLER's permission.

(b)    RESELLER shall purchase the quantities of motor fuels set forth herein in the Quarterly/ Annual Minimum Volume Schedule attached hereto as **Exhibit D** ("Contract Volumes") from CONOCOPHILLIPS. RESELLER's failure to purchase at least eighty percent (80%) of the motor fuels requirements set forth in **Exhibit D** ("Minimum Volume") from CONOCOPHILLIPS shall, subject to RESELLER's right to cure any default or breach which may be curable as set forth hereinafter, be cause for termination and/or nonrenewal of this Agreement by CONOCOPHILLIPS. The requirement of RESELLER to purchase Minimum Volume is a provision of this Agreement that is both reasonable and of material significance to the franchise relationship created by this Agreement. In the event RESELLER has failed to meet Minimum Volume for any calendar quarterly period of this Agreement, RESELLER shall be afforded the opportunity to cure such default by taking delivery of the unpurchased volume from the prior calendar quarter plus the Minimum Volume over the six (6) month period following the calendar quarter in which RESELLER failed to purchase the Minimum Volume ("Cure Period"). In determining whether the purchase volume has been deficient for a given calendar quarter, the volumes purchased in excess of the minimum volume(s) the calendar quarter for the preceding two (2) calendar quarters, if any, shall be credited to the volume for the deficient calendar quarter. Failure to purchase Minimum Volume and to effect cure during the Cure Period is the occurrence of an event which is relevant to the franchise relationship and as a result of which termination or nonrenewal of the franchise relationship is reasonable.

(c)    CONOCOPHILLIPS recognizes that there may occur extenuating and uncontrollable circumstances affecting the Station such as, but not limited to, road construction, natural disasters, supply shortages or abnormal market conditions, that may affect a Station from selling its Contract Volume. In such cases, RESELLER may make a written request for a reasonable temporary adjustment to the Contract Volumes set forth in **Exhibit D** stating specifically the reason the adjustment is being requested. CONOCOPHILLIPS agrees to respond to all volume adjustment requests within twenty-one (21) days of receipt.

(d)    To facilitate deliveries to the Station, at CONOCOPHILLIPS' written request, RESELLER agrees to order products by such method as CONOCOPHILLIPS reasonably determines, in CONOCOPHILLIPS' sole discretion, will best achieve compliance with the requirements set forth in this Section including, but not limited to, CONOCOPHILLIPS' Automatic Replenishment Program ("ARP"). In the event CONOCOPHILLIPS elects to receive orders or stage deliveries of motor fuel products to the Station via CONOCOPHILLIPS' ARP, RESELLER hereby agrees to comply with the following procedure:

(1)    On each day of Station operations including, but not limited to, Saturdays, Sundays and holidays, RESELLER shall via a telephonic transmission procedure prescribed by CONOCOPHILLIPS, enter into CONOCOPHILLIPS' ARP the following data:

(i)    The quantity in gallons of the prior days sales of each grade of motor fuel offered for sale at the Station; and

(ii)    The quantity in gallons of the ending inventory for the prior day of each grade of motor fuel stored in the underground storage tanks at the Station.

(2)    In the event the ARP is inoperable for any reason, upon timely notice from CONOCOPHILLIPS that all orders shall be placed to CONOCOPHILLIPS' order or dispatch desk, RESELLER shall place orders to such CONOCOPHILLIPS order desk or dispatch personnel as CONOCOPHILLIPS may direct or to CONOCOPHILLIPS' Interactive Voice Response Ordering System.

(3)    RESELLER shall accept delivery at such time, by such method of delivery, and in such minimum quantities per single delivery, as CONOCOPHILLIPS shall elect. RESELLER hereby grants CONOCOPHILLIPS twenty-four (24) hour per day access to RESELLER's motor fuel storage tanks at the Station for purposes of motor fuel delivery.

(4)    In all instances, CONOCOPHILLIPS reserves the right to charge RESELLER a demurrage or administrative charge(s) in such amounts as are reasonable and customary, in the event CONOCOPHILLIPS determines in good faith that RESELLER or any of its employees, contractors or representatives are responsible for delaying the delivery of CONOCOPHILLIPS' motor fuel to the Station including, but not limited to, a determination that the quantity of motor fuel products staged for delivery to the Station could not or should not in fact have been delivered because RESELLER failed to comply with, or erroneously reported the data to, the ARP.

## 12.   **DELIVERY.**

(a)    Deliveries of CONOCOPHILLIPS motor fuel shall be made at times determined by CONOCOPHILLIPS upon RESELLER's order of full truck and trailer quantities in single deliveries subject to CONOCOPHILLIPS' equipment and product availability. CONOCOPHILLIPS shall make all reasonable efforts to deliver motor fuels to the Station within twenty-four (24) hours of RESELLER's order, 365 days per year; however, CONOCOPHILLIPS shall not be required to make deliveries within forty-eight (48) hours following receipt of RESELLER order or outside of business hours or on Sunday or holidays.

(b)    CONOCOPHILLIPS will fill all orders with reasonable promptness, but shall not be liable for breach of this Agreement, or any losses or damages claimed to be suffered by RESELLER due to delays or failure in whole or in part to fill orders resulting from RESELLER's banking arrangements, ability for CONOCOPHILLIPS to confirm RESELLER's funds, acts of God, acts of publics enemies, laws, regulations, orders, requests, recommendations or rules of civil or military authorities, fires, floods, storms, strikes, labor disputes, accidents, equipment failure, shortage of labor, of crude oil, of refined products or refinery capacity, of materials, or of transportation, or any other cause beyond CONOCOPHILLIPS' reasonable control, either at its own plants or those of its sources of supply, or in connection with the delivery of its products. If because of any of the foregoing causes or other actual or threatened disruption in supply, CONOCOPHILLIPS is prevented or deems it necessary to not supply the full quantities of any one or more of its products hereunder, CONOCOPHILLIPS shall have the right without liability to RESELLER to allocate the quantity deliverable hereunder to RESELLER, to its other customers for like products, and to its own requirements in such manner as CONOCOPHILLIPS may deem reasonable, or according to any required allocation program, and RESELLER shall be bound by such allocation. In no event shall CONOCOPHILLIPS be liable for loss of profits or special or consequential damages because of delay or failure to make deliveries even if it has been advised that any such damages might occur.



(c)    If RESELLER requests delivery of less than CONOCOPHILLIPS' established minimum volumes, compensatory delivery charges will be imposed at CONOCOPHILLIPS' discretion. If, at that time this Agreement is entered into, the Station is equipped for the handling of only two (2) grades of gasoline, RESELLER acknowledges and agrees that CONOCOPHILLIPS has no obligation to supply three (3) grades of gasoline to the Station. In no circumstances is CONOCOPHILLIPS obligated to make deliveries into a tank which is or is suspected of leaking.

## 13.    TITLE TO MOTOR FUEL AND STOCK LOSSES.

(a)    Title to and risk of loss of CONOCOPHILLIPS motor fuel delivered by CONOCOPHILLIPS to RESELLER under this Agreement passes to RESELLER at the time the motor fuel enters the motor fuel storage tanks at the Station.

(b)    RESELLER shall make a good faith effort to advise CONOCOPHILLIPS of any claim of which RESELLER becomes aware as to quality of CONOCOPHILLIPS motor fuel delivered under this Agreement in writing within five (5) days after discovery thereof.

(c)    RESELLER shall make a good faith effort to advise CONOCOPHILLIPS of any claim of which RESELLER becomes aware as to quantity of CONOCOPHILLIPS motor fuel delivered under this Agreement in writing within ten (10) days after delivery.

## 14.    ALLOCATION.

If at any time the volume of CONOCOPHILLIPS motor fuel CONOCOPHILLIPS has available for sale and delivery to its customers is, for any reason not within CONOCOPHILLIPS' reasonable control, less than the volume needed to supply its customer demands, CONOCOPHILLIPS shall allocate the volume of available CONOCOPHILLIPS motor fuel to itself and its customers under a plan and formula that CONOCOPHILLIPS determines is fair and reasonable as applied to all customers of CONOCOPHILLIPS who have a demand for such products.

## 15.    PURCHASE PRICE.

The purchase price to be paid by RESELLER for the brands and grades of CONOCOPHILLIPS' motor fuel sold and delivered to the Station shall be the price in effect for the Station at the time CONOCOPHILLIPS loads the branded motor fuel at its bulk plant or terminal for delivery to the Station.

## 16.    TERMS OF PAYMENT AND CREDIT REQUIREMENTS.

(a)    RESELLER shall pay for CONOCOPHILLIPS' motor fuel, and all other goods and services, purchased from CONOCOPHILLIPS according to the terms and conditions established from time to time by CONOCOPHILLIPS' Credit Department. CONOCOPHILLIPS' Credit Department, for the purpose of evaluating RESELLER's financial status for credit granting purposes, will require from time to time RESELLER to provide CONOCOPHILLIPS with financial information. RESELLER's failure to respond to any such request may result in CONOCOPHILLIPS' withdrawal or denial of credit privileges to RESELLER. If RESELLER fails to fulfill the terms of payment, fails to provide financial information and/or if RESELLER's financial capabilities or creditworthiness shall, in CONOCOPHILLIPS' sole judgment, deteriorate, CONOCOPHILLIPS may, without prejudice to any other lawful remedies:

(1)    Defer shipments of product until payment is made in full;

(2)    Demand payment and/or cash in advance;

(3)    Demand additional security and/or financial guaranties;

(4)    Withdraw entirely all, and/or partially, credit privileges; and/or



(5)    Nonrenew or terminate this Agreement.

(b)    RESELLER may be required to maintain a security deposit as is reasonably determined by CONOCOPHILLIPS' Credit Department from time to time to be required. RESELLER shall deposit any such required security deposit into a bank account with CONOCOPHILLIPS promptly upon any such request by CONOCOPHILLIPS. In the event RESELLER has any outstanding amounts due on RESELLER's account and/or any ancillary agreements including, but not limited to, promissory notes, amortization agreements, equipment leasing or facility modification agreements, CONOCOPHILLIPS shall have the option to apply available credit and/or security deposits to offset RESELLER debt.

(c)    No payment made to CONOCOPHILLIPS by check or by any other instrument shall contain a restrictive endorsement of any kind. A restrictive endorsement shall have no legal effect, and shall not be claimed to be an accord and satisfaction of any account or balance due and owing from RESELLER, even if the instrument restrictively endorsed is processed for payment and CONOCOPHILLIPS retains the proceeds.

(d)    RESELLER agrees to establish an account with a financial institution that provides electronic funds transfer ("EFT") services and to authorize certain transfers of funds between that account and designated account(s) of CONOCOPHILLIPS under terms and conditions that may be established by CONOCOPHILLIPS from time to time. RESELLER shall provide CONOCOPHILLIPS with the information and authorization necessary to debit and credit RESELLER's account through EFT transactions. The type of RESELLER debiting transactions from which EFT's may be used include, but are not limited to, payment for rent, amortization agreements, promissory notes, motor fuel purchases, other product purchases, credit card chargebacks, repairs made by CONOCOPHILLIPS at RESELLER's Station, and other monies owed by RESELLER to CONOCOPHILLIPS. The types of RESELLER credit transactions which may be made through EFT's include, but are not limited to, CONOCOPHILLIPS purchases of credit card invoices, rebates or other price adjustments for which RESELLER may qualify. CONOCOPHILLIPS reserves the right to require RESELLER to make or receive payments for other additional types of transactions. RESELLER agrees to provide the necessary authorization and assistance to implement such additional EFT's promptly upon the request by CONOCOPHILLIPS.

## 17.    CREDIT CARD SALES.

CONOCOPHILLIPS has, or has made a arrangements with a third party processor to provide, a proprietary retail credit card system available for use by the public. RESELLER may make sales of Union 76 motor fuel or other products and service at the Station as authorized in CONOCOPHILLIPS' Service Station Credit Card Guide ("Guide'") to persons presenting a valid Union 76 credit card or a credit card issued by a card issuer listed in the Guide. If RESELLER elects to make credit card sales to customers presenting an acceptable credit card, RESELLER shall comply with the instructions, policies and restrictions set forth in the Guide and agrees that CONOCOPHILLIPS may refuse to accept credit card invoices, or may charge back to RESELLER any credit card invoices, where RESELLER has failed to comply with any instruction, policy or restriction set forth in the Guide. CONOCOPHILLIPS shall have the right, from time to time, to amend, add or delete any instruction, policy or restriction in the Guide including the right to charge a fee for CONOCOPHILLIPS' acceptance of credit card invoices evidencing purchases from RESELLER. If RESELLER is past due on any payment to CONOCOPHILLIPS, CONOCOPHILLIPS may, without limiting any other lawful remedy, first apply redemptions of authorized credit card invoices to the payment of the past due indebtedness.

## 18.    SIGNS.

(a)    Subject to applicable laws, ordinances, and regulations, and subject to CONOCOPHILLIPS' prior written approval as to format, location, size, and color scheme, RESELLER may install advertising materials only for the products, services and promotions available at the Station.

(b)    Further, RESELLER agrees that the dispenser posted price of each grade of gasoline, and if applicable, diesel fuel, offered for sale from the Station shall be displayed at all times on

appropriately illuminated signs at or near the street(s) fronting the Station, and that the size and color of price sign letters and numerals shall comply with CONOCOPHILLIPS' image requirements and any and all State and Federal requirements. In no instance shall RESELLER remove said signs, letters, or numerals without CONOCOPHILLIPS' prior written approval.

19. **NO EXCLUSIVE AREA.**
RESELLER and CONOCOPHILLIPS hereby agree that nothing herein, shall be construed as giving RESELLER an exclusive right to sell in any area. CONOCOPHILLIPS reserves the right to sell its motor fuel, tires, batteries, accessories, lubricating oils, whether branded or unbranded, or any other product anywhere, by any means, and in any area, including in the area or market in which the Station is located.

20. **MAINTENANCE AND REPAIRS.**
RESELLER shall keep the Station clean and well maintained. RESELLER understands that continuous maintenance does more than just convey an image of cleanliness, and a high level of professionalism, it invites customers to stop by the Station and buy products. RESELLER acknowledges and accepts the responsibility to maintain all equipment, including CONOCOPHILLIPS Equipment, located at the Station, at RESELLER's sole expense, clean, maintained, in good repair, and replaced if needed. Equipment shall be in compliance with applicable laws and meet the image standards of CONOCOPHILLIPS.

21. **TELECOMMUNICATIONS.**
CONOCOPHILLIPS reserves the right, from time to time, to require RESELLER to obtain telecommunications equipment for the processing and transfer of business data between CONOCOPHILLIPS and RESELLER. Data received or transmitted over such equipment may include, but is not limited to, the following: pricing information, credit card processing information, fuel delivery scheduling information, and other information deemed by CONOCOPHILLIPS to be necessary for the facilitation of the business set forth in this Agreement. Telecommunication equipment includes, but is not limited to, the following: electronic facsimile machines, personal computers equipped with telephone modems, satellite transmission and receiving equipment and Card Reader In Dispenser (CRIND) equipment. RESELLER agrees to obtain said equipment at RESELLER's sole expense, as well as pay any monthly fees for equipment or services, unless otherwise specified by CONOCOPHILLIPS. CONOCOPHILLIPS agrees to provide RESELLER at least sixty (60) days prior written notice of any equipment or service requirement relating to this Section.

22. **COMPLIANCE WITH LAWS.**
RESELLER has and will fully comply with any and all Federal, State and local laws including, but not limited to, ordinances, orders, rules, taxing requirements and regulations and all laws including, but not limited to, those laws relating to equal opportunity, affirmative action, clean air and water, environmental law, toxic or hazardous materials, occupational health and safety. RESELLER shall obtain all permits, licenses and approvals necessary for the performance of this Agreement. RESELLER does hereby warrant that no law, rule or ordinance of the United States, any state or any other government authority or agency has been violated in the performance of this Agreement. Failure to comply with any laws will be a material breach of this Agreement and is of material significance to the franchise relationship such that termination of this Agreement shall be permitted.

23. **ENVIRONMENTAL COMPLIANCE.**
(a)  RESELLER agrees to become informed about, comply and cooperate with and abide by all local, State and Federal laws, statutes, regulations and ordinances related to environmental protection, compliance or regulations and ordinances related to environmental protection, compliance or requirements related thereto, whether currently in effect or which may come into effect in the future including, but not limited to:

(1)    The Resource Conservation and Recovery Act, as amended, 42 USC 6901, et seq., the Clean Water Act, as amended, 33 USC 1251, et seq., the Clean Air Act, as amended, 42 USC 7401, et seq., and the Safe Drinking Water Act, as amended, 42 USC 300 f, et seq.;

(2)    The generation, handling, transportation, treatment, storage and/or disposal of solid or hazardous wastes. RESELLER agrees to implement appropriate recycling, waste management and waste minimization practices and procedures;

(3)    The Environmental Protection Act with special attention to the regulations governing the storage, dispensing and sale of unleaded gasoline;

(4)    All laws and ordinances related to the environment and with the rules, orders and regulations issued and promulgated thereunder, RESELLER shall procure and maintain all permits and licenses required thereunder; and

(5)    The underground storage tank ("UST") system compliance requirements, whether currently in effect or which may come into effect in the future.

## 24.    RECORD KEEPING AND AUDITS.

(a)    RESELLER shall maintain permanent and complete records of all sales of motor fuels as required by law and/or this Agreement. The records shall include sales slips, sales checks, other original sales records and a daily motor fuel inventory that shall include motor fuel deliveries received, motor fuel sales, including daily dispenser meter readings for all motor fuel products, which will support daily inventory reconciliation(s) made at the Station. If requested by CONOCOPHILLIPS, RESELLER shall provide sales records, and a statement of their accuracy and completeness signed and verified before a notary public, to CONOCOPHILLIPS.

(b)    CONOCOPHILLIPS, or their authorized representative, shall have the right to audit RESELLER's books, records, reports, or any and all other records to determine RESELLER's compliance with this Agreement. The purpose of such an audit by CONOCOPHILLIPS shall include, but is not limited to: (1) Determining the gallons of motor fuel sold under the Marks; (2) compliance with environmental regulations, statutes, and ordinances; (3) Verification of credit card receipts; and/or (4) Review of RESELLER's inventory reconciliation(s) records. If requested by CONOCOPHILLIPS, RESELLER shall provide a statement of the accuracy and completeness of said records signed and verified before a notary public.

## 25.    INDEMNIFICATION.

(a)    RESELLER shall protect, defend with counsel reasonably acceptable to CONOCOPHILLIPS, release, indemnify and hold free and harmless CONOCOPHILLIPS, its affiliates, employees, directors, officers, and agents from and against any and all claims, liabilities, losses, liens, demands, lawsuits and causes of action of every kind and character (claims) including without limitation the amount of judgments, fines, penalties, interest, court costs and legal fees incurred by CONOCOPHILLIPS, its affiliates, employees, directors, agents and employees in defense of same arising in favor of any party, including without limitation, governmental or quasi-governmental agencies or bodies, on account of claims, liens, debts, personal injuries, death, or damages to property (including property of CONOCOPHILLIPS, its affiliates, agents and employees) and without limitation by enumeration, all other claims of every character occurring in or in any way incident to, in connection with, or arising out of the conduct of RESELLER's business. RESELLER shall also investigate, handle, respond to, provide defense for and defend any such claim, at RESELLER's sole expense, and shall bear all other costs and expenses related thereto, even if any such claim is believed or determined to be groundless, false or fraudulent.

(b)    RESELLER acknowledges and agrees to provide CONOCOPHILLIPS written assurance within ten (10) days from CONOCOPHILLIPS' request for RESELLER to accept the tender of any



demand for indemnity and defense of any such claim and to notify and instruct RESELLER's insurance carriers that CONOCOPHILLIPS is an indemnified party.

26.  **INSURANCE.**

(a)    Without limiting RESELLER's obligations to indemnify and hold CONOCOPHILLIPS harmless as set forth under the Indemnification Section above, RESELLER agrees to purchase and maintain at all times during the Term hereof insurance acceptable to CONOCOPHILLIPS which is primary as to any other existing valid and collectible insurance and shall specifically name *ConocoPhillips Company, a Delaware corporation, its subsidiaries, affiliates and assigns*, as Additional Insureds with a Cross Liability Clause (Severability of Interest).  Such insurance shall include the following minimum types and limits:

(1)    Commercial General Liability Insurance, or Garage Liability Insurance, or the equivalent, covering all Station operations, RESELLER business, premises operations and products liability, and contractual liability, in an amount of at least $1,000,000 combined single limit for bodily injury and property damage per occurrence, $2,000,000 aggregate;

(2)    Comprehensive Automobile Liability Insurance covering all hired, owned or otherwise operated non-owned, vehicles used in RESELLER's business with a minimum combined single limit of $1,000,000 for bodily injury and property damage, including personal injury, per occurrence;

(3)    Garagekeepers Legal Liability Insurance, if applicable, covering customer's vehicles in RESELLER's care, custody and control, including coverage for loss by fire, explosion, theft, vandalism, and/or malicious mischief and collision or upset with a minimum limit of $50,000 each occurrence;

(4)    Liquor Liability Insurance covering, if applicable, liabilities arising from RESELLER's sale of alcoholic beverages from the Station with a minimum limit of $1,000,000 per occurrence; and

(5)    To the extent reasonably available and commercially affordable, Environmental Pollution Liability Insurance and/or Environmental Impairment Liability Insurance which specifically covers, but is not limited to, leaks occurring from underground tanks and piping system, whether they are sudden or gradual, with coverage extending to any and all expenses of clean-up or recovery, including excavation of contaminated soil, in an amount not less than $500,000 combined single limit of liability.

(b)    Upon the full execution of this Agreement and from time to time thereafter upon the request of CONOCOPHILLIPS, RESELLER shall provide CONOCOPHILLIPS with a certificate or certificates of insurance evidencing RESELLER's procurement of all the foregoing insurance coverage and that all such insurance is binding and in full force and effect.

(c)    The insurance polices required by this Insurance Section shall be written by companies satisfactory to CONOCOPHILLIPS.  RESELLER's insurance coverage and policies shall state that CONOCOPHILLIPS will receive at least thirty (30) days prior written notice of any cancellation or change. With regards to Workers' Compensation and Employer's Liability Insurance, subrogation shall be waived against CONOCOPHILLIPS.

(d)    RESELLER agrees to increase the amounts of any insurance described herein promptly upon receiving the written notice from CONOCOPHILLIPS to do so.

(e)    The insurance required hereunder in no way limits or restricts RESELLER's obligation as to indemnification of CONOCOPHILLIPS and others and, further, the insurance to be carried shall be in

no way limited by any limitation placed upon the Indemnification Section given as a matter of law. RESELLER shall immediately notify its insurance carrier, with a copy to CONOCOPHILLIPS, of all claims, liabilities, losses, liens, demands, or lawsuits and any other matters covered by any RESELLER's insurance. Any deductible amounts are RESELLER's responsibility.

## 27. TRANSFERS, SUBLETTING AND SALES.

(a)     RESELLER may not sell, assign, or transfer this Agreement or any rights hereunder, in whole or in part, without CONOCOPHILLIPS' prior written consent, which consent shall not be unreasonably withheld or delayed. This Agreement may not be assigned by operation of law. Any attempt by RESELLER to assign this Agreement or any rights hereunder without CONOCOPHILLIPS' prior written consent shall be void and of no force and effect.

(b)     The foregoing notwithstanding, provided RESELLER shall be in full compliance with all the terms and provisions of this Agreement, RESELLER may transfer this Agreement and RESELLER's rights hereunder to a corporation in which the RESELLER owns beneficially and of record, and shall continue to own, beneficially and of record throughout the term of this Agreement more than fifty percent (50%) of the capital stock and voting power of such a corporation. Prior to such acquisition, an appropriate resolution shall be duly adopted by such corporation acknowledging the foregoing requirement of ownership and regulating the issuance, assignment, transfer, sale or other disposition of the corporation's capital stock accordingly, and the contents of such resolution shall be reflected in the corporation's records and noted conspicuously on all stock certificates issued by the corporation. At least thirty (30) days prior to such transfer, CONOCOPHILLIPS shall be notified immediately following said resolution in writing of same. Upon any such transfer, and from time to time thereafter, RESELLER shall execute such instruments, including personal or corporate guarantees of the obligations of the corporation to which this Agreement and the rights hereunder have been transferred, as may be requested by CONOCOPHILLIPS in CONOCOPHILLIPS' sole judgment.

(c)     Upon the death or incapacity of RESELLER, if RESELLER is not incorporated, the rights granted under this Agreement may be transferable as provided by State or Federal law, or, if no valid State or Federal law shall be applicable, to the adult child or legal spouse of RESELLER, provided arrangements have been made satisfactory to CONOCOPHILLIPS for the continued active and competent management of the Station in compliance with all of the terms of this Agreement, including without limitation the qualification of said adult child or spouse as a CONOCOPHILLIPS reseller. Upon the death or incapacity of the controlling stockholder or stockholders, if RESELLER is incorporated, this Agreement will continue in effect, provided the active management of the Station continues in a manner which fully and completely complies with all of the terms of this Agreement.

(d)     Subject to such limitations or prohibitions imposed by the Petroleum Marketing Practices Act, 15 U.S.C. Section 2801, et seq. ("PMPA") or by State statute where PMPA does not pre-empt, this Agreement is personal to RESELLER and RESELLER will not without the prior written consent of CONOCOPHILLIPS (which consent shall not be unreasonably withheld or delayed): (1) assign, mortgage, encumber, or otherwise transfer this Agreement or the interest hereby created; (2) permit any lien or encumbrance to be place on the Equipment, (3) become associated with any other person as a partner or otherwise with respect to this Agreement, or (4) permit any other person, firm or corporation to occupy the Station or any part thereof; except as may otherwise be required by law. If RESELLER seeks CONOCOPHILLIPS' consent for any of the foregoing RESELLER shall contemporaneously provide CONOCOPHILLIPS with all pertinent documentation relating thereto.

(e)     If not prohibited by applicable law, if RESELLER receives an offer to assign or otherwise transfer this Agreement, the RESELLER's interest hereunder, or to convey, transfer, assign or alienate RESELLER's interests in the Station or RESELLER's interest hereunder which offer RESELLER desires to accept, RESELLER shall notify CONOCOPHILLIPS in writing of all terms and conditions of such offer, and CONOCOPHILLIPS shall have a right of first refusal and the option to acquire RESELLER's interest on such terms and conditions. If CONOCOPHILLIPS desires to exercise its right of first refusal,



RESELLER's right to assign or otherwise transfer shall be subject to the provisions of hereof.  In the event RESELLER sells, transfers or assigns RESELLER's interest in the Agreement to a corporation in which RESELLER has controlling interest and RESELLER offers in writing to personally guarantee the corporation's performance of RESELLER's obligations under this Agreement, CONOCOPHILLIPS' rights of first refusal under this shall not apply.

## 28.   **TERMINATION BY CONOCOPHILLIPS.**

(a)    This Agreement is subject to and governed by Title I of the Petroleum Marketing Practices Act, 15 USC 2801, et seq. ("PMPA"), as amended. To the extent any provision of this Agreement conflicts with the PMPA, that provision shall be deemed modified so as to comply with the PMPA.  Notice of termination or nonrenewal of this Agreement by CONOCOPHILLIPS shall be provided in the manner prescribed or permitted by the PMPA and the franchise created by this Agreement shall continue until the effective date, including any postponement thereof, of any such termination or nonrenewal.  A copy of the PMPA is attached to this Agreement as **Exhibit E.**

(b)    In addition to any other rights of termination which CONOCOPHILLIPS may have, upon the occurrence of any of the following events, or such other grounds as are set forth in the PMPA, CONOCOPHILLIPS shall have certain rights to terminate or nonrenew this Agreement. RESELLER and CONOCOPHILLIPS agree that the following events, by way of example, but not limitation are reasonable and of material significance to the franchise relationship and are lawful grounds for termination of this Agreement:

(1)    Default in the payment of any installment of rent or any other sum due CONOCOPHILLIPS from RESELLER when due;

(2)    RESELLER's failure to comply with any of the maintenance responsibilities and standards as set forth in this Agreement;

(3)    RESELLER's failure to comply with any applicable law, ordinance, regulation, judicial or administrative order, or other legal requirement of any governmental authorities pertaining to this Agreement and/or RESELLER's operation of the Station products;

(4)    RESELLER's attempts to sell, assign, give, grant, devise, or otherwise dispose of RESELLER's interest in this Agreement or the Station without the prior written consent of CONOCOPHILLIPS, which consent shall not be unreasonably withheld or delayed;

(5)    RESELLER's unauthorized loading, unloading, storage, transportation, and/or sale of petroleum products;

(6)    RESELLER's making or furnishing of any false or misleading statement, or failure to disclose information to CONOCOPHILLIPS, its agents or employees, concerning any material fact for the purpose of inducing CONOCOPHILLIPS to make any payment, deliver product, extend or continue to extend credit, or issue any credit memorandum to RESELLER or any other party acting in cooperation with RESELLER;

(7)    Any attachment, garnishment, execution or other legal process or proceeding is levied or brought, by anyone other than CONOCOPHILLIPS, against or involving the Agreement or the Station, or if any other financial impairment exists as to the Station, and such is not removed, cured, bonded, or satisfied within forty-five (45) days from such date of levy, execution, or other commencement of proceedings;

(8)    The Station is vacant, unattended or not operated for the retail sale of motor fuels for seven (7) consecutive days or such lesser period of time which under the facts and circumstances constitutes an unreasonable period of time; and



(9)    RESELLER's failure to comply with the use, operation and image standards and trademark requirements as set forth herein.

(c)    Nonrenewal or termination of this Agreement under this Section or any other Section shall not discharge RESELLER from any liability of RESELLER to CONOCOPHILLIPS occurring or accruing up to the effective date of any such nonrenewal or termination including, but not limited to, outstanding debt, insurance coverage and indemnity.

## 29.    TERMINATION BY RESELLER / CONOCOPHILLIPS' PURCHASE OPTION.

(a)    CONOCOPHILLIPS is hereby granted by RESELLER for itself, its successors and assigns, the right and option of purchasing all of RESELLER's right, title and interest in the Station ("Purchase Option"), during the Term of this Agreement upon the occurrence of any one (1) of the following events:

(1)    RESELLER, or its successors, assigns, heirs, devisees, administrators, executives or personal representatives shall sell, transfer, assign or terminate this Agreement; or

(2)    RESELLER fails to purchase the Minimum Volumes as set forth in **Exhibit D** at the Station.

(b)    RESELLER shall give CONOCOPHILLIPS sixty (60) days prior written notice of the occurrence of such event and CONOCOPHILLIPS shall have the right to exercise its Purchase Option. Failure to exercise the Purchase Option within the sixty (60) days, from the date CONOCOPHILLIPS receives notice, shall constitute a waiver by CONOCOPHILLIPS of its right to exercise its Purchase Option with respect to the circumstances in issue at the time, but shall not constitute a waiver of CONOCOPHILLIPS' Purchase Option as to any or all future events.

(c)    In the event CONOCOPHILLIPS elects to exercise its Purchase Option, the purchase price to be paid by CONOCOPHILLIPS shall be the fair market value of the Station at the time of CONOCOPHILLIPS' exercise of the Purchase Option. If RESELLER and CONOCOPHILLIPS are unable to mutually agree as to the fair market value within thirty (30) days of CONOCOPHILLIPS' exercise of the Purchase Option, the fair market value shall be determined by three MAI certified commercial real estate appraisers with no less that five (5) years experience in the area in which the Station is located ("appraiser"). Within ten (10) days of the conclusion of the thirty (30) day negotiation period, CONOCOPHILLIPS shall appoint the first appraiser, at CONOCOPHILLIPS' sole cost and expense, and RESELLER shall appoint the second appraiser, at RESELLER's sole cost and expense. Within the next twenty (20) days the two appraisers shall appoint a third appraiser and the costs and expenses of the third appraiser shall be equally divided between RESELLER and CONOCOPHILLIPS. Within the next sixty (60) days, the three appraisers shall in good faith determine the fair market value of the Station, the decision of any two such appraisers being binding upon the third. The appraisers shall send to RESELLER and CONOCOPHILLIPS a written statement of the value of the Station and within sixty (60) days of CONOCOPHILLIPS' receipt of same, CONOCOPHILLIPS may rescind its exercise of its Purchase Option upon written notice to RESELLER.

(d)    If the Purchase Option shall be exercised in accordance herewith (and not rescinded pursuant to subsection (c) immediately above), the parties shall proceed to close and closing shall occur no later than thirty (30) days from the date of determination of the purchase price. The whole of the purchase price less any expenses to be paid by RESELLER shall be paid in cash or immediately available funds at closing. RESELLER shall deliver by warranty deed to CONOCOPHILLIPS good and marketable title at closing. RESELLER shall bear the premium costs for issuance of an ALTA Owner's standard policy of title insurance. Each party shall bear one-half of the escrow fee and recordation costs. All taxes, rents, and utilities will be prorated as of the closing date.



(e)    CONOCOPHILLIPS and RESELLER shall execute and record a Memorandum of Purchase Option to provide record notice of the rights arising under this Section and a Memorandum of Right of First Refusal to provide record notice of the rights arising hereunder.

## 30.   LIQUIDATED DAMAGES.

(a)    The parties agree and acknowledge that CONOCOPHILLIPS has expended significant efforts and expense in securing the rights to use the Union 76 Marks that are licensed to RESELLER under this Agreement, and CONOCOPHILLIPS will further expend significant efforts and expense to produce and deliver or otherwise secure a supply of branded motor fuels for resale by RESELLER under said Marks.  RESELLER further acknowledges that the Marks licensed to RESELLER have unique value and impart goodwill value to the business of RESELLER.  RESELLER agrees and acknowledges that CONOCOPHILLIPS will be harmed by loss of sales to RESELLER in the event RESELLER does not purchase the contractually required Minimum Volumes set forth in this Agreement, or otherwise terminates this Agreement before the end of the Term hereof, or CONOCOPHILLIPS must suspend deliveries to the RESELLER because of RESELLER's breach in proportions /amounts that neither CONOCOPHILLIPS or RESELLER are able to reasonably determine.    Therefore, in the event RESELLER fails or refuses to perform hereunder, and thereby this Agreement is terminated prior to the expiration of the stated Term (excepting termination by the RESELLER based upon the breach or default by CONOCOPHILLIPS and CONOCOPHILLIPS' failure to cure such breach or default), or RESELLER is otherwise in breach hereof as a result of which CONOCOPHILLIPS suspends deliveries of motor fuel, RESELLER agrees that CONOCOPHILLIPS shall be entitled to liquidated damages as stipulated below.  These liquidated damages for RESELLER's failure to purchase the required Minimum Volumes under this Agreement, are in addition to any other damages or equitable relief available to CONOCOPHILLIPS, for breach of RESELLER's obligations under this Agreement, and shall not bar CONOCOPHILLIPS from seeking damages under any other agreements with RESELLER including, but not limited to, promissory notes or amortization agreements.  The parties agree that the damages stipulated below are a reasonable estimation of the amount of such damages as of the date of this Agreement and are not a penalty.

(1)    Liquidated damages payable to CONOCOPHILLIPS under this Section shall be an amount calculated by multiplying **$.03** times the minimum monthly gallons CONOCOPHILLIPS reasonably expects to be purchased by RESELLER as specified in this Agreement, times the number of months remaining in the Term of this Agreement, including any fraction of a month, commencing as of the time of the breach, refusal to perform, or termination whichever is earlier.  This amount of liquidated damages is due and payable as of the date of said breach, termination, or failure to perform whichever date is earlier.

## 31.   INDEPENDENT CONTRACTOR.

RESELLER is, and shall remain at all times, an independent contractor hereunder.  It is agreed that none of the provisions of this Agreement reserves, or shall be construed as reserving to CONOCOPHILLIPS any right to exercise control over the business or operations of RESELLER upon the Station or to direct, in any respect, the manner in which such business and operations shall be conducted (including the price at which products and merchandise are to be sold), it being understood and agreed that the entire control and direction of such activities shall be and at all times remain with RESELLER.  RESELLER shall have no authority to employ any persons as employees, or agents, for or on behalf of CONOCOPHILLIPS for any purpose, and neither RESELLER, nor any other persons performing any duties or engaging in any work at the request of RESELLER shall be deemed to be the employees or agents of CONOCOPHILLIPS.  RESELLER shall not erect or permit any sign, insignia, or other advertising device, upon or near the Station which would in any way indicate or imply that CONOCOPHILLIPS is the owner or operator of the Station.



32. **NOTICE.**

(a) Any demands, requests or notices required or permitted to be given hereunder to RESELLER shall be deemed properly given and served when deposited, postage prepaid, certified, in the United States mail, addressed to RESELLER at the Station or, in lieu of such mailing, personally served upon RESELLER.

(b) Any notices hereunder required or permitted to be given under this Agreement to CONOCOPHILLIPS by RESELLER shall be deemed properly given and served when deposited, postage prepaid, Certified, in the United States mail, addressed to CONOCOPHILLIPS: **ConocoPhillips Company, P.O. Box 2197, Houston, TX 77252-2197 Attn: Marketing Contract Administration Department TR-1036A.**

33. **FORCE MAJUERE.**

The obligation of the parties to deliver and receive CONOCOPHILLIPS motor fuel under this Agreement shall be suspended and excused if CONOCOPHILLIPS is prevented from or delayed in producing, manufacturing, transporting or delivering in its normal manner, CONOCOPHILLIPS motor fuel or the materials from which CONOCOPHILLIPS motor fuel is manufactured, or RESELLER is prevented from receiving or selling CONOCOPHILLIPS motor fuel at the Station, because of Acts of God, earthquake, fire, flood, or the elements, malicious mischief, riots, strikes, lockouts, boycotts, picketing, labor disputes or disturbances, war, compliance with any directive, order or regulation or any governmental authority or representative thereof acting under claim or color of authority; loss or shortage of any CONOCOPHILLIPS motor fuel or of any part of CONOCOPHILLIPS' own or customary transportation or delivery facilities, or for any reason beyond CONOCOPHILLIPS' or RESELLER's reasonable control, whether or not similar to the foregoing. Whenever such causes in CONOCOPHILLIPS judgment require restriction of deliveries, CONOCOPHILLIPS reserves the right in its discretion to restrict deliveries without liability, whether or not delivering to others.

34. **REVIEW OF AGREEMENT.**

RESELLER acknowledges that RESELLER has received a copy of this Agreement and all of its exhibits and addendums which were given to RESELLER at least ten (10) business days prior to the date RESELLER signed this Agreement.

35. **SECTION TITLES.**

The section titles contained in this Agreement are for convenience only and shall be without substantive meaning or content of any kind whatsoever.

36. **WAIVER.**

Waiver by CONOCOPHILLIPS or RESELLER of a default or breach of any provision, obligation, term or condition under this Agreement shall not be construed as a continuing waiver, or as a waiver of default or breach of any other provision, obligation, term or condition or of any subsequent default or breach of the same provision, obligation, term or condition.

37. **WARRANTY AND REPRESENTATION.**

(a) RESELLER ACKNOWLEDGES THAT RESELLER HAS ENTERED INTO THIS AGREEMENT AFTER MAKING AN INDEPENDENT INVESTIGATION OF THE UNION 76 SERVICE STATION SYSTEM AND OPERATIONS AND NOT UPON ANY REPRESENTATION AS TO PROFITS OR EARNINGS WHICH RESELLER IN PARTICULAR MIGHT BE EXPECTED TO REALIZE, NOR HAS ANYONE MADE ANY OTHER REPRESENTATION WHICH IS NOT EXPRESSLY SET FORTH HEREIN TO INDUCE RESELLER TO ACCEPT THE FRANCHISE GRANTED HEREIN AND EXECUTE THIS AGREEMENT.

(b) CONOCOPHILLIPS WARRANTS THE TITLE TO ALL PRODUCTS SOLD HEREUNDER AND THAT SUCH PRODUCTS MET THE DESCRIPTION HEREIN. NO OTHER WARRANTIES

EXPRESSED OR IMPLIED ARE MADE BY CONOCOPHILLIPS, INCLUDING, BUT NOT LIMITED TO, FITNESS FOR A PARTICULAR PURPOSE; SUCH WARRANTIES ARE EXPRESSLY EXCLUDED FROM THIS AGREEMENT.

### 38. CONFIDENTIALITY.

RESELLER acknowledges that the systems, methods, procedures and information provided by CONOCOPHILLIPS to its resellers are the confidential and valuable property of CONOCOPHILLIPS, and therefore, RESELLER shall keep such information in a secure place and shall use such information in a confidential manner and shall not disclose it to third parties or use it, or allow others to use it, other than for the purposes of and as authorized by this Agreement. RESELLER shall only disclose such information to RESELLER's employees, accountants, attorneys and business counselors on a "need to know" basis, such information for the purposes of fulfilling their job responsibilities, and only if they undertake to keep such information confidential. RESELLER shall ensure that individuals disclosed confidential information are informed of and requested to observe RESELLER's confidentiality obligation under this Agreement.

### 39. SEVERABILITY.

Should any of the provisions contained in this Agreement be now, or hereafter become, illegal or unenforceable by State or Federal laws or otherwise, such provisions shall be void during the period of conflict, and the remaining provisions shall continue to be of full force and effect. If subsequent to the Contract Date of this Agreement valid State or Federal laws or regulations governing the relationship between RESELLER and CONOCOPHILLIPS take effect, this Agreement shall be considered to incorporate any mandatory requirements of such laws or regulations so long as they shall be effective, and any provisions of this Agreement in conflict therewith shall during such period be void.

### 40. SECURITY INTEREST.

(a)     In order to secure payment of all RESELLER's present and future indebtedness owed by RESELLER to CONOCOPHILLIPS at any time during the Term of this Agreement or upon its termination or expiration, RESELLER hereby grants to CONOCOPHILLIPS a security interest and/or a purchase money security interest in:

(1)     All of RESELLER's inventory of petroleum products and other products purchased from CONOCOPHILLIPS, regardless of when purchased;

(2)     All chattel paper, general intangibles and accounts receivable owing to RESELLER regardless of when or how incurred;

(3)     All of RESELLER's equipment purchased from CONOCOPHILLIPS or its predecessor in interest, regardless of when purchased; and

(4)     All proceeds of RESELLER's inventory, accounts receivable and equipment. RESELLER agrees to sign all financing statements and renewals as necessary to provide public record of this security interest.

(b)     In the event of insolvency of RESELLER, assignment for benefit of creditors, the institution of bankruptcy, insolvency, reorganization, receivership, debt adjustment, or liquidation proceedings, by or against RESELLER, or failure of RESELLER to perform any of the obligations of payment in accordance with the terms of payment established by CONOCOPHILLIPS from time to time, CONOCOPHILLIPS shall have the option without notice or demand upon RESELLER to declare an event of default under the Uniform Commercial Code, and upon any such default, CONOCOPHILLIPS may declare all of RESELLER's indebtedness to CONOCOPHILLIPS immediately due and payable. Thereafter CONOCOPHILLIPS may proceed to enforce payment and may exercise any and all rights available to it. In addition, CONOCOPHILLIPS reserves the right to require a security deposit, letter of credit, and/or personal guaranty in accordance with CONOCOPHILLIPS' RESELLER security policy in effect from time to time.



**41.  LEGAL FEES.**

(a)    In the event either party to this Agreement retains counsel and/or institutes a mediation, arbitration proceeding, or lawsuit for violation of or to enforce any of the covenants, obligations and/or conditions of this Agreement, or if either party initiates a mediation, arbitration proceeding, or lawsuit against the other for a declaration of rights under this Agreement, or if either party intervenes in a lawsuit in which the other is a party, to enforce or protect its interests or rights hereunder, the prevailing party shall be entitled to reimbursement of all of its costs, expenses and reasonable attorney fees incurred in connection therewith from the other party.

(b)    RESELLER agrees to pay all attorney fees, costs of suit and reasonable expenses incurred by CONOCOPHILLIPS in connection with the collection of any indebtedness owed, enforcement of indemnity protections or any liability of RESELLER to CONOCOPHILLIPS.

**42.  ASSIGNMENT AND MODIFICATION.**

No amendment or other modification of this Agreement shall be valid or binding on either party hereto unless in writing and executed by both parties.  As provided elsewhere herein, RESELLER shall not assign this Agreement, or any part thereof or interest therein without the prior written consent of CONOCOPHILLIPS, which consent shall not be unreasonably withheld or delayed.  Any unauthorized assignment shall be dismissed by CONOCOPHILLIPS as invalid and void. CONOCOPHILLIPS may assign all of its right, title, and interest in this Agreement, and the franchise relationship created by this Agreement to any affiliate, subsidiary, operating division, or independent marketer of CONOCOPHILLIPS without RESELLERS's prior written consent.

**43.  CHOICE OF LAW AND VENUE.**

This Agreement shall be governed, construed and interpreted under and in accordance with the laws of the State where the Station is located.  Each party hereby expressly consents to exclusive jurisdiction of the courts of the State where the Station is located and of any Federal court located in the State where the station is located in connection with any action or proceeding arising out of or relating to this Agreement.

**44.  CONTRACTING ENTITY.**

(a)    The individual, partnership and/or corporation first set forth above as RESELLER is the only entity that CONOCOPHILLIPS recognizes as the party contracting hereunder as RESELLER.  Any name RESELLER uses as a "d.b.a." or fictitious firm name shall not be recognized by CONOCOPHILLIPS as the RESELLER.

(b)    RESELLER agrees that all Business Documents (as defined below) required under this Agreement or in conjunction with the operation of the Station shall be identical to the identity of RESELLER in this Agreement.  RESELLER understands and acknowledges that Business Documents include, but are not limited to, business licenses, permits, business checking accounts, security agreements, financing statements, insurance polices, proofs of insurance, and utilities ("Business Documents").

(c)    In the event CONOCOPHILLIPS becomes aware of Business Documents containing names other than RESELLER's name as set forth in this Agreement, upon written notice from CONOCOPHILLIPS, RESELLER agrees that RESELLER shall promptly, at RESELLER's expense, correct the name on the Business Document(s) to be identical to the name of RESELLER as set forth herein. RESELLER understands that any other party, other than the named RESELLER, asserting that they are a party hereof will be dismissed as invalid and shall not be recognized in any manner as a party to this Agreement.

(d)    If RESELLER consists of more than one (1) person, each person's liability under this Agreement shall be joint and several.

**45.    EXHIBITS.**

Exhibits **A, B, C, D, E** and **F** referenced herein, and the preamble and recitals to this Agreement, are hereby incorporated herein and made a part hereof by this reference.

**46.    ENTIRE AGREEMENT.**

(a)    This Agreement cancels and supersedes, as of the Contract Date hereof, all prior written and or oral, expressed or implied, agreements between CONOCOPHILLIPS and RESELLER in regards to the following:

(1)    RESELLER's and CONOCOPHILLIPS' rights, duties and obligations in respect of RESELLER's operation of the Station;

(2)    The sale and delivery of CONOCOPHILLIPS motor fuel at the Station and all the terms and conditions as to CONOCOPHILLIPS' sale to RESELLER and RESELLER's purchase from CONOCOPHILLIPS, of CONOCOPHILLIPS motor fuels for sale at the Station; and

(3)    Any and all of the relationship which exists between CONOCOPHILLIPS and RESELLER.

(b)    Neither CONOCOPHILLIPS nor RESELLER is obligated by any inducement, statement, representation, promise or agreement made by either of them that is not included in this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement effective as of the Contract Date first set forth above.

ConocoPhillips Company:                    RESELLER: Milestone Pacific Properties, LLC

By _____            By _____
David Helt                                          Bob Sidhu
Manager, Wholesale Sales – Dealer/Reseller        President

Date _____6|30|06_____                Date _____5|31|06_____

**EXHIBIT A**
__0045 / 837120__

**STATION LOCATION**

Milestone Pacific Properties, LLC
199 Lincoln Rd. West
Vallejo, Ca. 94590

**EXHIBIT B**
__0045 / 837120__

<u>SIGNS</u>

| Quantity | Description: |
|----------|--------------|
|          |              |
|          |              |
|          |              |
|          |              |
|          |              |
|          |              |
|          |              |
|          |              |
|          |              |

**EXHIBIT C**
**0045 / 837120**

**HOURS OF OPERATION**

For the months of January Through December - **24**

| | | |
|---|---|---|
| Sunday | AM | PM |
| Monday | AM | PM |
| Tuesday | AM | PM |
| Wednesday | AM | PM |
| Thursday | AM | PM |
| Friday | AM | PM |
| Saturday | AM | PM |



Revised 3/2/04



**EXHIBIT D**
<u>0045 / 837120</u>

<u>MONTHLY/QUARTERLY/ANNUAL MINIMUM VOLUME SCHEDULE</u>

AS OF DATE: <u>April 1, 2006</u>

## Gasoline

|  | 1st Qtr Jan-Mar | 2nd Qtr Apr-Jun | 3rd Qtr Jul-Sep | 4th Qtr Oct-Dec | Annual Jan-Dec |
|---|---|---|---|---|---|
| Fuel Volume | 750,000 | 750,000 | 750,000 | 750,000 | 3,000,000 |
| Total | 750,000 | 750,000 | 750,000 | 750,000 | 3,000,000 |

## Diesel

|  | 1st Qtr Jan-Mar | 2nd Qtr Apr-Jun | 3rd Qtr Jul-Sep | 4th Qtr Oct-Dec | Annual Jan-Dec |
|---|---|---|---|---|---|
| Fuel Volume | 60,000 | 60,000 | 60,000 | 60,000 | 240,000 |
| Total | 60,000 | 60,000 | 60,000 | 60,000 | 240,000 |





**EXHIBIT E**
0045 / 837120

## PETROLEUM MARKETING PRACTICES ACT (PMPA)

AN ACT To provide for the protection of franchised distributors and retailers of motor fuel and to encourage conservation of automotive gasoline and competitor in the marketing of such gasoline by requiring that information regarding the octane rating of automotive gasoline be disclosed to consumers.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That this Act may be cited as the "Petroleum Marketing Practices Act".*

TABLE OF CONTENTS

TITLE I-FRANCHISE PROTECTION

Sec. 2801. Definitions.
Sec. 2802. Franchise relationship; termination and nonrenewal.
Sec. 2803. Trial franchises and interim franchises; nonrenewal.
Sec. 2804. Notification of termination or nonrenewal.
Sec. 2805. Enforcement.
Sec. 2806. Relationship of this title to State law.

TITLE 1-FRANCHISE PROTECTION

DEFINITIONS

Sec. 2801.  Definitions

As used in this subchapter:

(1)    (A) The term **"franchise"** means any contract-

(i) between a refiner and a distributor,

(ii) between a refiner and a retailer,

(iii) between a distributor and another distributor, or

(iv) between a distributor and a retailer,

under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use.

(B) The term **"franchise"** includes-

(i) any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy;

(ii) any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed-

(I) under a trademark owned or controlled by a refiner; or

(II) under a contract which has existed continuously since May 15, 1973, and pursuant to  which, on May 15, 1973, motor fuel was sold, consigned or distributed under a trademark owned or controlled on such date by a refiner; and

(iii) the unexpired portion of any franchise, as defined by the preceding provisions of this paragraph, which is transferred or assigned as authorized by the provisions of such franchise or by any applicable provision of State law which permits such transfer or assignment without regard to any provision of the franchise.

(2)    The term "**franchise relationship**" means the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise.

(3)    The term "**franchisor**" means a refiner or distributor (as the case may be) who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

(4)    The term "**franchisee**" means a retailer or distributor (as the case may be) who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

(5)    The term "**refiner**" means any person engaged in the refining of crude oil to produce motor fuel, and includes any affiliate of such person.

(6)    The term "**distributor**" means any person, including any affiliate of such person, who-

(A) purchases motor fuel for sale, consignment, or distribution to another; or

(B) receives motor fuel on consignment for consignment or distribution to his own motor fuel accounts or to accounts of his supplier, but shall not include a person who is an employee of, or merely serves as a common carrier providing transportation service for, such supplier.

(7)    The term "**retailer**" means any person who purchases motor fuel for sale to the general public for ultimate consumption.

(8)    The term "**marketing premises**" means, in the case of any franchise, premises which, under such franchise, are to be employed by the franchisee in connection with the sale, consignment, or distribution of motor fuel.

(9)    The term "**leased marketing premises**" means marketing premises owned, leased, or in any way controlled by a franchisor and which the franchisee is authorized or permitted, under the franchise, to employ in connection with the sale, consignment or distribution of motor fuel.

(10) The term "**contract**" means any oral or written agreement. For supply purposes, delivery levels during the same month of the previous year shall be prima facie evidence of an agreement to deliver such levels.

(11) The term "**trademark**" means any trademark, trade name, service mark, or other identifying symbol or name.

(12) The term "**motor fuel**" means gasoline and diesel fuel of a type distributed for use as a fuel in self-propelled vehicles designed primarily for use on public streets, roads, and highways.

(13) The term "**failure**" does not include-

(A) any failure which is only technical or unimportant to the franchise relationship;

(B) any failure for a cause beyond the reasonable control of the franchisee; or

(C)  any failure based on a provision of the franchise which is illegal or unenforceable under the law of any State (or subdivision thereof).

(14) The term "**fail to renew**" and "**nonrenewal**" mean, with respect to any franchise relationship, a failure to reinstate, continue, or extend the franchise relationship-

(A) at the conclusion of the term, or on the expiration date, stated in the relevant franchise;

(B) at any time, in the case of the relevant franchise which does not state a term of duration or an expiration date; or

(C) following a termination (on or after June 19, 1978) of the relevant franchise which was entered into prior to June 19, 1978, and has not been renewed after such date.

(15) The term "**affiliate**" means any person who (other than by means of a franchise) controls, is controlled by, or is under common control with, any other person.

(16) The term "**relevant geographic market area**" includes a State or a standard metropolitan statistical area as periodically established by the Office of Management and Budget.

(17) The term "**termination**" includes cancellation.

(18) The term "**commerce**" means any trade, traffic, transportation, exchange, or other commerce-



(A) between any State and any place outside of such State; or

(B) which affects any trade, transportation, exchange, or other commerce described in subparagraph (A).

(19) The term "**State**" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, American Samoa, Guam, and any other commonwealth, territory, or possession of the United States.

## FRANCHISE RELATIONSHIP; TERMINATION AND NONRENEWAL

Sec. 2802.  Franchise relationship

(a)   General prohibition against termination or nonrenewal

Except as provided in subsection (b) of this section and section 2803 of this title, no franchisor engaged in the sale, consignment, or distribution of motor fuel in commerce may-

(1) terminate any franchise (entered into or renewed on or after June 19, 1978) prior to the conclusion of the term, or the expiration date, stated in the franchise; or

(2) fail to renew any franchise relationship (without regard to the date on which the relevant franchise was entered into or renewed).

(b)   Precondition and grounds for termination or nonrenewal

(l) Any franchisor may terminate any franchise (entered into or renewed on or after June 19, 1978) or may fail to renew any franchise relationship, if-

(A) the notification requirements of section 2804 of this title are met; and

(B) such termination is based upon a ground described in paragraph (2) or such nonrenewal is based upon a ground described in paragraph (2) or (3).

(2) For purposes of this subsection, the following are grounds for termination of a franchise or nonrenewal of a franchise relationship:

(A) A failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship, if the franchisor first acquired actual or constructive knowledge of such failure-

(i) not more than 120 days prior to the date on which notification of termination or nonrenewal is given, if notification is given pursuant to section 2804(a) of this title; or

(ii) not more than 60 days prior to the date on which notification of termination or nonrenewal is given, if less than 90 days notification is given pursuant to section 2804(b)(1) of this title.

(B) A failure by the franchisee to exert good faith efforts to carry out the provisions of the franchise, if-

(i) the franchisee was apprised by the franchisor in writing of such failure and was afforded a reasonable opportunity to exert good faith efforts to carry out such provisions; and

(ii) such failure thereafter continued within the period which began not more than 180 days before the date notification of termination or nonrenewal was given pursuant to section 2804 of this title.

(C) The occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable, if such event occurs during the period the franchise is in effect and the franchisor first acquired actual or constructive knowledge of such occurrence-

(i) not more than 120 days prior to the date on which notification of termination or nonrenewal is given, if notification is given pursuant to section 2804(a) in this title; or

(ii) not more than 60 days prior to the date on which notification of termination or nonrenewal is given, if less than 90 days notification is given pursuant to section 2804(b)(1) in this title.

(D) An agreement, in writing, between the franchisor and the franchisee to terminate the franchise or not to renew the franchise relationship, if-



(i) such agreement is entered into not more than 180 days prior to the date of such termination or, in the case of nonrenewal, not more than 180 days prior to the conclusion of the term, or the expiration date, stated in the franchise;

(ii) the franchisee is promptly provided with a copy of such agreement, together with the summary statement described in section 2804(d) of this title; and

(iii) within 7 days after the date on which the franchisee is provided a copy of such agreement, the franchisee has not posted by certified mail a written notice to the franchisor repudiating such agreement.

(E) In the case of any franchise entered into prior to June 19, 1978, and in the case of any franchise entered into or renewed on or after such date (the term of which is 3 years or longer, or with respect to which the franchisee was offered a term of 3 years or longer), a determination made by the franchisor in good faith and in the normal course of business to withdraw from the marketing of motor fuel through retail outlets in the relevant geographic market area in which the marketing premises are located, if—

(i) such determination—

(I) was made after the date such franchise was entered into or renewed, and

(II) was based upon the occurrence of changes in relevant facts and circumstances after such date;

(ii) the termination or nonrenewal is not for the purpose of converting the premises, which are the subject of the franchise, to operation by employees or agents of the franchisor for such franchisor's own account; and

(iii) in the case of leased marketing premises—

(I) the franchisor, during the 180-day period after notification was given pursuant to section 2804 in this title, either made a bona fide offer to sell, transfer, or assign to the franchisee such franchisor's interests in such premises, or, if applicable, offered the franchisee a right of first refusal of at least 45 days duration of an offer, made by another, to purchase such franchisor's interest in such premises; or

(II) in the case of the sale, transfer, or assignment to another person of the franchisor's interest in such premises in connection with the sale, transfer, or assignment to such other person of the franchisor' interest in one or more other marketing premises, if such other person offers, in good faith, a franchise to the franchisee on terms and conditions which are not discriminatory to the franchisee as compared to franchises then currently being offered by such other person or franchises then in effect and with respect to which such other person is the franchisor.

(3) For purposes of this subsection, the following are grounds for **nonrenewal** of a franchise relationship:

(A) The failure of the franchisor and the franchisee to agree to changes or additions to the provisions of the franchise, if—

(i) such charges or additions are the result of determinations made by the franchisor in good faith and in the normal course of business; and

(ii) such failure is not the result of the franchisor's insistence upon such changes or additions for the purpose of converting the leased marketing premises to operation by employees or agents of the franchisor for the benefit of the franchisor or otherwise preventing the renewal of the franchise relationship.

(B) The receipt of numerous bona fide customer complaints by the franchisor concerning the franchisee's operation of the marketing premises, if—

(i) the franchisee was promptly apprised of the existence and nature of such complaints following receipt of such complaints by the franchisor; and

(ii) if such complaints related to the condition of such premises or to the conduct of any employee of such franchisee, the franchisee did not promptly take action to cure or correct the basis of such complaints.

(C) A failure by the franchisee to operate the marketing premises in a clean, safe, and healthful manner, if the franchisee failed to do so on two or more previous occasions and the franchisor notified the franchisee of such failures.

(D) In the case of any franchise entered into prior to June 19, 1978 (the unexpired term of which, on such date, is 3 years or longer) and, in the case of any franchise entered into or renewed on or after such date (the term of which was 3 years or longer, or with respect to which the franchisee was offered a term of 3 years or longer), a determination made by the franchisor in good faith and in the normal course of business, if—

(i) such determination is—

  

(I) to convert the leased marketing premises to a use other than the sale or distribution of motor fuel,

(II) to materially alter, add to, or replace such premises,

(III) to sell such premises, or

(IV) that renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or reasonable additions to the provisions of the franchise which may be acceptable to the franchisee;

(ii) with respect to a determination referred to in subclause (II) or (IV), such determination is not made for the purpose of converting the leased marketing premises to operation by employees or agents of the franchisor for such franchisor's own account; and

(iii) in the case of leased marketing premises such franchisor, during the 90-day period after notification was given pursuant to section 2804 of this section, either-

(I) made a bona fide offer to sell, transfer, or assign to the franchisee such franchisor's interests in such premises; or

(II) if applicable, offered the franchisee a right of first refusal of at least 45-days duration of an offer, made by another, to purchase such franchisor's interest in such premises.

(c)    Definition

As used in subsection (b)(2)(C) of this section, the term "an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable" includes events such as-

(1) fraud or criminal misconduct by the franchisee relevant to the operation of the marketing premises;

(2) declaration of bankruptcy or judicial determination of insolvency of the franchisee;

(3) continuing severe physical or mental disability of the franchisee of at least 3 months duration which renders the franchisee unable to provide for the continued proper operation of the marketing premises;

(4) loss of the franchisor's right to grant possession of the leased marketing premises through expiration of an underlying lease, if-

(A) the franchisee was notified in writing, prior to the commencement of the term of the then existing franchise-

(i) of the duration of the underlying lease; and

(ii) of the fact that such underlying lease might expire and not be renewed during the term of such franchise (in the case of termination) or at the end of such term (in the case of nonrenewal);

(B) during the 90-day period after notification was given pursuant to section 2804 of this title, the franchisor offers to assign to the franchisee any option to extend the underlying lease or option to purchase the marketing premises that is held by the franchisor, except that the franchisor may condition the assignment upon receipt by the franchisor of-

(i) an unconditional release executed by both the landowner and the franchisee releasing the franchisor from any and all liability accruing after the date of the assignment for-

(I) financial obligations under the option (or the resulting extended lease or purchase agreement);

(II) environmental contamination to (or originating from) the marketing premises; or

(III) the operation or condition of the marketing premises; and

(ii) an instrument executed by both the landowner and the franchisee that ensures the franchisor and the contractors of the franchisor reasonable access to the marketing premises for the purpose of testing for and remediating any environmental contamination that may be present at the premises; or

(C) in a situation in which the franchisee acquires possession of the leased marketing premises effective immediately after the loss of the right of the franchisor to grant possession (through an assignment pursuant to subparagraph (B) or by obtaining a new lease or purchasing the marketing premises from the landowner), the franchisor (if requested in writing by the franchisee not later than 30 days after notification was given pursuant to section 2804 of this title), during the 90-day period after notification was given pursuant to section 2804 of this title-



(i) made a bona fide offer to sell, transfer, or assign to the franchisee the interest of the franchisor in any improvements or equipment located on the premises; or

(ii) if applicable, offered the franchisee a right of first refusal (for at least 45 days) of an offer, made by another person, to purchase the interest of the franchisor in the improvements and equipment.

(5) condemnation or other taking, in whole or in part, of the marketing premises pursuant to the power of eminent domain;

(6) loss of the franchisor's right to grant the right to use the trademark which is the subject of the franchise, unless such loss was due to trademark abuse, violation of Federal or State law, or other fault or negligence of the franchisor, which such abuse, violation, or other fault or negligence is related to action taken in bad faith by the franchisor;

(7) destruction (other than by the franchisor) of all or a substantial part of the marketing premises;

(8) failure by the franchisee to pay to the franchisor in a timely manner when due all sums to which the franchisor is legally entitled;

(9) failure by the franchisee to operate the marketing premises for-

(A) 7 consecutive days, or

(B) such lesser period which under the facts and circumstances constitutes an unreasonable period of time;

(10) willful adulteration, mislabeling or misbranding of motor fuels or other trademark violations by the franchisee;

(11) knowing failure of the franchisee to comply with Federal, State or local laws or regulations relevant to the operation of the marketing premises; and

(12) conviction of the franchisee of any felony involving moral turpitude.

(d)    Compensation, etc., for franchisee upon condemnation or destruction of marketing premises

In the case of any termination of a franchise (entered into or renewed on or after June 19, 1978), or in the case of any nonrenewal of a franchise relationship (without regard to the date on which such franchise relationship was entered into or renewed)-

(1) if such termination or nonrenewal is based upon an event described in subsection (c)(5) of this section, the franchisor shall fairly apportion between the franchisor and the franchisee compensation, if any, received by the franchisor based upon any loss of business opportunity or good will; and

(2) if such termination or nonrenewal is based upon an event described in subsection (c)(7) of this section and the leased marketing premises are subsequently rebuilt or replaced by the franchisor and operated under a franchise, the franchisor shall, within a reasonable period of time, grant to the franchisee a right of first refusal of the franchise under which such premises are to be operated.

## TRIAL FRANCHISES AND INTERIM FRANCHISES; NONRENEWAL

Section 2803. Trial and interim franchises

(a)    Nonapplicability of statutory nonrenewal provisions

The provisions of section 2802 of this title shall not apply to the nonrenewal of any franchise relationship-

(1) under a trial franchise; or

(2) under an interim franchise.

(b)    Definitions

For purposes of this section-

(1) The term "**trial franchise**" means any franchise-

(A) which is entered into on or after June 19, 1978;



(B) the franchisee of which has not previously been a party to a franchise with the franchisor;

(C) the initial term of which is for a period of not more than 1 year; and

(D) which is in writing and states clearly and conspicuously-

(i) that the franchise is a trial franchise;

(ii) the duration of the initial term of the franchise;

(iii) that the franchisor may fail to renew the franchise relationship at the conclusion of the initial term stated in the franchise by notifying the franchisee, in accordance with the provisions of section 2804 of this title, of the franchisor's intention not to renew the franchise relationship; and

(iv) that the provisions of section 2802 of this title, limiting the right of a franchisor to fail to renew a franchise relationship, are not applicable to such trial franchise.

(2) The term "**trial franchise**" does not include any unexpired period of any term of any franchise (other than a trial franchise, as defined by paragraph (1)) which was transferred or assigned by a franchisee to the extent authorized by the provisions of the franchise or any applicable provision of State law which permits such transfer or assignment, without regard to which provision of the franchise.

(3) The term "**interim franchise**" means any franchise-

(A) which is entered into on or after the date of June 19, 1978;

(B) the term of which, when combined with the terms of all prior interim franchises between the franchisor and the franchisee, does not exceed 3 years;

(C) the effective date of which occurs immediately after the expiration of a prior franchise, applicable to the marketing premises, which was not renewed if such nonrenewal-

(i) was based upon a determination described in section 2802(b)(2)(E) of this title, and

(ii) the requirements of section 2802(b)(2)(E) of this title were satisfied; and

(D) which is in writing and states clearly and conspicuously-

(i) that the franchise is an interim franchise;

(ii) the duration of the franchise; and

(iii) that the franchisor may fail to renew the franchise at the conclusion of the term stated in the franchise based upon a determination made by the franchisor in good faith and in the normal course of business to withdraw from the marketing of motor fuel through retail outlets in the relevant geographic market area in which the marketing premises are located if the requirements of section 2802(b)(2)(E) (ii) and (iii) of this title are satisfied.

(c)    Nonrenewal upon meeting statutory notification requirements

If the notification requirements of section 2804 of this title are met, any franchisor may fail to renew any franchise relationship-

(1) under any trial franchise, at the conclusion of the initial term of such trial franchise; and

(2) under any interim franchise, at the conclusion of the term of such interim franchise, if-
(A) such nonrenewal is based upon a determination described in section 2802(b)(2)(E) of this title; and

(B) the requirements of section 2802((b)(2)(E) (ii) and (iii) of this title are satisfied.

NOTIFICATION OF TERMINATION OR NONRENEWAL

Sec. 2804. Notification of termination or nonrenewal of franchise relationship

(a)    General requirements applicable to franchisor

Prior to termination of any franchise or nonrenewal of any franchise relationship, the franchisor shall furnish notification of such termination or such nonrenewal to the franchisee who is a party to such franchise or such franchise relationship-

(1) in the manner described in subsection (c) of this section; and

(2) except as provided in subsection (b) of this section, not less than 90 days prior to the date on which such termination or nonrenewal takes effect.

(b)    Additional requirements applicable to franchisor

(1) In circumstances in which it would not be reasonable for the franchisor to furnish notification, not less than 90 days prior to the date on which termination or nonrenewal takes effect, as required by subsection (a)(2) of this section-

(A) such franchisor shall furnish notification to the franchisee affected thereby on the earliest date on which furnishing of such notification is reasonably practicable; and

(B) in the case of leased marketing premises, such franchisor -

(i) may not establish a new franchise relationship with respect to such premises before the expiration of the 30 day period which begins-

(I) on the date notification was posted or personally delivered, or

(II) if later, on the date on which such termination or nonrenewal takes effect; and

(ii) may, if permitted to do so by the franchise agreement, repossess such premises and, in circumstances under which it would be reasonable to do so, operate such premises through employees or agents.

(2) In the case of any termination of any franchise or any nonrenewal of any franchise relationship pursuant to the provisions of section 2802(b)(2)(E) of this title or section 2803(c)(2) of this title, the franchisor shall-

(A) furnish notification to the franchisee not less than 180 days prior to the date on which such termination or nonrenewal takes effect; and

(B) promptly provide a copy to such notification, together with a plan describing the schedule and conditions under which the franchisor will withdraw from the marketing of motor fuel through retail outlets in the relevant geographic area, to the Governor of each State which contains a portion of such area.

(c)    Manner and form of notification

Notification under this section-

(1) shall be in writing;

(2) shall be posted by certified mail or personally delivered to the franchisee; and

(3) shall contain-

(A) a statement of intention to terminate the franchise or not to renew the franchise relationship, together with the reasons therefor,

(B) the date on which such termination or nonrenewal takes effect; and

(C) the summary statement prepared under subsection (d) of this section.

(d)    Preparation, publication, etc., of statutory summaries

(l) Not later than 30 days after June 19, 1978, the Secretary of Energy shall prepare and publish in the Federal Register a simple and concise summary of the provisions of this subchapter, including a statement of the respective responsibilities of, and the remedies and relief available to, any franchisor and franchisee under this subchapter.

(2) In the case of summaries required to be furnished under the provisions of section 2802(b)(2)(D) of this title or subsection (c)(3)(C) of this section before the date of publication of such summary in the Federal Register, such summary may be furnished not later than 5 days after it is so published rather than at the time required under such provisions.


ENFORCEMENT

### Sec. 2805. Enforcement provisions

(a)   Maintenance of civil action by franchisee against franchisor; jurisdiction and venue; time for commencement of action

If a franchisor fails to comply with the requirements of section 2802 or 2803 of this title, the franchise may maintain a civil action against such franchisor. Such action may be brought, without regard to the amount in controversy, in the district court of the United States in any judicial district in which the principal place of business of such franchisor is located or in which such franchisee is doing business, except that no such action may be maintained unless commenced within 1 year after the later of-

(1) the date of termination of the franchise or nonrenewal of the franchise relationship; or

(2) the date the franchisor fails to comply with the requirements of section 2802 or 2803 of this title.

(b)   Equitable relief by court; bond requirements; grounds for nonexercise of court's equitable powers

(1) In any action under subsection (a) of this section, the court shall grant such equitable relief as the court determines is necessary to remedy the effects of any failure to comply with the requirements of section 2802 or 2803 of this title, including declaratory judgment, mandatory or prohibitive injunctive relief, and interim equitable relief.

(2) Except as provided in paragraph (3), in any action under subsection (a) of this section, the court shall grant a preliminary injunction if-

(A) the franchisee shows-

(i) the franchise of which he is a party has been terminated or the franchise relationship to which he is a party has not been renewed, and

(ii) there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation; and

(B) the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted.

(3) Nothing in this subsection prevents any court from requiring the franchisee in any action under subsection (a) of this section to post a bond, in an amount established by the court, prior to the issuance or continuation of any equitable relief.

(4) In any action under subsection (a) of this section, the court need not exercise its equity powers to compel continuation or renewal of the franchise relationship if such action was commenced-

(A) more than 90 days after the date on which notification pursuant to section 2804(a) of this title was posted or personally delivered to the franchisee;

(B) more than 180 days after the date on which notification pursuant to section 2804(b)(2) of this title was posted or personally delivered to the franchisee; or

(C) more than 30 days after the date on which the termination of such franchise or the nonrenewal of such franchise relationship takes effect if less than 90 days notification was provided pursuant to section 2804(b)(1) of this title.

(c)   Burden of proof; burden of going forward with evidence

In any action under subsection (a) of this section, the franchisee shall have the burden of proving the termination of the franchise or the nonrenewal of the franchise relationship. The franchisor shall bear the burden of going forward with evidence to establish as an affirmative defense that such termination or nonrenewal was permitted under section 2802(b) or 2803 of this title, and, if applicable, that such franchisor complied with the requirements of section 2802(d) of this title.

(d)   Actual and exemplary damages and attorney and expert witness fees to franchisee; determination by court of right to exemplary damages and amount; attorney and expert witness fees to franchisor for frivolous actions

(1) If the franchisee prevails in any action under subsection (a) of this section, such franchisee shall be entitled-

(A) consistent with the Federal Rules of Civil Procedure, to actual damages;

  

(B) in the case of any such action which is based upon conduct of the franchisor which was in willful disregard of the requirements of section 2802 or 2803 of this title, or the rights of the franchisee thereunder, to exemplary damages, where appropriate; and

(C) to reasonable attorney and expert witness fees to be paid by the franchisor, unless the court determines that only nominal damages are to be awarded to such franchisee, in which case the court, in its discretion, need not direct that such fees be paid by the franchisor.

(2) The question of whether to award exemplary damages and the amount of any such award shall be determined by the court and not by a jury.

(3) In any action under subsection (a) of this section, the court may, in its discretion direct that reasonable attorney and expert witness fees be paid by the franchisee if the court finds that such action is frivolous.

(e)    Discretionary power of court to compel continuation or renewal of franchise relationship; grounds for noncompulsion; right of franchisee to actual damages and attorney and expert witness fees unaffected

(1) In any action under subsection (a) of this section with respect to a failure of a franchisor to renew a franchise relationship in compliance with the requirements of section 2802 of this title, the court may not compel a continuation or renewal of the franchise relationship if the franchisor demonstrates to the satisfaction of the court that-

(A) the basis for such nonrenewal is a determination made by the franchisor in good faith and in the normal course of business-

(i) to convert the leased marketing premises to a use other than the sale or distribution of motor fuel,

(ii) to materially alter, add to, or replace such premises,

(iii) to sell such premises,

(iv) to withdraw from the marketing of motor fuel through retail outlets in the relevant geographic market area in which the marketing premises are located, or

(v) that renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or reasonable additions to the provisions of the franchise which may be acceptable to the franchisee; and

(B) the requirements of section 2804 of this title have been complied with.

(2) The provisions of paragraph (1) shall not affect any right of any franchisee to recover actual damages and reasonable attorney and expert witness fees under subsection (d) of this section if such nonrenewal is prohibited by section 2802 of this title.

(f)    Release or waiver of rights

(1)    No franchisor shall require, as a condition of entering into or renewing the franchise relationship, a franchisee to release or waive-

(A) any right that the franchisee has under this subchapter or other Federal law; or

(B) any right that the franchisee may have under any valid and applicable State law.

(2) No provision of any franchise shall be valid or enforceable if the provision specifies that the interpretation or enforcement of the franchise shall be governed by the law of any State other than the State in which the franchisee has the principal place of business of the franchisee.

RELATIONSHIP OF THIS TITLE TO STATE LAW

Sec. 2806. Relationship of statutory provisions to State and local laws

(a)    Termination or nonrenewal of franchise

(1) To the extent that any provision of this subchapter applies to the termination (or the furnishing of notification with respect thereto) of any franchise, or to the nonrenewal (or the furnishing of notification with respect thereto) of any franchise relationship, no State or any political subdivision thereof may adopt, enforce, or continue in effect any provision of any law or regulation (including any remedy or penalty applicable to any violation thereof) with respect to termination (or the furnishing of notification with respect thereto) of any such franchise or to the nonrenewal (or the furnishing of notification with respect



thereto) of any such franchise relationship unless such provision of such law or regulation is the same as the applicable provision of this subchapter.

(2) No State or political subdivision of a State may adopt, enforce, or continue in effect any provision of law (including a regulation) that requires a payment for the goodwill of a franchisee on the termination of a franchise of nonrenewal of a franchise relationship authorized by this subchapter.

(b)    Transfer or assignment of franchise

(1) Nothing in this subchapter authorizes any transfer or assignment of any franchise or prohibits any transfer or assignment of any franchise as authorized by the provisions of such franchise or by any applicable provision of State law which permits such transfer or assignment without regard to any provision of the franchise.

(2) Nothing in this subchapter shall prohibit any State from specifying the terms and conditions under which any franchise or franchise relationship may be transferred to the designated successor of a franchisee upon the death of the franchisee.



**Exhibit F**

## Image Improvement Addendum to Union 76 Branded Reseller Agreement

Whereas RESELLER understands that CONOCOPHILLIPS is in the process of evaluating and making changes to its Union 76 branded service station image standards, RESELLER and CONOCOPHILLIPS agree as follows:

1.  RESELLER shall, at RESELLER's sole cost and expense, construct and install service station image improvements, and facilities, fixtures, and equipment, as required, so as to cause RESELLER's service station to comply with the guidelines published on CONOCOPHILLIPS' website or published in such manner as CONOCOPHILLIPS may designate from time to time ("Image Improvements"). Estimates of the costs for making such Image Improvements provided by CONOCOPHILLIPS are for forecasting purposes and are subject to change due to timing, program definition, material availability, or changes in scope.

2.  Notwithstanding the one year time limitation contained in Section 5(b)(3) of this Agreement, the completion date for the Image Improvements provided for in this Image Improvement Addendum is Jan 1, 2007 ("Completion Date"). RESELLER agrees that if such Image Improvements are not completed by the Completion Date, such failure is a material breach of the Agreement and is of material significance to the franchise relationship, and CONOCOPHILLIPS shall therefore have the right to terminate this Agreement.

3.  If the Image Improvements are not completed by the Completion Date and in accordance with CONOCOPHILLIPS' Image Requirements, CONOCOPHILLIPS may at its option assess and charge to RESELLER an image compliance assessment at the rate of $100 per day until the Image Improvements are completed and the Station is in compliance with CONOCOPHILLIPS' Image Requirements.

4.  <u>Approval Process.</u> RESELLER's scope of work and final plans are to be submitted by RESELLER to a CONOCOPHILLIPS engineer with copies for reference to RESELLER's field marketing representative for review and approval prior to RESELLER seeking to obtain permits and ordering of equipment. All entitlement and permitting conditions must also be reviewed and approved by a local CONOCOPHILLIPS Real Estate Regional Director prior to final approval by the local approving authority.

    RESELLER is to use only vendors, specifications and materials as may be approved by CONOCOPHILLIPS. Alternate vendors or contractors selected by RESELLER shall require approval from a CONOCOPHILLIPS engineer. RESELLER shall notify a CONOCOPHILLIPS engineer for a 50% completion inspection and obtain a 50% approval letter from the CONOCOPHILLIPS engineer. RESELLER shall notify a CONOCOPHILLIPS engineer for a 100% completion inspection and obtain a 100% completion letter with punch list items from the CONOCOPHILLIPS engineer. RESELLER shall notify a CONOCOPHILLIPS engineer for a final inspection, including completed punch list items, and obtain a final approval and acceptance notice from the CONOCOPHILLIPS engineer. RESELLER shall submit the acceptance notice to RESELLER's field representative.

Agreed and accepted, this __30__ day of __June_____, 2006.

RESELLER:
Milestone Pacific Properties, LLC

By:_____
    Bob Sidhu
    President

CONOCOPHILLIPS COMPANY:

By:_____
    David Helt
    Manager, Wholesale Sales – Dealer/Reseller

## OFFICER CERTIFICATION
### 0045 / 837120

The undersigned does hereby confirm to be an officer of _____,
a _____ corporation ("Corporation").  The
undersigned certifies that as an officer of the Corporation he/she is duly authorized to
execute any and/all documents and/or other instruments on behalf of the Corporation.
The execution of the foregoing Agreement and any ancillary documents related to the
Agreement, by the undersigned are and shall be binding upon the Corporation.

Signature: _____

Print Name: _____ BOOB SIDHU _____

Corporate Title: _____ MEMBER _____

Date: _____ 5/31/00 _____

Dealer name: Milestone Pacific Properties, LLC
Unit #: 0045/837120
Sold To #: 0010070275
Effective Date: April 1, 2006
Expiration Date: March 31, 2016

## 76 BRANDED TEMPERATURE ADJUSTMENT AGREEMENT

Dear Reseller:

You have elected to purchase various motor fuels from CONOCOPHILLIPS for the above subject service station, pursuant to a UNION 76 AGREEMENT ("Agreement").

By this Agreement you acknowledge that CONOCOPHILLIPS has advised you that single deliveries made to your service station may be on a 60 degrees Fahrenheit temperature corrected basis, unless you elect to accept delivery on a gross gallonage basis.

You understand and agree that the election made herein shall be effective for a period of one (1) year from the date of this letter and then on a year to year basis thereafter unless canceled by written notice given thirty (30) calendar days prior to the expiration of any one (1) year period.

You hereby elect to accept single deliveries on the following basis (choose one):

____X____ Temperature Corrected

_____ Gross Gallonage

ACCEPTED AND AGREED TO

THIS __30__ DAY OF __JuNE__, 2006.

CONOCOPHILLIPS COMPANY:                    RESELLER: Milestone Pacific Properties, LLC

_____           _____
David Helt                                 Bob Sidhu
Manager, Wholesale Sales – Dealer/Reseller President

tempadj.doc (Rev. 3/4/04 dlb)

December 8, 2005

Milestone Pacific Properties, LLC
199 Lincoln Rd. West
Vallejo, Ca. 94590

Unit #:  0045/837120
Account #: 0010070275
Effective Date:  April 1, 2006
Expiration Date:  March 31, 2016

## 76 BRANDED FACILITY ALLOWANCE AGREEMENT

Dear Reseller:
In order to meet offers that have previously been made to you by one or more of our competitors, we agree to give you the following facility allowance, relating to that certain Service Station referenced above for each gallon of motor fuel purchased by your Service Station, pursuant to our Union 76 Branded Reseller Agreement.

| PRODUCTS | RATE | TIME PERIOD |
|---|---|---|
| Union 76 Branded Motor Fuel | $0.03/gal (from gallon one) | Each Load/Off Invoice |

This allowance may be decreased or be withdrawn by CONOCOPHILLIPS at any time, upon no less than ninety (90) days prior written notice to you.

We further agree that if CONOCOPHILLIPS exercises its right to decrease or withdraw the allowance, you may terminate your Union 76 Branded Reseller Agreement as of the effective date of the proposed change, or withdrawal by written notice given to CONOCOPHILLIPS, not less than ten (10) days prior to the effective date of the change or withdrawal.

Please sign, date and return the copy of this letter indicating your acceptance of these terms.

ConocoPhillips Company

David Helt
Manager Wholesale Sales—Dealer / Reseller

ACCEPTED AND AGREED TO THIS
**30** day of **JuNE** , 2006.

Milestone Pacific Properties, LLC

Bob Sidhu
President

(76facallow.doc revised 4/15/03 DLB)

# CERTIFICATE OF EXEMPTION RETAIL SALES TAX (Destination)

SELLER: CONOCOPHILLIPS CO., P. O. BOX 1267, PONCA CITY, OKLAHOMA 74602- 1267          FAX #918-662-5600

CONCERNING STATE SALES TAX, THE BILLING INSTRUCTIONS FOR PURCHASED PRODUCT SHOULD BE AS FOLLOWS:
A.  ___          I AM NOT EXEMPT THE SALES TAX ON MY PURCHASE.
B.  ___          I AM EXEMPT SALES TAX ON THE FOLLOWING PETROLEUM PRODUCTS FOR THE REASON(S) BELOW:

_____

_____

PURCHASER'S DESCRIPTION OF BUSINESS ACTIVITY _____

_____

## REASONS FOR QUALIFYING FOR EXEMPTION OF SALES TAX
B1.  ___          PURCHASE FOR RESALE.
B2.  ___          I AM A WHOLESALER.
B3.  ___          PRODUCT(S) PURCHASED WILL BECOME AN INGREDIENT OR COMPONENT PART OF ARTICLES
                  MANUFACTURED OR COMPOUNDED FOR SALE.
B4.  ___          EXEMPT INDUSTRY (CHECK ONE) ___ FARMING ___ MINING ___ MANUFACTURING ___OTHER
B5.  ___          I AM A COMMON CARRIER. MY I.C.C. OR CERTIFICATE OF CONVENIENCE NUMBER IS _____

B6.  ___          OTHER REASON OF SALES TAX EXEMPTION - EXPLAIN IN DETAIL:

*B7.  ___         I AM LICENSED TO PAY DIRECTLY STATE FUEL TAX ON SALES OF MOTOR FUEL OR SPECIAL FUEL.

MY SPECIAL FUELS LICENSE NUMBER IS _____

MY MOTOR FUELS LICENSE NUMBER IS _____
MY VALID SALES TAX LICENSE OR PERMIT NUMBER(S) IS:
ORIGIN STATE _____ NO. _____

STATE _____ NO. _____

STATE _____ NO. _____

DEST / HOME STATE _____ NO. _____

"I UNDERSTAND THAT I AM SOLELY RESPONSIBLE FOR PURCHASING WITHIN THE ABOVE CATEGORIES AND ACKNOWLEDGE THAT
MISUSE OF THE RESALE PRIVILEGE CLAIMED BY USE OF THE CERTIFICATE MAY SUBJECT ME TO PENALTIES AND INTEREST
IMPOSED BY THE VARIOUS STATES AS WELL AS THE TAX."

THIS CERTIFICATE SHALL BE CONSIDERED AS PART OF EACH ORDER UNLESS WRITTEN NOTICE IS GIVEN TO THE CONTRARY,
AND IT SHALL REMAIN IN EFFECT UNTIL REVOKED IN WRITING OR EXPIRED BY STATE STATUTE. THE UNDERSIGNED
PURCHASER FURTHER AGREES THAT SHOULD THE SALE TO HIM BE LATER HELD SUBJECT TO THE TAX, HE ASSUMES FULL
LIABILITY.

*THIS EXEMPTION IS NOT VALID FOR THE STATES OF:
CALIFORNIA  GEORGIA  ILLINOIS  INDIANA  MICHIGAN  NEW YORK

PLEASE NOTE THAT VALID LOUISIANA REGISTRATION NUMBERS INCLUDE THE LETTER 'W' IN THEM.
*¶IF OKLAHOMA, PLEASE ENCLOSE A COPY OF YOUR OKLAHOMA SALES TAX PERMIT.

NAME CO: **Milestone Pacific Properties, LLC**  Site # **837120**

FEIN # _____          Address:  **199 Lincoln Rd. West**

Signature: _____          **Vallejo  Ca.  94590**
           **Bob Sidhu**
           Printed or typed name with authorization to bind          Phone #.  **925-768-4441**   Fax #:  **707-644-7682**

Title:  **President**          Date: _____

IF YOU HAVE ENTERED A TAX NUMBER ABOVE, THE DEALER MUST FAX THIS FORM TO CONOCOPHILLIPS
#918-662-5600 PRIOR TO THE EFFECTIVE DATE OF THE MOTOR FUEL SUPPLY AGREEMENT.

# EXHIBIT B

**REC'D BY WRA**

NAME: _Bob C._

Site No. **837120**    DATE REC'D _10/3/06_

COPY



Amendment to Addendum to
## Union 76 Branded Reseller Agreement

This Amendment to Addendum to Union 76 Branded Reseller Agreement is made between **ConocoPhillips Company, a Delaware corporation** ("ConocoPhillips") and **Milestone Pacific Properties, LLC, a California limited liability company** ("Reseller") (the "Amendment").

Whereas, ConocoPhillips and Reseller entered into an **Addendum to Union 76 Branded Reseller Agreement** dated **December 8, 2005** (the "Addendum"). The Addendum supplemented that certain **Union 76 Branded Reseller** Agreement between ConocoPhillips and Reseller dated **December 8, 2005.**

Whereas, Reseller completed the improvements (as defined in the Addendum) on **October 1, 2006.**

Whereas, Reseller and ConocoPhillips desires to make certain changes to the terms and provisions of the Amendment, all effective as of **October 1, 2006 (the "Effective Date").**

Now therefore, Reseller and ConocoPhillips, for valuable consideration, agree as follows:

1.  The Completion Date (as defined in the Addendum) is hereby changed to **October 1, 2006.**
2.  The Rebate (as defined in the Addendum) is hereby changed to **$0.02656.**
3.  The Maximum annual Rebate Gallons (as defined in the Addendum) is hereby changed to **3,000,000.**
4.  The maximum Gallons Purchased (as defined in the Addendum) during the remaining term hereof shall not exceed **30,000,000.**
5.  The first Rebate Year (as defined in the Addendum) shall begin on **October 1, 2006** and each subsequent Rebate Year shall begin on the same month and day of each year thereafter.
6.  The current Rebate Year (as defined in the Addendum) began on the Effective Date and each subsequent Rebate Year shall begin on the same month and day of each year thereafter.
7.  The remaining term of the Supply Agreement shall begin on **the Effective Date** and end on **September 30, 2016.**
8.  Except as specifically provided for herein, all of the terms and conditions of the Addendum shall remain in full force and effect.

This Amendment may be executed in one or more counterparts, each of which shall constitute an original agreement, but all of which together shall constitute one and the same agreement.

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date first above written.

Witness(es)

_David L. Vann_

David L. Vann

Print Name PAUL GHAFOORI

_David C. Vann_

David C. Vann

Print Name IVENDER SIDHU

_David C. Vann_

David C. Vann

Print Name JAGDEEP K. SIDHU

Reseller
Milestone Pacific Properties, LLC

By _____

Paul Ghafoori

By _____

Ivender Sidhu

By _Jagdeep K. Sidhu_

Jagdeep Sidhu

Print Name _____

ConocoPhillips Company

By _____

David Helt, Manager
Wholesale Sales

# EXHIBIT C

REC'D BY WRA

AME:  ~Bob C.~

DATE REC'D  10/3/06

COPY



Site:    837120

_____, California

## Promissory Note

**$500,000**

**Date:  December 8, 2005**

For value received, the receipt and sufficiency of which are hereby acknowledged, **Milestone Pacific Properties, LLC, a California limited liability company** (herein referred to as "Borrower"), promises to pay to **ConocoPhillips Company** (hereinafter referred to as "ConocoPhillips") or order, the principal sum of **Five Hundred Thousand** and NO/100ths DOLLARS (**$500,000**), payable at the rate and manner provided for below in this Promissory Note (the "Note").

WHEREAS, Borrower entered into a mutually beneficial, long-term, **Union 76 Branded Reseller  Agreement** with ConocoPhillips dated **December 8, 2005,** (herein, together with all supplements, exhibits, amendments, and modifications thereto, the "Supply Agreement") pertaining to the property located at **199 West Lincoln Rd. Vallejo, California** (the "Site").

WHEREAS, Borrower agrees and acknowledges that ConocoPhillips relies on Borrower's commitment to complete the Improvements (as defined in the Supply Agreement).

WHEREAS, ConocoPhillips agreed to advance up to **$500,000** (together with accrued interest added to increase principal, if any, the "Loan"). ConocoPhillips shall advance the Loan from time to time as the Improvements (as defined in the Supply Agreement) are completed and approved by ConocoPhillips, in its sole discretion, together with the documentation presented to ConocoPhillips at ConocoPhillips' reasonable request for payment of said approved Improvements.  ConocoPhillips' agreement to advance the Loan is in consideration of the following:

A.  Borrower's entering into the Supply Agreement and agreeing to purchase a minimum of **30,000,000** gallons beginning on **January 1, 2006** and through the remaining term thereof;

B.  Borrower's agreement to execute a Deed of Trust and Security Agreement covering the Site (the "Deed of Trust") in order to secure the following:

1.   payment of  the Loan with interest thereon, evidenced hereby;

2.   the performance and observance of all of the provisions hereof; and

3.   payment, performance and observance by Borrower of the provisions of the other Loan Documents (as defined below).

The Note, the Deed of Trust, the Supply Agreement and any other documents or agreements executed in connection with the Loan are herein collectively referred to as the "Loan Documents".

## I.    PROMISE TO PAY.

Borrower shall make quarterly principal and interest payments beginning on **April 01, 2006** (the "First Payment Date") and on the first day of every January, April, July and October thereafter until the Note is paid in full.  The quarterly payments of principal and interest shall be in the amount of **$19,918.12** (the "Payment(s)") and are sufficient to fully amortize the Loan by the Maturity Date (as defined below), except upon the occurrence of an Event of Default (as defined herein).

Interest shall accrue at the Note Rate from the date of funding.  Interest accrued from the date advanced to the earlier of the date which is six months from the day the first funds are advanced or the Completion Date (as defined in the Supply Agreement) shall be added as an increase to principal on the Completion Date and shall accrue interest at the Note Rate until paid.

Interest accrued prior to the **Completion Date** which is not added to increase principal shall be due 7 months from the date of funding and on the first day of each month thereafter until the date which is 3 months prior to the First Payment Date.

Principal advanced hereunder shall accrue interest (based on a 365/366-day year) from the date advanced until paid in full at the rate of **.10** per annum (the "Note Rate").  Interest shall be due as provided for herein.

Any remaining principal plus accrued and unpaid interest shall be due, owing and payable on **December 31, 2015** (the **"Maturity Date"**).

In the event of a default under the Note, or any other Loan Document, the principal shall bear interest at a default rate of eight percent (8%) higher than the Note Rate (the "Default Rate").

## II.    DEFAULTS; REMEDIES.

A.    Events of Default.  The unpaid principal balance of the Loan shall immediately become due and payable as of the date on which any of the following events occur ("Events of Default"):

1.    Borrower for any reason ceases to operate the Site pursuant to the terms of the Supply Agreement;

2.    The Supply Agreement is terminated for any reason;

3.    Borrower leases or sells or otherwise transfers any interest in the Site to another, unless ConocoPhillips consents to the transfer in advance in writing.

4.    Borrower fails to perform any covenant or observe any condition contained in any of the Loan Documents or becomes in default under any of the Loan Documents (as defined herein); or

5.    A petition is filed by or against Borrower, any general partner or principal owning 25% or more in the aggregate of Borrower or any guarantor of the Note, under the United States Bankruptcy Code, or any acts amendatory thereof or supplemental thereto, or under any statute of the United States of America, or any state in connection with insolvency or reorganization, or for a portion of Borrower's property.

6.    Borrower defaults under any covenants, condition, restriction, reservation, easements, license, liens, agreements and other matters, whether or not of record, negatively affecting the condition of title or Borrower's interest in the Site.

B.    Remedies.  If there is an Event of Default, then in addition to any other rights and remedies available to ConocoPhillips, ConocoPhillips may declare the unpaid principal balance of the Note  immediately due and payable, and ConocoPhillips shall be entitled to enforce any security for this Note.  Whether or not ConocoPhillips exercises its right to accelerate, the

unpaid portion of the Note shall accrue interest at the Default Rate from the date the Event of Default occurred.

### III.    COSTS AND ATTORNEY FEES.

Borrower agrees to reimburse ConocoPhillips on demand for all legal fees and other costs and expenses incurred in collection or enforcing this Note and protecting or realizing on any collateral, together with interest at the Default Rate.  Without limitation, such costs and fees shall include fees, costs and expenses incurred with or without suit and in any appeal, any proceedings under present or future federal bankruptcy act or state receivership fees, costs, expenses and interest.  Payment of such costs and fees shall be a condition precedent to the curing of any Event of Default or the satisfaction of this Note.

### IV.    WAIVERS.

Borrower and all endorsers, sureties, and guarantors hereof jointly and severally waive presentment for payment, demand, notice of nonpayment, notice of protest, protest of this Note, and all other notices in connection with the delivery, acceptance, performance, default, dishonor, or enforcement of the payment under this Note except such notices as are specifically required by this Note and they agree that the liability of each of them shall be unconditional without regard to the liability of any other party and shall not be in any manner affected by any indulgence, extension of time, renewal, waiver, or modification granted or consented to by ConocoPhillips.  Borrower and all endorsers, sureties, and guarantors hereof consent to any and all extensions of time, renewals, waivers, or modifications that may be granted by ConocoPhillips with respect to the payment or other provisions of this Note, and to the release of any property now or hereafter securing this Note with or without substitution and agree that additional makers, endorsers, guarantors, or sureties may become parties hereto without notice to them or affecting their liability hereunder.

### V.    LIMITATION OF INTEREST CHARGES.

Interest, fees, and charges collected or to be collected under this Note shall not exceed the maximum amounts permitted by any applicable usury laws.  If any interest, fee or charge would exceed the maximum amount permitted, said interest, the excess shall reduce fee or charge.  Any sums collected from Borrower that exceed the maximum amount permitted will be refunded.  ConocoPhillips may choose to make the refund either by treating the excess as prepayments of principal or by making a direct payment to Borrower.

### VI.    SECURITY.

This Note is secured by the Deed of Trust.

### VII.    GOVERNING LAW.

This instrument and the rights and obligations of the parties hereunder shall be governed by and construed in accordance with the internal laws of the State of **California** without regard to principles of conflicts of law.

### VIII.    NOTICES.

Any notice to Borrower under this Note shall be to the Site address or such other address as may be designated by the Borrower in writing and shall be deemed to have been given on the date delivered in the case of personal delivery or, if mailed, one day after deposited in first class or certified mail.

### IX.    BUSINESS LOAN REPRESENTATION.

Borrower represents and warrants to ConocoPhillips that the Loan evidenced by this Note, together with any and all renewals, extension, modifications, or future advances is to be used by Borrower solely for a business and commercial purpose which is the improvement of Borrower's service station.  Borrower further acknowledges that ConocoPhillips has relied upon this representation and warranty in making this Loan and advancing funds to Borrower.

**X.    OBLIGATION JOINT AND SEVERAL.**

This Note shall inure to the benefit of and bind the heirs administrators, executors, successors and assigns of ConocoPhillips and each of the signers, and shall be construed as the joint and several obligation of each of the signers where there is more than one.  Where there is more than one Borrower named herein, reference herein to "Borrower" shall mean all and any one or more of them and the words used herein in the singular shall be deemed to have been used in the plural where the contexts and construction so require.

Signed In the presence of:

Witnesses:

*PAUL GHAFOORI*
Print Name: _____

*IWINDER SIDHU*
Print Name: _____

*JAGDEEP SIDHU*
Print Name: _____

Borrower:
Milestone Pacific Properties, LLC

By: _____
Paul Ghafoori

By: _____
Ivender Sidhu

By: _____
Jagdeep Sidhu

# EXHIBIT D

REC'D BY WRA

NAME: Bob C.

DATE REC'D 10/3/06

COPY

Site:  837120

, California

## Modification of Promissory Note

Date: **September 19, 2006**

This Modification of Promissory Note is entered into between **Milestone Pacific Properties, LLC, a California limited liability company** ("Borrower") and ConocoPhillips Company, a Delaware corporation ("ConocoPhillips") ("Modification").

Whereas, Borrower delivered a Promissory Note dated **December 8, 2005**, promising to pay to ConocoPhillips or order, the principal sum of **Five Hundred Thousand** and NO/100ths DOLLARS **($500,000)**, payable at the rate and manner provided for therein (the "Note").

Whereas, Borrower did not complete construction of the Improvements (as defined in the **Addendum to Union 76 Branded Reseller Agreement** dated **December 8, 2005** between Borrower and ConocoPhillips (the "Supply Agreement") until **October 1, 2006**. The Supply Agreement was signed in connection with the Note.

Whereas, Borrower and ConocoPhillips for valuable consideration desire to amend certain terms of the Note and recast the principal and interest payments effective as of **October 1, 2006** ("Effective Date").

NOW, THEREFORE, for value received, Borrower and ConocoPhillips agree as follows:
1. The principal balance of the Note as of **October 1, 2006** was **$500,000.00** (the 10/1/2006 Loan Balance").
2. The Payments (as defined in the Note) have been recast and are hereby changed to **$19,918.12,** which amount is sufficient to fully amortize the October 1, 2006 Loan Balance over the remaining term of the Note.
3. The date of the first payment is hereby changed to **January 01, 2007**.
4. The Maturity Date (as defined in the Note) is hereby changed to **September 30, 2016**.
5. Except as specifically provided for herein, all of the terms and conditions of the Note shall remain in full force and effect.

This Modification may be executed in one or more counterparts, each of which shall constitute an original agreement, but all of which together shall constitute one and the same agreement.

IN WITNESS WHEREOF, the parties have executed this Modification as of the date first above written.

Witness(es)

Print Name _PAUL GHAFOORI_

Borrower
Milestone Pacific Properties, LLC

By
Paul Ghafoori

Print Name _Ivinder Sidhu_

Print Name _JAGDEEP K. SIDHU_

By _____
Ivender Sidhu

By _Jagdeep K. Sidhu_
Jagdeep Sidhu

# EXHIBIT E

Recorded in Official Records, Solano County    1/17/2006
                                               8:00:AM
**Marc C Tonnesen**                            AR28
Acting Assessor/Recorder                       07

03 First American Title Co

RECORDING REQUESTED BY          Doc#: 200600006344    Titles: 3    Pages: 14
FIRST AMERICAN TITLE
                                                     Fees     65.00
                                                     Taxes     0.00
                                                     Other     0.00
                                                     PAID    $65.00

Site No: 837120
FILED FOR RECORD AT THE REQUEST OF:
ConocoPhillips Company
600 N. Dairy Ashford, TR 1054-A
Houston, TX  77079

*NCS 201479*    **DEED OF TRUST, Assignment of Leases and Rents,**    *UNRECORDED*
                **Security Agreement and Fixture Filing**              *LEASES TERMS*
                                                                       *LESS THAN 35*
              This Deed of Trust and Security Agreement and Fixture filing is made December 8,  *YEARS*
**2005** (the "Deed of Trust") among the following parties:

Grantor:    **Milestone Pacific Properties, LLC, a California limited liability company,**
            whose address is **1800 Sutter Street, Concord, CA  94520.**
Trustee:    **First American Title Insurance Company,** whose address is **3 Greenway**
            **Plaza, Ste. 1100, Houston, TX 77046;** and
Beneficiary: **ConocoPhillips Company,** whose address is **600 N. Dairy Ashford, TR 1054-A,**
            **Houston, TX  77079.**

Common Address of Property:  **199 West Lincoln Rd., Vallejo, Solano County, California.**

    **WITNESSETH:**


I.    **Grant.**
        Grantor does hereby irrevocably, as their interests appear, Grant, Bargain, Sell and Convey
to Trustee in Trust with Power of Sale and Right of Entry and Possession, all their rights, interests,
estates and claims, both in law or in equity, now owned or hereafter acquired, in and to that certain
real property located in **Solano** County, State of **California**, which is more fully described in Exhibit
A attached hereto and by this reference incorporated herein, including any leasehold interests
therein held. (the "Land") together with the following:

    A.  any and all buildings and improvements now or hereafter erected thereon, including, but not
    limited to, the fixtures, attachments, appliances, equipment, machinery, and other articles
    attached to such buildings and improvements (the "Improvements"). The Improvements and
    the Land are herein collectively referred to as the "Property";

    B.  all rights, interests, estate or other claims, both in law and in equity

    C.  all easements, rights-of-way and rights used in connection therewith or as a means of
    access thereto, and all tenements, hereditaments and appurtenances thereof and thereto, and
    all water rights and shares of stock evidencing the same;

                                                                                    5


                        **"VERIFIED"**

D. all right, title and interest, now owned or hereafter acquired, in and to any land lying within the right-of-way of any street, open or proposed, adjacent to or used in connection with the Property;

E. all right, title and interest in and to all tangible personal property (the "Personal Property") now or hereafter owned or at any time hereafter located on or at the Property or used in connection therewith, including but not limited to, all goods, machinery, tools, insurance proceeds, equipment, all inventory related to the operation of the Property and any business operated thereon, lighting fixtures and office maintenance and other supplies and all proceeds thereof;

F. all the estate, interest, right, title, other claim or demand, including claims or demands with respect to the proceeds of insurance in effect with respect thereto, now owned or hereafter acquired in the Collateral Property (as hereinafter defined) and any and all awards made for the taking by eminent domain or by any proceedings or purchase in lieu thereof of the whole or any part of the Property;

G. any and all existing and future leases (including subleases thereof), whether written or oral, rental agreements and all future agreements for use and occupancy, and any and all extensions, renewals and replacements thereof, upon all or relating to any part of the Property (hereinafter collectively referred to as the "Leases"); and any and all guaranties of tenant's performance under any and all of the Leases;

H. the immediate and continuing right to collect and receive all of the rents, income, receipts, revenues, issues, profits and other income of any nature now due or which may become due or may now or shall hereafter arise or issue from or out of the Leases or from or out of the Property or any part thereof, including but not limited to, all accounts receivable, instruments, and general intangibles related to the operation of the Property and any business operated thereon and all proceeds thereof, (all such moneys rights and claims described in this paragraph being hereinafter called "Cash Collateral") excepting therefrom, any sums which by the express provisions of any of the Leases are payable directly to any governmental authority or to any other person, firm or Company other than the landlord under the Leases, however, so long as no Event of Default (as defined in Section VIII hereof) has occurred and remains uncured, Grantor shall have a license to collect and receive the Cash Collateral, which license shall terminate immediately upon an Event of Default with the right to receive and collect the Cash Collateral then reverting to Beneficiary;

I. all additions, accessions, replacements, substitutions proceeds and products of the Collateral Property as described herein;

J. all general intangibles relating primarily to the development or use of the Property, including but not limited to all governmental permits relating to the construction on the Property, all names under or by which the Property, or any of the Improvements may at any time be operated or known and all rights to carry on business under any such names or any variant thereof, and all trade-marks and good will in any way relating to the Property;

K. all reserves, deferred payments, deposits, refunds, cost savings and payments of any kind relating to the construction of any improvements on the Property;

L. the Cash Collateral;

M. all other Property in which a security interest may be granted under the Uniform Commercial Code of **California**; and

6

N. all proceeds of any conversion, whether voluntary or involuntary, of any of the foregoing into cash or liquidated claims including without limitation the proceeds of insurance or condemnation and all rights of the Grantor to refunds of real estate taxes and assessments.

The entire estate, property, and interest hereby conveyed to Beneficiary may hereafter be referred to as the "Collateral Property".

## II.   The Loan.

This Deed of Trust is given in return for the Loan that Grantor has this day received from Beneficiary. In consideration of the Loan and the premises and in order to secure payment of Indebtedness (as defined herein below) in the principal amount of **$500,000** with interest thereon, evidenced by a Promissory Note dated **December 8, 2005** from Grantor to Beneficiary, as such agreement may be modified, amended and supplemented (the "Note") Grantor has duly authorized the execution of

A. this Deed of Trust;

B. the Note;

C. a **Union 76 Branded Reseller Agreement** dated **December 8, 2005** (as such agreement may be modified, amended and supplemented, the "Supply Agreement").

The above documents and any and all other documents and/or agreements executed by Grantor now or hereafter evidencing or securing the payment of the Indebtedness (as defined herein below) are herein referred to as the Security Documents.

## III.   This Deed of Trust is Given to Secure.

A. Payment the Indebtedness in the principal amount of **$500,000** with interest thereon, evidenced by the Note and any and all modifications, extensions and renewals thereof. The interest rate, payment terms or the balance due on the Note and the indebtedness evidenced thereby may be indexed, adjusted, renewed, or renegotiated without affecting the priority of this Deed of Trust.

B. Payment of all sums which may become due from Grantor or advances by Beneficiary or its successor, with interest thereon at the rate set forth in the Note, which include, but are not limited to, fire and other hazard insurance and taxes upon the real property herein described, according to the terms of this Deed of Trust; payment of all attorney fees and costs incurred by Beneficiary in foreclosing this Deed of Trust or realizing upon any of the collateral for the obligations which this Deed of Trust secures; payment of all sums advanced by Beneficiary to or on behalf of Grantor for the purpose of clearing encumbrances or defects from the title to the Property where Beneficiary, in good faith, believes such encumbrances to be superior to the lien of the Deed of Trust; payment by Grantor of all attorney fees and costs incurred by Trustee or Beneficiary in any bankruptcy proceedings or any reorganization or arrangement proceeding under the United States Bankruptcy Code affecting Grantor or this Deed of Trust, and payment of all other sums advanced by Beneficiary to protect the Collateral Property, with interest thereon at the rate set forth in the Note.

C. Payment of all other sums, with interest thereon, which may hereafter be loaned to Grantor, their respective successors, or assigns, by Beneficiary, when evidenced by a promissory note, note or other agreement reciting that they are secured by this Deed of Trust.

D. Payment of all of the obligations of Grantor under the Note.

7

E.  Payment of all of the obligations of Grantor under the Supply Agreement.

All payments and obligations included in this section as being secured hereby are hereinafter referred to as the "Indebtedness".

## IV.  Security Agreement; Fixture Filing.

A.  Grantor hereby grants to Beneficiary a security interest in all of the following (collectively, the "Personal Property"):

1.  the Personal Property located on or at the Property, including without limitation, any and all property of similar type or kind hereafter located on or at the Property for the purpose of securing all obligations of Grantor contained in the Security Documents;

2.  All existing and future goods located on or off the Property which are now or in the future owned by the Grantor and used or to be used solely in the operation or occupancy of the Collateral Property or in any construction on the Property but which are not effectively made real property under the granting clause above, including but not limited to all appliances, furniture and furnishings, building service equipment, and building materials, supplies and equipment;

3.  All general intangibles relating primarily to the development or use of the Property, including but not limited to all governmental permits relating to the construction on the Property, all names under or by which the Property, or any of the Improvements may at any time be operated or known and all rights to carry on business under any such names or any variant thereof, and all trade-marks and goodwill in any way relating to the Property;

4.  All reserves, deferred payments, deposits, refunds, cost savings and payments of any kind relating to the construction of the Improvements on the Property;

5.  the Cash Collateral; and

6.  all other property in which a security interest may be granted under the Uniform Commercial Code of **California.**

B.  This Deed of Trust constitutes a security agreement as that term is used in the Uniform Commercial Code of **California** with respect to the Personal Property covered hereby. Grantor hereby grants to Beneficiary a security interest in all Personal Property covered hereby, and a security interest shall attach thereto and shall be vested directly in Beneficiary to secure the sums secured by this Deed of Trust and all other sums and charges which may become due hereunder. Grantor, upon request from Beneficiary, agrees to file financing and continuation statements with respect to the Personal Property, from time to time as necessary to perfect and continue the perfection of Beneficiary's security interest in the Personal Property. Grantor also agrees to execute and deliver such further instruments as Beneficiary may reasonably request to further evidence and secure Beneficiary's interest in the Personal Property and shall pay all filing fees in connection therewith.

C.  This Deed of Trust constitutes a financing statement filed as a fixture filing in the Official Records of the County in which the Property is located with respect to any and all fixtures included within the term " Property" as used herein and with respect to any goods or other personal property that may now or hereafter become such fixtures.

8

### V.     Warranties, Representation and Covenants of Grantor.

Grantor hereby makes the following warranties, representations and covenants: Neither the Property nor the Personal Property is used principally for agricultural or farming purposes; the fixtures are not used or bought for personal, family or household purposes.

A.   The Security Documents will not violate any provision of law, any order of any court or other agency or government, or any indenture, partnership agreement or other agreement or instrument to which Grantor is a party or by which Grantor or any of his property is bound, or be in conflict with, result in a breach of or constitute (with due notice and/or passage of time) a default under any such indenture, agreement or other instrument, or result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of the property or assets of Grantor, except as contemplated by the Security Documents, and no action with respect thereto by Grantor is required.

B.   All information, reports, papers and data given to Beneficiary are accurate and correct in all material respects and complete insofar as completeness may be necessary to give Beneficiary a true and accurate knowledge of the subject matter thereof.

C.   As of the time and date of recordation of this Deed of Trust, Grantor will have good and marketable title to the Property, and good and marketable title to the Personal Property, and the right to assign the Leases and Cash Collateral to Beneficiary free and clear of any prior assignment, liens, charges, encumbrances, security interests and adverse claims whatsoever except any permitted encumbrances.

D.   There is no prior assignment of the Leases or of its right, title and interest therein or in the Cash Collateral to accrue thereunder, which will be or remain effective upon recordation of this Deed of Trust.

E.   A true and complete copy of all of the existing Leases assigned hereunder, together with all amendments, supplements and other modifications, has been delivered to Beneficiary and no material default under any existing Lease remains uncured.

### VI.     Grantor's Covenants.

To protect the security of this Deed of Trust, Grantor covenants and agrees:

A.   To commit no act of waste and to take good care of the Property; at its sole expense to make all necessary repairs to the Property; to keep the Property and Personal Property in good condition and repair, to permit no waste thereof; to complete any building, structure, or improvement being built or about to be built thereon; to restore promptly any building, structure or improvement thereon which may be damaged or destroyed; and to comply with all laws, ordinances, regulations, covenants, conditions, and restrictions affecting the Property.

B.   To pay before delinquent all lawful taxes, liens, assessments or other governmental charges upon the Collateral Property; to keep the Collateral Property free and clear of all other charges, liens or encumbrances impairing or which, upon due notice and/or the passing of time, may impair the security of this Deed of Trust.

C.   To keep the Improvements now or hereafter erected on the Land and the Personal Property herein continuously insured against loss by fire or other hazards in an amount not less than the total debt secured by this Deed of Trust plus any other deed of trust or mortgage superior to this Deed of Trust. All policies shall name Beneficiary as an additional insured, and be in such companies as the Beneficiary may approve and have loss payable first to the Beneficiary, and then to the Grantor. The amount collected under any insurance policy may be applied upon any indebtedness hereby secured in such order, as the Beneficiary shall determine. Such application

9

by the Beneficiary shall not cause discontinuance of any proceedings to foreclose this Deed of Trust. In the event of foreclosure, all rights of the Grantor in insurance policies then in force shall pass to the purchaser at the foreclosure sale.

D.  To defend any action or proceeding purporting to affect the security hereof or the rights or powers of Beneficiary, and to pay all costs and expenses, including cost of title search and attorneys' fees in a reasonable amount, in any such action or proceeding, and in any suit brought by Beneficiary to foreclose this Deed of Trust.

E.  To pay all costs, fees and expenses in connection with this Deed of Trust, including the expenses of the Beneficiary incurred in enforcing the obligations secured hereby.

F.  Not to permit or suffer any construction, mechanic's, materialmen's or other lien to be created or to remain a lien upon any of the Property.  So long as an Event of Default shall not have occurred and be continuing hereunder, Grantor shall have the right to contest or object to the amount or validity of any such claim and demand by appropriate administrative or judicial proceedings, in which event, the following provisions shall apply:

G.  Grantor shall give Beneficiary written notice of Grantor's intent to so contest or object to such claim or demand.

H.  Grantor shall thereafter diligently proceed to cause such claim or demand to be removed and discharged.

I.  Grantor, if requested by Beneficiary, shall deposit with Beneficiary a bond or other assurance satisfactory to Beneficiary in such amounts as Beneficiary shall require, but not more than 150% of the amount of the claim(s) or demand(s) plus costs, expenses, including reasonable attorneys' fees and interest.

J.  Regarding Hazardous Substances (this section is herein referred to as the "Hazardous Substances Section").

1.  The Property (i) is not and has not been a site for the illegal use, generation, manufacture, storage, disposal, or transportation of any substances defined as or included in the definition of "hazardous substances", "hazardous materials", or "toxic substances" under any applicable federal or state laws or regulations (collectively, "Hazardous Materials"); (ii) is presently in compliance with all federal, state or local laws, ordinances, regulations, orders, and directives pertaining to Hazardous Materials on or about the Collateral Property (collectively, "Hazardous Materials Laws"); and (iii) is not being used or has not been used in any manner which has resulted or will result in Hazardous Material being spilled or disposed on any adjacent or other property.

2.  Not to permit the Property to be used for the illegal storage or disposal of any Hazardous Materials and (ii) to keep and maintain the Property in compliance with all Hazardous Material Laws.

3.  To indemnify and hold Beneficiary harmless from and against any and all claims, demands, losses, liens, liabilities, penalties, fines, lawsuits and other proceedings arising directly or indirectly from the breach of any of the representations, warranties or covenants contained in this Hazardous Substances Section.

4.  The obligations under this Hazardous Substances Section are unconditional and shall not be limited by any nonrecourse or other limitations of liability provided for in the Security Documents and any exhibits attached thereto or signed in connection therewith.

5.  The agreements, representations, warranties and covenants set forth in this Hazardous Substances Section shall survive the transfer of the Collateral Property pursuant to foreclosure proceedings (whether judicial or nonjudicial), by deed in lieu of foreclosure or otherwise.

10

K.  Regarding Handicapped Access:

1.  To keep the Collateral Property at all times strictly in compliance, to the extent applicable, with the requirements of the Americans with Disabilities Act of 1990, the Fair Housing Amendments Act of 1988, all state and local laws and ordinances related to handicapped access, and all rules, regulations and orders issued pursuant thereto (hereinafter collectively referred to as the "Access Laws").

2.  To give prompt notice to Beneficiary of the receipt of any complaints related to violations of any Access Laws and of the commencement of any proceedings or investigations that relate to compliance with applicable Access Laws.

3.  To indemnify, defend, and hold harmless Beneficiary from and against any and all claims, demands, damages, costs, expenses, losses, liabilities, penalties, fines, and other proceedings including without limitation reasonable attorney fees and expenses arising directly or indirectly from or out of or in any way connected with any failure of the Property to comply with applicable Access Laws. The obligations and liabilities under this section shall survive any termination, satisfaction, assignment, entry of a judgment of foreclosure, or delivery of a deed in lieu of foreclosure.

L.  Not to seek, make or consent to any change in the zoning or conditions of use of the Improvements or the Property without the prior written consent of the Beneficiary.

M.  To comply with and make all payments required under the provisions of any covenants, conditions or restrictions affecting the Property.

N.  To use or allow the use of the Collateral Property to be only in compliance with all laws, ordinances and other requirements of any governmental authority.

O.  To make all payments required by all of the Security Documents.

P.  Not to sell, convey or otherwise transfer neither the Property nor any part thereof or interest therein (by contract or otherwise), without Beneficiary's prior written consent. Any such sale or transfer shall constitute an Event of Default without any grace or cure period.

Q.  To comply with all of the terms of the Note and all of the other Security Documents.

R.  To keep (or cause to be kept) the Property in good repair, neither damaging nor abandoning it and allow the Beneficiary to inspect it upon reasonable notice.

S.  To furnish to the Beneficiary, from time to time as the Beneficiary may reasonably request but not less than annually, copies of their financial statements, the financial statements of its major stock holders, general partners and of any guarantors consisting of consolidated and consolidating balance sheet and income statement with supporting schedules for the undersigned and any guarantor. The statements are to be prepared in accordance with generally accepted accounting principles by an independent certified public accountant acceptable to Beneficiary.

## VII.  Mutual Covenants:

It is mutually agreed that:

A.  In the event any portion of the Property is taken or damaged in condemnation or eminent domain proceeding, the entire amount of the award or such portion as may be necessary to fully satisfy the Indebtedness, shall be paid to Beneficiary to be applied to said obligation.

11

B.  Should Grantor fail to pay when due any taxes, assessments, insurance premiums, liens, encumbrances, including but not limited to any mortgages superior hereto, utilities or other charges against the Collateral Property, Beneficiary may, in its sole and absolute discretion, pay the same and the amount so paid, with interest at the rate set forth in the Note secured hereby, shall be added to and become a part of the Indebtedness

C.  By accepting payment of any sum secured hereby after its due date, Beneficiary does not waive its right to require prompt payment when due of all other sums so secured or to declare default for failure to so pay.

## VIII.  Events of Default.

The occurrence of the following shall constitute a default hereunder ("Events of Default"):

A.  An Event of Default occurs under the terms of any of the Security Documents;

B.  Grantor fails to perform any covenant or observe any condition contained in any of the Security Documents or any of the Security Documents are terminated.

C.  Grantor fails to perform any covenant or observe any condition contained in any lease that grants a leasehold interest in the Collateral Property, or any portion thereof, to Grantor.

D.  Grantor leases, sells, further encumbers or otherwise transfers any interest in the Collateral Property to another (including, but not limited to, a transfer of any general partners' partnership interest in Grantor or any general partner of Grantor, a transfer of the stock of any major stock holder of Grantor) unless Beneficiary consents to the transfer.

E.  There is a default under any lien on the Collateral Property which default remains uncured for more than 15 days, if the default requires payment of money, or 30 days if the default cannot be cured by the payment of money.

F.  The holder of any lien on the Collateral Property initiates foreclosure proceedings;

G.  Grantor allows any lien or encumbrance to be filed against the Collateral Property without Beneficiary's prior written consent.

## IX.    Remedies.

Upon the occurrence of an Event of Default all sums secured hereby shall immediately become due and payable at the option of the Beneficiary.

If the Beneficiary declares that the Note and this Deed of Trust are in default, the Beneficiary will have all rights given by law or set forth in this Deed of Trust.  This includes the right to do any one or more of the following:

A.  take possession of and manage the Collateral Property, including the collection of the Cash Collateral;

B.  Have a receiver appointed to take possession of any or all of the Collateral Property, with the power to protect and preserve the Collateral Property and to operate the Collateral Property preceding foreclosure or sale and apply the proceeds over and above cost of the receivership, against the Indebtedness.  The receiver may serve without bond if permitted by law. Beneficiary's right to the appointment of a receiver shall exist whether or not apparent value of the Collateral Property exceeds the Indebtedness by a substantial amount. Grantor hereby irrevocably consents to the appointment of a receiver on the terms set forth herein;

C.  Instruct Trustee to sell the Collateral Property, in accordance with the Deed of Trust Act of the State of **California** and the Uniform Commercial Code of **California** where applicable, at public auction to the highest bidder (any person except Trustee may bid at Trustee's sale). Trustee will then proceed as follows:

12

1.  apply the proceeds of the sale as follows: (1) to the expense of the sale, including a reasonable Trustee's fee and attorney's fee; (2) to the Indebtedness; and (3) the surplus, if any, shall be distributed to the persons entitled thereto; and

2.  Deliver to the purchaser at the sale its deed, without warranty, which shall convey to the purchaser the interest in the Collateral Property which Grantor had or had the power to convey at the time of his execution of this Deed of Trust, and such as he may have acquired thereafter. Trustee's deed shall recite the facts showing that the sale was conducted in compliance with all the requirements of law and of this Deed of Trust, which recital shall be prima facie evidence of such compliance and conclusive evidence thereof in favor of bona fide purchaser and encumbrances for value.

D.  cause this Deed of Trust to be foreclosed as a mortgage and start a court action which will result in a sale of the Collateral Property to reduce the Indebtedness; or

E.  Exercise any other right or remedy provided under law or in equity.

Grantor agrees to pay to Beneficiary immediately and without demand all costs and expenses, (including but not limited to reasonable attorney fees) incurred by Beneficiary in enforcing its rights and remedies hereunder.

## X.  Miscellaneous.

A.  Beneficiary may from time to time appoint in writing a successor trustee. Upon the recording of such appointment in the mortgage records of the county in which this Deed of Trust is recorded, the successor trustee shall be vested with all powers of the original trustee. The trustee is not obligated to notify any party hereto of pending sale or of an action or proceeding in which Grantor, Trustee, or Beneficiary shall be a party unless the Trustee brings such action or proceeding.

B.  The Security Documents are expressly limited so that in no event whatsoever shall the amount of interest paid or agreed to be paid to Beneficiary exceed the highest lawful rate permissible under applicable usury laws. In the event the payment of interest is in excess of such highest lawful rate, then such obligation shall, automatically and retroactively be deemed reduced to the highest lawful rate. If Beneficiary ever receives as interest an amount that would exceed such highest lawful rate, the amount of excessive interest shall not be applied to the payment of interest, but shall, automatically and retroactively be applied to the sums due hereunder. If the excessive interest exceeds such sums due, the amount shall be immediately returned without interest.

C.  The Trustee shall reconvey all or any part of the Property covered by this Deed of Trust to the person entitled thereto on written request of the Grantor and the Beneficiary or upon satisfaction of the obligation secured and written request for reconveyances by the Beneficiary or the person entitled thereto.

D.  This Deed of Trust applies to, inures to the benefit of, and is binding not only on the parties hereto, but on their heirs, devisees, legatees, administrators, executors, and assigns. The term Beneficiary shall mean the holder and owner of any amortization agreement, note and/or supply agreement secured hereby, whether or not named as Beneficiary herein.

E.  If the Beneficiary declares that an Event of Default has occurred, the entire amount of all unpaid principal, interest, other amounts due on the Note and this Deed of Trust and the Beneficiary's costs of collection and reasonable attorney fees shall become immediately due and payable.

13

F.   If all of the repairs or payments are note made as agreed in this Deed of Trust, the Beneficiary may do so.  The cost of these repairs and payments will be added to the principal, will bear interest at the same rate provided in the Note and will be repaid to the Beneficiary upon demand.

G.   All notices must be in writing and personally delivered or sent by certified mail, return receipt requested, to the addresses given in this Deed of Trust.  Address changes may be made upon notice to the other party.

H.   This Deed of Trust can only be changed by an agreement in writing signed by the Grantor and Beneficiary.

I.   Grantor agrees to the terms of this Deed of Trust.  If the Grantor is a Company, its proper corporate officers' signature(s) and its corporate seal are affixed.

J.   This Deed of Trust shall be governed in all respects by the local laws of the State of **California**, to the extent that local law is not preempted by federal law with respect to any aspect of this Deed of Trust or by the laws of the State of **California** with respect to any aspect of this Deed of Trust and any other Security Documents recorded in the appropriate office of land records in the State of **California**. Exclusive jurisdiction and venue over any dispute with may arise hereunder shall be in either the United States District Court for the State of **California**, or in the Superior Court for the county in which the Property is located, and each party hereby irrevocably consents to the jurisdiction of such courts over any such dispute.

NOW, THEREFORE, if the Indebtedness shall be paid and the obligations hereunder shall be performed according to their tenor and if all the terms, covenants, conditions and agreements of the Grantor herein contained shall be fully and faithfully performed, observed and complied with, then this Deed of Trust shall be void, but otherwise remain in full force and effect.

Grantor:
Milestone Pacific Properties, LLC

By: _____   MEMBER
Paul Ghafoori

By: _____   MEMBER
Ivender Sidhu

By: _____   MEMBER
Jagdeep Sidhu

14

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of _Contra Costa_ } ss.

On _12/12/05_, before me, _J. Villasenor, Notary Public_
Date                              Name and Title of Officer (e.g., "Jane Doe, Notary Public")

personally appeared _Paul Ghafoori, Jvender Sidhu and Jagdeep Sidhu_
Name(s) of Signer(s)

☐ personally known to me
☒ proved to me on the basis of satisfactory evidence

to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

J. VILLASENOR
COMM. # 1417324
NOTARY PUBLIC-CALIFORNIA
CONTRA COSTA COUNTY
COMM. EXP. MAY 27, 2007

WITNESS my hand and official seal.

_____
Place Notary Seal Above                     Signature of Notary Public

—————————————— OPTIONAL ——————————————
*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**
Title or Type of Document: _____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer**
Signer's Name: _____
☐ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer Is Representing: _____

| RIGHT THUMBPRINT OF SIGNER |
| --- |
| Top of thumb here |

© 1997 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402     Prod. No. 5907     Reorder: Call Toll-Free 1-800-876-6827

"VERIFIED"

**EXHIBIT A**

REAL PROPERTY IN THE CITY OF VALLEJO, COUNTY OF SOLANO, STATE OF CALIFORNIA, DESCRIBED AS FOLLOWS:

PARCEL ONE:

BEGINNING AT A POINT ON THE EASTERN LINE OF LOT 74, AS SAID LOT IS SHOWN ON THAT CERTAIN MAP ENTITLED "CARQUINEZ SUBDIVISION, UNIT NO. 3," FILED FOR RECORD IN THE OFFICE OF THE COUNTY RECORDER OF SOLANO COUNTY, CALIFORNIA, IN BOOK 9 OF MAPS, PAGE 49, DISTANT THEREON SOUTHERLY 13 FEET FROM NORTHEASTERN CORNER THEREOF, RUNNING THENCE SOUTH 83 DEG. 42 MIN. EAST 39.35 FEET; THENCE NORTH 5 DEG. 43 MIN. EAST 38.50 FEET; THENCE NORTH 61 DEG. 18 MIN. EAST 6 FEET; THENCE SOUTH 83 DEG. 42 MIN. EAST 92.60 FEET; THENCE NORTH 6 DEG. 18 MIN. EAST 13.10 FEET; THENCE SOUTH 83 DEG. 42 MIN. EAST 62.59 FEET, MORE OR LESS TO THE WESTERN LINE OF U.S. HIGHWAY 40 AT A POINT DISTANT NORTHERLY ALONG SAID HIGHWAY 98.2 FEET FROM THE INTERSECTION THEREOF WITH THE NORTHERN LINE OF LOT 91, AS SAID LOT IS SHOWN ON THE MAP HEREINABOVE DESCRIBED, THENCE ALONG SAID HIGHWAY NORTHERLY 81.8 FEET TO THE BEGINNING OF A CURVE TO THE LEFT WITH A RADIUS OF 20 FEET; THENCE ALONG SAID CURVE TO THE LEFT A DISTANCE OF 31.42 FEET; THENCE NORTH 81 DEG. 44 MIN. 35 SEC. WEST ALONG THE SOUTHERN LINE OF MAGAZINE STREET, 180 FEET TO THE NORTHEAST CORNER OF LOT 77, THENCE SOUTHERLY ALONG THE EASTERN LINE OF LOTS 77, 76 75 AND 74 AS SAID LOTS ARE SHOWN ON THE MAP HEREINABOVE DESCRIBED, 163 FEET TO THE POINT OF BEGINNING.

EXCEPTING THEREFROM:

ALL THAT PORTION THEREOF NOW INCLUDED IN HIGHWAY RIGHT OF WAY AS DESCRIBED IN DEED FROM TERRY CURTOLA AND WIFE TO STATE OF CALIFORNIA RECORDED MAY 28, 1956 IN BOOK 831 OF OFFICIAL RECORDS, PAGE 375, AS RECORDER'S INSTRUMENT NO. 9820.

PARCEL TWO:

LOTS 75, 76 AND 77, AS SHOWN ON THE MAP ENTITLED: CARQUINEZ SUBDIVISION, UNIT NO. 3, SOLANO COUNTY, CALIFORNIA," FILED IN THE OFFICE OF THE COUNTY RECORDER OF SOLANO COUNTY, CALIFORNIA ON SEPTEMBER 18, 1940 IN BOOK 9 OF MAPS, PAGE 49.

PARCEL THREE:

ALL THAT PORTION OF THAT CERTAIN PARCEL OF LAND DESCRIBED IN DEED TO STATE OF CALIFORNIA DATED MARCH 28, 1951 AND RECORDED JUNE 11, 1951 OF OFFICIAL RECORDS, IN BOOK 582 PAGE 467, SOLANO COUNTY RECORDS, WHICH LIES SOUTHERLY OF A LINE DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE CENTER OF THAT CERTAIN 60 FOOT WIDE STREET KNOWN AS MAGAZINE STREET AS SHOWN AND DELINEATED ON THAT CERTAIN MAP ENTITLED: CARQUINEZ SUBDIVISION, UNIT NO. 3," RECORDED IN BOOK 9 OF MAPS, PAGE 49, SOLANO COUNTY RECORDS; SAID POINT LYING NORTH 86 DEG. 44 MIN. 33 SEC. EAST 150.29 FEET FROM A POINT MARKING THE NORTHEAST CORNER OF LOT NO. 77 OF SAID SUBDIVISION UNIT NO. 3; THENCE FROM SAID POINT OF BEGINNING FROM A TANGENT THAT BEARS NORTH 16 DEG. 56 MIN. 11 SEC. WEST, BY A CURVE CONCAVE TO THE SOUTHWEST HAVING A RADIUS OF 92.00 FEET; THROUGH AN ANGLE OF 4 DEG. 53 MIN. 24 SEC., A DISTANCE OF 7.85 FEET; THENCE NORTH 21 DEG. 49 MIN. 35 SEC. WET 77.96 FEET; THENCE ALONG A CURVE CONCAVE TO THE SOUTH HAVING A RADIUS OF 30.00 FEET THROUGH AN ANGLE OF 87 DEG. 11 MIN. 34 SEC., A DISTANCE OF 45.65 FEET; THENCE SOUTH 70 DEG. 58 MIN. 51 SEC. WEST, 187.75 FEET TO A POINT IN THE CENTER OF SAID MAGAZINE STREET SAID POINT LYING NORTH 65 DEG. 21 MIN. 45 SEC. WEST, 106.36 FEET FROM SAID NORTHEAST CORNER OF SAID LOT NO. 77.

EXCEPTING THEREFROM:

THAT PORTION THEREOF DESCRIBED IN THAT CERTAIN MEMORANDUM OF LEASE EXECUTED BY AND BETWEEN TERRY A. CURTOLA, ET UX, AS LESSOR, AND SHELL OIL COMPANY AS LESSEE, DATED JUNE 4, 1957 AND RECORDED OCTOBER 10, 1957 IN BOOK 901 OF OFFICIAL RECORDS, PAGE 319, INSTRUMENT NO. 16432, AND MEMORANDUM OF LEASE AS AMENDED, RECORDED DECEMBER 27, 1978 IN BOOK 1978 OF OFFICIAL RECORDS, PAGE 109623, INSTRUMENT NO. 63865.

PARCEL FOUR:

THAT CERTAIN PARCEL OF LAND WHICH IS AN ABANDONED PORTION OF MAGAZINE STREET SHOWN ON THE MAP ENTITLED: CARQUINEZ SUBDIVISION, UNIT NO. 3," PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT LYING IN THE CENTER OF ABOVE SAID MAGAZINE STREET, SAID POINT ALSO LYING NORTH 65 DEG. 21 MIN. 45 SEC. WEST, 106.36 FEET FROM A POINT MARKING THE NORTHEAST CORNER OF LOT 77, CARQUINEZ SUBDIVISION UNIT NO. 3, MAP RECORDED SEPTEMBER 18, 1940 IN BOOK 9 OF MAPS, PAGE 49, SOLANO COUNTY RECORDS; THENCE FROM SAID POINT OF BEGINNING NORTH 70 DEG. 58 MIN. 51 SEC. EAST, 65.46 FEET TO A POINT IN THE NORTH LINE OF SAID MAGAZINE STREET; THENCE ALONG LAST SAID NORTH LINE SOUTH 81 DEG. 44 MIN. 35 SEC. EAST, 174.15 FEET; THENCE SOUTH 21 DEG. 49 MIN. 35 SEC. EAST 26.62 FEET; THENCE ALONG A CURVE CONCAVE TO THE SOUTHWEST HAVING A RADIUS OF 92.00 FEET THROUGH AN ANGLE OF 24 DEG. 22 MIN. 07 SEC. A DISTANCE OF 39.13 FEET TO A POINT MARKING THE INTERSECTION OF THE SOUTH LINE OF MAGAZINE STREET WITH THE WEST LINE OF STATE HIGHWAY, ROAD X-SOL-7-F, AS SAID STATE HIGHWAY EXISTED SEPTEMBER 19, 1956; THENCE ALONG LAST SAID SOUTH LINE NORTH 81 DEG. 44 MIN. 35 SEC. WEST, 256.00 FEET; THENCE NORTH 5 DEG. 10 MIN. 58 SEC. EAST, 30.04 FEET TO THE POINT OF BEGINNING.

EXCEPTING THEREFROM:

THAT PORTION THEREOF DESCRIBED IN THAT CERTAIN MEMORANDUM OF LEASE EXECUTED BY AND BETWEEN TERRY A. CURTOLA, ET UX, AS LESSOR, AND SHELL OIL COMPANY AS LESSEE, DATED JUNE 4, 1957 AND RECORDED OCTOBER 10, 1957 IN BOOK 901 OF OFFICIAL RECORDS, PAGE 319, INSTRUMENT NO. 16432, AND MEMORANDUM OF LEASE AS AMENDED, RECORDED DECEMBER 27, 1978 IN BOOK 1978 OF OFFICIAL RECORDS, PAGE 109623, INSTRUMENT NO. 63865.

PARCEL FIVE:

BEGINNING AT THE NORTHEAST CORNER OF PARCEL NO. 1, AS SAID PARCEL IS DESCRIBED IN THE DEED FROM ARTHUR T. ANDREWS, ET UX, TO WALTER SUCHORSKI, ET UX, RECORDED MARCH 24, 1965 IN BOOK 1329 OF OFFICIAL RECORDS, PAGE 205, INSTRUMENT NO. 8087; SAID POINT BEING THE NORTHWEST CORNER OF THE LAND DESCRIBED IN DEED FROM HARRY R. GOMEZ, ET AL, TO THE STATE OF CALIFORNIA RECORDED DECEMBER 1, 1955, IN BOOK 802, OF OFFICIAL RECORDS, PAGE 341, INSTRUMENT NO. 23481; THENCE RUNNING ALONG THE NORTHERLY LINE OF SAID SUCHORSKI PARCEL NORTH 83 DEG. 42 MIN. WEST 20.11 FEET MORE OR LESS TO AN ANGLE POINT IN SAID NORTH LINE, THENCE RUNNING SOUTH 06 DEG. 18 MIN. WEST, 13.10 FEET TO AN ANGLE POINT IN SAID SUCHORSKI PARCEL; THENCE RUNNING SOUTH 83 DEG. 42 MIN. EAST TO A POINT IN THE WEST LINE OF SAID PARCEL CONVEYED TO THE STATE OF CALIFORNIA; THENCE RUNNING NORTHERLY ALONG SAID WEST LINE TO THE POINT OF BEGINNING.

PARCEL SIX:

THAT PORTION OF LOTS 92, 93, AND 100, AS SHOWN ON THE MAP ENTITLED: CARQUINEZ SUBDIVISION, UNIT NO. 3, SOLANO COUNTY, CALIFORNIA," FILED IN THE OFFICE OF THE COUNTY RECORDER OF SOLANO COUNTY, CALIFORNIA ON SEPTEMBER 18, 1940 IN BOOK 9 OF MAPS, PAGE 49, PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHEAST CORNER OF THAT CERTAIN EASEMENT FOR WATER MAIN GRANTED TO THE CITY OF VALLEJO FROM TERRY CURTOLA AND WIFE BY DEED DATED NOVEMBER 1, 1956 AND RECORDED NOVEMBER 13, 1956 IN BOOK 857, AT PAGE 150, AS RECORDER'S SERIES NO. 20214, OFFICIAL RECORDS OF THE COUNTY OF SOLANO, STATE OF CALIFORNIA; THENCE WESTERLY ALONG THE NORTH LINE OF SAID EASEMENT, NORTH 81 DEG. 44 MIN. 35 SEC. WEST 130.00 FEET; THENCE NORTH 16 DEG. 00 MIN. 10 SEC. WEST, 20.26 FEET TO THE SOUTHERLY LINE OF THE PROPERTY OF THE STATE OF CALIFORNIA AS SAID LINE IS DESCRIBED IN THAT CERTAIN DEED TO TERRY CURTOLA FROM THE STATE OF CALIFORNIA RECORDED IN BOOK 843, PAGE 574, OFFICIAL RECORDS OF THE COUNTY OF SOLANO, STATE OF CALIFORNIA, SERIES NO. 14962; THENCE NORTH 70 DEG. 58 MIN. 51 SEC., EAST, 82.00 FEET; THENCE ALONG A CURVE TO THE RIGHT HAVING A RADIUS OF 30.00 FEET, A CENTRAL ANGLE OF 87 DEG. 11 MIN. 34 SEC. AND AN ARC LENGTH OF 45.65 FEET; THENCE SOUTH 21 DEG. 49 MIN. 35 SEC. EAST 51.34 FEET TO THE POINT OF BEGINNING.

APN's 062-061-310 and 062-061-340

END OF DOCUMENT

# EXHIBIT F

## SECURITY AGREEMENT

The undersigned Debtor or Debtors ("DEBTOR") and ConocoPhillips Company, a wholly owned subsidiary of ConocoPhillips, a Delaware corporation, and any affiliated or related companies ("CONOCOPHILLIPS") agree as follows:

1. **Definitions.** All capitalized terms used herein without definitions shall have the respective meanings provided therefor in the Credit Agreement.

In addition:

(a) The term "State," as used herein, means the State of California. Deleted: Delaware

(b) All terms defined in the Uniform Commercial Code of the State and used herein shall have the same definitions herein as specified therein. However, if a term is defined in Article 9 of the Uniform Commercial Code of the State differently than in another Article of the Uniform Commercial Code of the State, the term has the meaning specified in Article 9.

(c) The term "Obligations," as used herein, means all of the indebtedness, obligations and liabilities of DEBTOR to CONOCOPHILLIPS, individually or collectively, whether direct or indirect, joint or several, absolute or contingent, due or to become due, now existing or hereafter arising in any manner or at any time, including those arising under or in respect of the agreement or agreements by which CONOCOPHILLIPS extends any credit to DEBTOR, no matter how such agreement is denominated (the "Credit Agreement"), any promissory notes or other instruments or agreements executed and delivered pursuant thereto or in connection therewith or this Agreement.

(d) The term "Event of Default," as used herein, means the failure of DEBTOR to pay or perform any of the Obligations as and when due to be paid or performed under the terms of the Credit Agreement. "Event of Default" also includes, but is not limited to, the following: (i) CONOCOPHILLIPS does not have a first priority purchase money security interest in the Collateral or a first priority security interest in the Collateral, as the case may be; (ii) DEBTOR fails to obtain and/or maintain any governmental permits or licenses for DEBTOR to operate a business or to sell personal property or such permits are withdrawn, canceled or terminated by the issuing authority; (iii) DEBTOR makes any representation or warranty, or provides information, to CONOCOPHILLIPS that proves to be materially false or misleading; (iv) a significant part of the Collateral is lost, substantially damaged, or destroyed; (v) there is a material adverse change in DEBTOR's business condition or affairs, financial or otherwise, that in CONOCOPHILLIPS' sole judgment impairs the prospects that DEBTOR will pay and perform the Obligations in a timely manner; (vi) DEBTOR terminates its business or any insolvency, receivership, reorganization, or liquidation proceedings are started by or against DEBTOR or by or against any guarantor of or surety for DEBTOR's obligations, or any part thereof, secured hereby; (vii) DEBTOR fails to pay the full amount of any tax, fee or assessment due or owing to any federal, state, or local governmental authority (viii) the Collateral is subjected to levy of execution or other judicial process; (ix) DEBTOR breaches or terminates any Lease, Retail Gasoline Storage and Purchase Agreement, Retail Gasoline Purchase Contract, or any other Agreement or Lease or understanding now existing or hereinafter arising, between DEBTOR and CONOCOPHILLIPS; (x) DEBTOR is found to be in violation of any federal, state or local law, ordinance, regulation, order or directive pertaining to the illegal use, generation, manufacture, storage, disposal, or transportation of any substances defined as, or included in the definition of, "hazardous substances," "hazardous materials," or "toxic substances;" (xi) DEBTOR is found to be in violation of the Americans With Disabilities Act of 1990, as amended, or the Fair Housing Act Amendment of 1988, as amended; (xii) the death of the DEBTOR or of any guarantor of or surety for DEBTOR's obligations, or any part thereof, secured hereby.

2. **Grant of Security Interest.** The DEBTOR hereby grants to CONOCOPHILLIPS, to secure the payment and performance in full of all of the Obligations, a purchase money security interest in any property sold to DEBTOR by CONOCOPHILLIPS or personal property acquired by DEBTOR with funds advanced by CONOCOPHILLIPS and a security interest in and so pledges and assigns to CONOCOPHILLIPS the following properties, assets and rights of the DEBTOR, wherever located, whether owned now or hereafter acquired or arising, and all proceeds and products thereof (all of the same being hereinafter called the "Collateral"): all personal and fixture property of every kind and nature including without limitation all Goods (including Inventory, Equipment, Fixtures and any accessions thereto), any other contract rights or rights to the payment of money, insurance claims and proceeds, and all General Intangibles including, without limitation, all payment intangibles, trademarks, trademark applications, trade names, copyrights, copyright applications, software, engineering or architectural drawings, service marks, customer lists, goodwill, and all licenses, permits, agreements of any kind or nature pursuant to which the DEBTOR possesses, uses or has authority to possess or use property (whether tangible or intangible) of others or others possess, use or have authority to possess or use property (whether tangible or intangible) of the DEBTOR, and all recorded data of any kind or nature, regardless of the medium of recording, including, without limitation, all software, writings, plans, specifications and schematics. To the extent applicable, terms contained in this section are given the meanings defined in Article 9 of the Uniform Commercial Code as adopted in the State of California and is intended to include all personal property of the DEBTOR, wherever located, whether owned now or acquired later. Deleted: Delaware

3. **Authorization to File Financing Statements.** DEBTOR hereby irrevocably authorizes CONOCOPHILLIPS at any time and from time to time to file in any Uniform Commercial Code jurisdiction any initial financing statements and amendments, or continuations thereto, with or without DEBTOR's signature or authentication, that (a) indicate the Collateral (i) as all assets of DEBTOR or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the Uniform Commercial Code of the State or such jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail, and (b) contain any other information required by part 5 of Article 9 of the Uniform Commercial Code of the State for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether DEBTOR is an organization, the type of organization and any organization identification number issued to DEBTOR and, (ii) in the case of a financing statement filed as a fixture filing, a sufficient description of real property to which the Collateral relates. DEBTOR agrees to furnish any such information to CONOCOPHILLIPS promptly upon request. DEBTOR also ratifies its authorization for CONOCOPHILLIPS to have filed in any Uniform Commercial Code jurisdiction any like initial financing statements or amendments thereto if filed prior to the date hereof and authorizes CONOCOPHILLIPS to give any other notices that CONOCOPHILLIPS deems necessary to protect and perfect the rights granted by this Security Agreement.

4. **Other Actions.** Further to insure the attachment, perfection and first priority of, and the ability of CONOCOPHILLIPS to enforce, CONOCOPHILLIPS's security interest in the Collateral, DEBTOR agrees, in each case at DEBTOR's own expense, to take the following actions with respect to the following Collateral:

4.1. **Collateral in the Possession of a Bailee.** If any Goods are at any time in the possession of a bailee, DEBTOR shall promptly notify CONOCOPHILLIPS thereof and, if requested by CONOCOPHILLIPS, shall promptly obtain an acknowledgement from the bailee, in form and substance satisfactory to CONOCOPHILLIPS, that the bailee holds such Collateral for the benefit of CONOCOPHILLIPS and shall act upon the instructions of CONOCOPHILLIPS, without the further consent of DEBTOR. CONOCOPHILLIPS agrees with DEBTOR that CONOCOPHILLIPS shall not give any such instructions unless an Event of Default has occurred and is continuing or would occur after taking into account any action by DEBTOR with respect to the bailee.

4.2. **Other Actions as to any and all Collateral.** DEBTOR further agrees to take any other action reasonably requested by CONOCOPHILLIPS to insure the attachment, perfection and first priority of, and the ability of CONOCOPHILLIPS to enforce, CONOCOPHILLIPS's security interest in any and all of the Collateral including, without limitation, (a) executing, delivering and, where appropriate, filing financing statements and amendments relating

12/12/2002

thereto under the Uniform Commercial Code, to the extent, if any, that DEBTOR's signature thereon is required therefor, (b) causing CONOCOPHILLIPS' name to be noted as secured party on any certificate of title for a titled good if such notation is a condition to attachment, perfection or priority of, or ability of CONOCOPHILLIPS to enforce, CONOCOPHILLIPS' security interest in such Collateral, (c) complying with any provision of any statute, regulation or treaty of the United States as to any Collateral if compliance with such provision is a condition to attachment, perfection or priority of, or ability of CONOCOPHILLIPS to enforce, CONOCOPHILLIPS' security interest in such Collateral, (d) obtaining governmental and other third party consents and approvals, including, without limitation any consent of any licensor, lessor or other person obligated on Collateral, (e) obtaining waivers from mortgagees and landlords in form and substance satisfactory to CONOCOPHILLIPS and (f) taking all actions required by any earlier versions of the Uniform Commercial Code or by other law, as applicable in any relevant Uniform Commercial Code jurisdiction, or by other law as applicable in any foreign jurisdiction.

5.  **Relation to Other Security Documents.** The provisions of this Agreement supplement the provisions of any real estate mortgage or deed of trust granted by DEBTOR to CONOCOPHILLIPS and securing the payment or performance of any of the Obligations. Nothing contained in any such real estate mortgage or deed of trust shall derogate from any of the rights or remedies of CONOCOPHILLIPS hereunder.

6.  **Representations and Warranties Concerning DEBTOR's Legal Status.** DEBTOR represents and warrants to CONOCOPHILLIPS that (check one of the following):

☐  DEBTOR is an individual or individuals whose "principal residence or residences," as that term is used in UCC § 9-307, is or are in the State(s) of _____. DEBTOR warrants that his/her/their legal name is or names are _____.

☐  DEBTOR is an organization whose sole "place of business," as that term is used in UCC § 9-307, is in the State of California. DEBTOR warrants that its "jurisdiction of organization," as that term is used in UCC § 9-503, is the State of California. DEBTOR further warrants that its name as it appears on the public record of that State is Milestone Pacific Properties, LLC. and that its organizational identification number is _____.

☐  DEBTOR is an organization with more than one place of business whose "chief executive office," as that term is used in UCC § 9-307, is in the State of _____. DEBTOR warrants that its "jurisdiction of organization," as that term is used in UCC § 9-503, is the State of _____. DEBTOR further warrants that its name as it appears on the public record of that State is _____ and that its organizational identification number is _____.

7.  **Covenants Concerning DEBTOR's Legal Status.** DEBTOR covenants with CONOCOPHILLIPS as follows: (a) without providing at least 30 days prior written notice to CONOCOPHILLIPS, DEBTOR will not change its name, its place of business or, if more than one, chief executive office, or its mailing address or organizational identification number if it has one, (b) if DEBTOR does not have an organizational identification number and later obtains one, DEBTOR shall forthwith notify CONOCOPHILLIPS of such organizational identification number, and (c) DEBTOR will not change its type of organization, jurisdiction of organization or other legal structure.

8.  **Representations and Warranties Concerning Collateral, Etc.** DEBTOR further represents and warrants to CONOCOPHILLIPS as follows: (a) DEBTOR is the owner of or has other rights in or power to transfer the Collateral, free from any adverse lien, security interest or other encumbrance, except for the security interest created by this Agreement, and other liens permitted by the Credit Agreement, (b) none of the Collateral constitutes, or is the proceeds of, "farm products" as defined in §9-102(a)(34) of the Uniform Commercial Code of the State, (c) none of the account debtors or other persons obligated on any of the Collateral is a governmental authority subject to the Federal Assignment of Claims Act or like federal, state or local statute or rule in respect of such Collateral.

9.  **Covenants Concerning Collateral, Etc.** DEBTOR further covenants with CONOCOPHILLIPS as follows: (a) the Collateral, to the extent not delivered to CONOCOPHILLIPS pursuant to section 4, will be kept at those locations listed in Exhibit "A" hereto, and DEBTOR will not remove the Collateral from such locations, without providing at least 30 days prior written notice to CONOCOPHILLIPS, (b) except for the security interest herein granted and liens permitted by the Credit Agreement, DEBTOR is or shall be the owner of, or have other rights in, the Collateral, free from any lien, security interest or other encumbrance, and DEBTOR shall defend the same against all claims and demands of all persons at any time claiming the same or any interests therein adverse to CONOCOPHILLIPS, (c) DEBTOR shall not pledge, mortgage or create, or suffer to exist a security interest in the Collateral in favor of any person other than CONOCOPHILLIPS except for liens permitted by the Credit Agreement, (d) DEBTOR will keep the Collateral in good order and repair and will not use, or permit any person to use, the same in violation of law or any policy of insurance thereon, (e) as provided in the Credit Agreement, DEBTOR will permit CONOCOPHILLIPS, or its designee, to inspect the Collateral at any reasonable time, wherever located, (f) DEBTOR will pay promptly when due all taxes, assessments, governmental charges and levies upon the Collateral or incurred in connection with the use or operation of such Collateral or incurred in connection with this Agreement, (g) DEBTOR will continue to operate, its business in compliance with all applicable provisions of the federal Fair Labor Standards Act, as amended, and with all applicable provisions of federal, state and local statutes and ordinances dealing with the control, shipment, storage or disposal of hazardous materials or substances, and (h) DEBTOR will not sell or otherwise dispose, or offer to sell or otherwise dispose, of the Collateral or any interest therein except for (i) sales and leases of Inventory and licenses of General Intangibles in the ordinary course of business and (ii) so long as no Event of Default has occurred and is continuing, sales or other dispositions of obsolete items of Equipment in the ordinary course of business consistent with past practices dispositions permitted by the Credit Agreement.

10.  **Insurance.**

10.1.  **Maintenance of Insurance.** DEBTOR will maintain with financially sound and reputable insurers insurance with respect to its properties and business against such casualties and contingencies as shall be in accordance with general practices of businesses engaged in similar activities in similar geographic areas. Such insurance shall be in such minimum amounts that DEBTOR will not be deemed a co-insurer under applicable insurance laws, regulations and policies and otherwise shall be in such amounts, contain such terms, be in such form and be for such periods as may be reasonably satisfactory to CONOCOPHILLIPS. In addition, all such insurance shall be payable to CONOCOPHILLIPS as loss payee. Without limiting the foregoing, DEBTOR will (i) keep all of its physical property insured with casualty or physical hazard insurance on an "all risks" basis, with broad form flood and earthquake coverage and electronic data processing coverage, with a full replacement cost endorsement and an "agreed amount" clause in an amount equal to 100% of the full replacement cost of such property, (ii) maintain all such workers' compensation or similar insurance as may be required by law and (iii) maintain, in amounts and with deductibles equal to those generally maintained by businesses engaged in similar activities in similar geographic areas, general public liability insurance against claims of bodily injury, death or property damage occurring, on, in or about the properties of DEBTOR; business interruption insurance; and product liability insurance.

2                                    12/12/2002

10.2. **Insurance Proceeds.** The proceeds of any casualty insurance in respect of any casualty loss of any of the Collateral shall, subject to the rights, if any, of other parties with a prior interest in the property covered thereby, (i) so long as no Default or Event of Default has occurred and is continuing and to the extent that the amount of such proceeds is less than $5,000, be disbursed to DEBTOR for direct application by DEBTOR solely to the repair or replacement of DEBTOR's property so damaged or destroyed and (ii) in all other circumstances, be held by CONOCOPHILLIPS as cash collateral, upon such terms and conditions as CONOCOPHILLIPS may at its sole option, disburse from time to time all or any part of such proceeds so held as cash collateral, upon such terms and conditions as CONOCOPHILLIPS may reasonably prescribe, for direct application by DEBTOR solely to the repair or replacement of DEBTOR's property so damaged or destroyed, or CONOCOPHILLIPS may apply all or any part of such proceeds to the Obligations with the Commitment (if not then terminated) being reduced by the amount so applied to the Obligations.

10.3. **Notice of Cancellation, etc.** All policies of insurance shall provide for at least thirty (30) days prior written cancellation notice to CONOCOPHILLIPS. In the event of failure by DEBTOR to provide and maintain insurance as herein provided, CONOCOPHILLIPS may, at its option, provide such insurance and charge the amount thereof to DEBTOR. DEBTOR shall furnish CONOCOPHILLIPS with certificates of insurance and policies evidencing compliance with the foregoing insurance provision.

11. **Collateral Protection Expenses; Preservation of Collateral.**

11.1. **Expenses Incurred by CONOCOPHILLIPS.** In its discretion, CONOCOPHILLIPS may discharge taxes and other encumbrances at any time levied or placed on any of the Collateral, make repairs thereto and pay any necessary filing fees or, if the debtor fails to do so, insurance premiums. DEBTOR agrees to reimburse CONOCOPHILLIPS on demand for any and all expenditures so made. CONOCOPHILLIPS shall have no obligation to DEBTOR to make any such expenditures, nor shall the making thereof relieve DEBTOR of any default.

11.2. **CONOCOPHILLIPS' Obligations and Duties.** Anything herein to the contrary notwithstanding, DEBTOR shall remain liable under each contract or agreement comprised in the Collateral to be observed or performed by DEBTOR thereunder. CONOCOPHILLIPS shall not have any obligation or liability under any such contract or agreement by reason of or arising out of this Agreement or the receipt by CONOCOPHILLIPS of any payment relating to any of the Collateral, nor shall CONOCOPHILLIPS be obligated in any manner to perform any of the obligations of DEBTOR under or pursuant to any such contract or agreement, to make inquiry as to the nature or sufficiency of any payment received by CONOCOPHILLIPS in respect of the Collateral or as to the sufficiency of any performance by any party under any such contract or agreement, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to CONOCOPHILLIPS or to which CONOCOPHILLIPS may be entitled at any time or times. CONOCOPHILLIPS' sole duty with respect to the custody, safe keeping and physical preservation of the Collateral in its possession, under §9-207 of the Uniform Commercial Code of the State or otherwise, shall be to deal with such Collateral in the same manner as CONOCOPHILLIPS deals with similar property for its own account.

12. **Securities and Deposits.** Whether or not any Obligations are due, CONOCOPHILLIPS may following and during the continuance of a Default and Event of Default demand, sue for, collect, or make any settlement or compromise which it deems desirable with respect to the Collateral. Regardless of the adequacy of Collateral or any other security for the Obligations, any deposits or other sums at any time credited by or due from CONOCOPHILLIPS to DEBTOR may at any time be applied to or set off against any of the Obligations then due and owing

13. **Notification to Account Debtors and Other Persons Obligated on Collateral.** If a Default or an Event of Default shall have occurred and be continuing, DEBTOR shall, at the request of CONOCOPHILLIPS, notify account debtors and other persons obligated on any of the Collateral of the security interest of CONOCOPHILLIPS in any Collateral and that payment thereof is to be made directly to CONOCOPHILLIPS or to any financial institution designated by CONOCOPHILLIPS as CONOCOPHILLIPS' agent therefor, and CONOCOPHILLIPS may itself, if a Default or an Event of Default shall have occurred and be continuing), without notice to or demand upon DEBTOR, so notify account debtors and other persons obligated on Collateral. After the making of such a request or the giving of any such notification, DEBTOR shall hold any proceeds of Collateral received by DEBTOR as trustee for CONOCOPHILLIPS without commingling the same with other funds of DEBTOR and shall turn the same over to CONOCOPHILLIPS in the identical form received, together with any necessary endorsements or assignments.

14. **Power of Attorney.**

14.1. **Appointment and Powers of CONOCOPHILLIPS.** DEBTOR hereby irrevocably constitutes and appoints CONOCOPHILLIPS and any officer or agent thereof, with full power of substitution, as its true and lawful attorneys-in-fact with full irrevocable power and authority in the place and stead of DEBTOR or in CONOCOPHILLIPS' own name, for the purpose of carrying out the terms of this Agreement, to take any and all appropriate action and to execute any and all documents and instruments that may be necessary or desirable to accomplish the purposes of this Agreement and, without limiting the generality of the foregoing, hereby gives said attorneys the power and right, on behalf of DEBTOR, without notice to or assent by DEBTOR, to do the following:

(a) upon the occurrence and during the continuance of a Default or an Event of Default, generally to sell, transfer, pledge, make any agreement with respect to or otherwise deal with any of the Collateral in such manner as is consistent with the Uniform Commercial Code of the State and as fully and completely as though CONOCOPHILLIPS were the absolute owner thereof for all purposes, and to do at DEBTOR's expense, at any time, or from time to time, all acts and things which CONOCOPHILLIPS deems necessary to protect, preserve or realize upon the Collateral and CONOCOPHILLIPS' security interest therein, in order to effect the intent of this Agreement, all as fully and effectively as DEBTOR might do; and

(b) to the extent that DEBTOR's authorization given in section 3 is not sufficient, to file such financing statements with respect hereto, with or without DEBTOR's signature, or a photocopy of this Agreement in substitution for a financing statement, as CONOCOPHILLIPS may deem appropriate and to execute in DEBTOR's name such financing statements and amendments thereto and continuation statements which may require DEBTOR's signature.

14.2. **Ratification by DEBTOR.** To the extent permitted by law, DEBTOR hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof. This power of attorney is a power coupled with an interest and shall be irrevocable.

14.3. **No Duty on CONOCOPHILLIPS.** The powers conferred on CONOCOPHILLIPS hereunder are solely to protect its interests in the Collateral and shall not impose any duty upon it to exercise any such powers. CONOCOPHILLIPS shall be accountable only for the amounts that it actually receives as a result of the exercise of such powers and neither it nor any of its officers, directors, employees or agents shall be responsible to DEBTOR for any act or failure to act, except for CONOCOPHILLIPS' own gross negligence or willful misconduct.

15. **Remedies.** If an Event of Default shall have occurred and be continuing, CONOCOPHILLIPS may, without notice to or demand upon DEBTOR, declare this Agreement to be in default, and CONOCOPHILLIPS shall thereafter have in any jurisdiction in which enforcement hereof is sought, in addition to all other rights and remedies, the rights and remedies of a secured party under the Uniform Commercial Code of the State or of any jurisdiction in which Collateral is located, including, without limitation, the right to take possession of the Collateral, and for that purpose CONOCOPHILLIPS may, so far as DEBTOR can give

12/12/2002

authority therefor, enter upon any premises on which the Collateral may be situated and remove the same therefrom. CONOCOPHILLIPS may in its discretion require DEBTOR to assemble all or any part of the Collateral at such location or locations within the jurisdiction(s) of DEBTOR'S principal offices or at such other locations as CONOCOPHILLIPS may reasonably designate. Unless the Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, CONOCOPHILLIPS shall give to DEBTOR at least five Business Days prior written notice of the time and place of any public sale of Collateral or of the time after which any private sale or any other intended disposition is to be made. DEBTOR hereby acknowledges that five Business Days prior written notice of any such sale or sales shall be reasonable notice. In addition, DEBTOR waives any and all rights that it may have to a judicial hearing in advance of the enforcement of any of CONOCOPHILLIPS' rights hereunder, including, without limitation, its right following an Event of Default to take immediate possession of the Collateral and to exercise its rights with respect thereto.

16.   **Standards for Exercising Remedies.** To the extent that applicable law imposes duties on CONOCOPHILLIPS to exercise remedies in a commercially reasonable manner, DEBTOR acknowledges and agrees that it is not commercially unreasonable for CONOCOPHILLIPS (a) to fail to incur expenses reasonably deemed significant by CONOCOPHILLIPS to prepare Collateral for disposition or otherwise to complete raw material or work in process into finished Goods or other finished products for disposition, (b) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (c) to fail to exercise collection remedies against account debtors or other persons obligated on Collateral or to remove liens or encumbrances on or any adverse claims against Collateral, (d) to exercise collection remedies against account debtors and other persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (e) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (f) to contact other persons, whether or not in the same business as DEBTOR, for expressions of interest in acquiring all or any portion of the Collateral, (g) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the collateral is of a specialized nature, (h) to dispose of Collateral by utilizing Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets, (i) to dispose of assets in wholesale rather than retail markets, (j) to disclaim disposition warranties, (k) to purchase insurance or credit enhancements to insure CONOCOPHILLIPS against risks of loss, collection or disposition of Collateral or to provide to CONOCOPHILLIPS a guaranteed return from the collection or disposition of Collateral, or (l) to the extent deemed appropriate by CONOCOPHILLIPS, to obtain the services of other brokers, consultants and other professionals to assist CONOCOPHILLIPS in the collection or disposition of any of the Collateral. DEBTOR acknowledges that the purpose of this section 16 is to provide non-exclusive indications of what actions or omissions by CONOCOPHILLIPS shall not be commercially unreasonable in CONOCOPHILLIPS' exercise of remedies against the Collateral and that other actions or omissions by CONOCOPHILLIPS shall not be deemed commercially unreasonable solely on account of not being indicated in this section 16. Without limitation upon the foregoing, nothing contained in this section 16 shall be construed to grant any rights to DEBTOR or to impose any duties on CONOCOPHILLIPS that would not have been granted or imposed by this Agreement or by applicable law in the absence of this section 16.

17.   **No Waiver by CONOCOPHILLIPS, etc.** CONOCOPHILLIPS shall not be deemed to have waived any of its rights upon or under the Obligations or the Collateral unless such waiver shall be in writing and signed by CONOCOPHILLIPS. No delay or omission on the part of CONOCOPHILLIPS in exercising any right shall operate as a waiver of such right or any other right. A waiver on any one occasion shall not be construed as a bar to or waiver of any right on any future occasion. All rights and remedies of CONOCOPHILLIPS with respect to the Obligations or the Collateral, whether evidenced hereby or by any other instrument or papers, shall be cumulative and may be exercised singularly, alternatively, successively or concurrently at such time or at such times as CONOCOPHILLIPS deems expedient

18.   **Suretyship Waivers by DEBTOR.** DEBTOR waives demand, notice, protest, notice of acceptance of this Agreement, notice of loans made, credit extended, Collateral received or delivered or other action taken reliance hereon and all other demands and notices of any description. With respect to both the Obligations and the Collateral, DEBTOR assents to any extension or postponement of the time of payment or any other indulgence, to any substitution, exchange or release of or failure to perfect any security interest in any Collateral, to the addition or release of any party or person primarily or secondarily liable, to the acceptance of partial payment thereon and the settlement, compromising or adjusting of any thereof, all in such manner and at such time or times as CONOCOPHILLIPS may deem advisable. CONOCOPHILLIPS shall have no duty as to the collection or protection of the Collateral or any income thereon, nor as to the preservation of rights against prior parties, nor as to the preservation of any rights pertaining thereto beyond the safe custody thereof as set forth in section 11.2. DEBTOR further waives any and all other suretyship defenses.

19.   **Marshalling.** CONOCOPHILLIPS shall not be required to marshal any present or future collateral security (including but not limited to this Agreement and the Collateral) for, or other assurances of payment of, the Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of its rights hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights, however existing or arising. To the extent that it lawfully may, the DEBTOR hereby agrees that it will not invoke any law relating to the marshalling of collateral which might cause delay in or impede the enforcement of CONOCOPHILLIPS' rights under this Agreement or under any other instrument creating or evidencing any of the Obligations or under which any of the Obligations is outstanding or by which any of the Obligations is secured or payment thereof is otherwise assured, and, to the extent that it lawfully may, DEBTOR hereby irrevocably waives the benefits of all such laws.

20.   **Proceeds of Dispositions; Expenses.** DEBTOR shall pay to CONOCOPHILLIPS on demand any and all expenses, including reasonable attorneys' fees and disbursements, incurred or paid by CONOCOPHILLIPS in protecting, preserving or enforcing CONOCOPHILLIPS' rights under or in respect of any of the Obligations or any of the Collateral. After deducting all of said expenses, the residue of any proceeds of collection or sale of the Obligations or Collateral shall, to the extent actually received in cash, be applied to the payment of the Obligations in such order or preference as CONOCOPHILLIPS may determine or in such order or preference as is provided in the Credit Agreement, proper allowance and provision being made for any Obligations not then due. Upon the final payment and satisfaction in full of all of the Obligations and after making any payments required by Sections 9-608(a)(1)(C) or 9-615(a)(3) of the Uniform Commercial Code of the State, any excess shall be returned to DEBTOR, and DEBTOR shall remain liable for any deficiency in the payment of the Obligations.

21.   **Overdue Amounts.** Until paid, all amounts due and payable by DEBTOR hereunder shall be a debt secured by the Collateral and shall bear, whether before or after judgment, interest at the rate of interest for overdue principal set forth in the Credit Agreement.

22.   **Governing Law; Consent to Jurisdiction.** THIS SECURITY AGREEMENT SHALL BE GOVERNED BY ARTICLE 9 OF THE UNIFORM COMMERCIAL CODE AS ADOPTED IN THE STATE OF CALIFORNIA, EXCLUSIVE OF ANY CONFLICT OR CHOICE-OF-LAW RULES, INCLUDING THOSE CONTAINED IN ARTICLE 9, THAT WOULD APPLY THE LAWS OF A DIFFERENT JURISDICTION. DEBTOR agrees that any suit for the enforcement of this Agreement may be brought in the courts of the State or any federal court sitting therein and consents to the non-exclusive jurisdiction of such court and to service of process in any such suit being made upon DEBTOR by mail at the address specified in section 24 herein. DEBTOR hereby waives any objection that it may now or hereafter have to the venue of any such suit or any such court or that such suit is brought in an inconvenient court.

23.   **Waiver of Jury Trial.** DEBTOR WAIVES ITS RIGHT TO A JURY TRIAL WITH RESPECT TO ANY ACTION OR CLAIM ARISING OUT OF ANY DISPUTE IN CONNECTION WITH THIS AGREEMENT, ANY RIGHTS OR OBLIGATIONS HEREUNDER OR THE PERFORMANCE OF ANY SUCH RIGHTS OR OBLIGATIONS. Except as prohibited by law, DEBTOR waives any right that it may have to claim or recover in any litigation referred to in the

preceding sentence any special, exemplary, punitive or consequential damages or any damages other than, or in addition to, actual damages. DEBTOR (i) certifies that neither CONOCOPHILLIPS nor any representative, agent or attorney of CONOCOPHILLIPS has represented, expressly or otherwise, that CONOCOPHILLIPS would not, in the event of litigation, seek to enforce the foregoing waivers and (ii) acknowledges that, in entering into the Credit Agreement, (and the other Loan Documents to which CONOCOPHILLIPS is a party), CONOCOPHILLIPS is relying upon, among other things, the waivers and certifications contained in this section 23.

24. **Notice.** Notices to either party shall be in writing and may be delivered to the party personally, or by mail addressed to the party as set forth below or as otherwise designated in writing:

ConocoPhillips
Attn: Michelle Wilson
P O Box 88
Bartlesville, OK 74005

Milestone Pacific Properties, L.L.C.
Attn: Jagdeep Sidhu and Saeed Ghafoori
1800 Sutter St. #775
Concord, CA 94520

25. **Fair Credit Reporting Act.** DEBTOR authorizes CONOCOPHILLIPS to obtain credit reports on DEBTOR.

26. **Application of Funds.** DEBTOR authorizes CONOCOPHILLIPS to apply all funds received from DEBTOR, or from the Collateral in any manner, to the Obligations in such manner as CONOCOPHILLIPS in its sole discretion chooses.

27. **Miscellaneous.** The headings of each section of this Agreement are for convenience only and shall not define or limit the provisions thereof. This Agreement and all rights and obligations hereunder shall be binding upon DEBTOR and its respective successors and assigns, and shall inure to the benefit of CONOCOPHILLIPS and its successors and assigns. If any term of this Agreement shall be held to be invalid, illegal or unenforceable, the validity of all other terms hereof shall in no way be affected thereby, and this Agreement shall be construed and be enforceable as if such invalid, illegal or unenforceable term had not been included herein. DEBTOR acknowledges receipt of a copy of this Agreement.

IN WITNESS WHEREOF, intending to be legally bound, DEBTOR has caused this Agreement to be duly executed as of the date first above written.

Dated: August 4, 2005

ConocoPhillips Company, a wholly
owned subsidiary of ConocoPhillips

Kelly Neal
DM

DEBTOR: Milestone Pacific Properties, LLC.

DEBTOR'S NAME: Jagdeep Sidhu
TITLE: Principal

DEBTOR'S SPOUSE NAME: ININDER SIDHU

DEBTOR'S NAME: Saeed Ghafoori

DEBTOR'S SPOUSE NAME: Gissou Ghafoori

5

12/12/2002

# EXHIBIT G

# PERSONAL GUARANTY

This Personal Guaranty ("Guaranty") is entered into as of August 4, 2005 ("Effective Date") and is in consideration of, and as an inducement for ConocoPhillips Company, a Delaware corporation, its divisions, affiliates, subsidiaries and/or assigns (hereinafter referred to as "ConocoPhillips") entering into certain agreements with Milestone Pacific Properties, LLC (hereinafter referred to as "DEBTOR"), and in the further consideration of, and as a further inducement for, any credit extended, to be extended or continued, or any other financial accommodations given, to be given or continued, by ConocoPhillips to DEBTOR, the undersigned Jagdeep Sidhu and Saeed Ghafoori hereinafter referred to as "GUARANTOR") provides this Guaranty.

NOW, THEREFORE, GUARANTOR agrees to the following:

1.     GUARANTOR does hereby absolutely and unconditionally guarantee the prompt payment of any and all indebtedness hereafter incurred by DEBTOR to ConocoPhillips (the "Indebtedness"). GUARANTOR acknowledges ConocoPhillips would not extend any credit to DEBTOR without the providing by GUARANTOR of this Guaranty, and acknowledges that GUARANTOR holds an interest, equitable or otherwise, in DEBTOR. The word "Indebtedness" is used herein in its most comprehensive sense and includes any and all advances, debts, obligations and liabilities of DEBTOR or any one or more of them hereafter made, incurred or created, whether voluntarily or involuntarily and however arising, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, and whether DEBTOR may be liable individually or jointly with others. Such Indebtedness may include, but is not limited to, monies that may hereafter become owing under one or more of the following:

(1)     On open account, whether billed or unbilled;

(2)     For any services to be rendered;

(3)     For merchandise or products sold or to be sold; and

(4)     On notes, checks, drafts, and any other instrument for the payment of money executed, or to be executed or endorsed, and delivered by DEBTOR to ConocoPhillips.

2.     GUARANTOR agrees that ConocoPhillips may in ConocoPhillips' discretion with notice and demand and without prejudice to or in any way limiting or diminishing the liability of GUARANTOR under this Guaranty:

(1)     Renew, compromise, extend, accelerate or otherwise change the time for payment of, or otherwise change the terms of the Indebtedness or any part thereof, including increase or decrease of the rate of interest thereon with the consent of DEBTOR;

(2)     Take, modify, alter, release, reconvey, exchange or renew any security, or abstain from perfecting, acting on or otherwise taking advantage of any security;

(3)     File or refrain from filing a claim in any bankruptcy proceeding of DEBTOR or any other GUARANTOR (if any);

(4)     Realize on any Indebtedness;

(5)     Take any checks, notes, or other obligations, secured or unsecured, in any amount, purportedly in payment of the whole or any part of any Indebtedness; and

(6)     Otherwise deal with the DEBTOR and other parties and security as ConocoPhillips may deem appropriate.

3.     GUARANTOR agrees and acknowledges that this Guaranty shall be a general and continuing guaranty and shall cover all Indebtedness of DEBTOR, and where more than one entity is a part of DEBTOR, the several obligations of each entity as well as their joint obligations, including those obligations incurred at least ten (10) days after such time as ConocoPhillips shall have actually received written notice of revocation of this Guaranty.

12/12/2002

A

Field Code Changed

4.   GUARANTOR agrees that in order to revoke this Guaranty, GUARANTOR shall send notice to ConocoPhillips by certified mail or overnight delivery to the following address: ConocoPhillips Company, 411 Keeler, Dock, Bartlesville, OK 74004, Attn: Michelle Wilson, 1310P POB. Such revocation shall apply only to such agreements, leases, extensions of credit, or other indebtedness or obligations entered into or created at least ten (10) days after the date of receipt of such notice of revocation, and shall not apply to Indebtedness thereafter becoming due and payable under agreements, leases, sales or other obligations entered into prior to such revocation. Any payments made after receipt of such notice of revocation shall be applied as ConocoPhillips may elect

5.   Until full payment of any and all Indebtedness is paid to ConocoPhillips, GUARANTOR waives all right of subrogation and benefit of or right to participate in any security now or hereafter held by ConocoPhillips.

6.   GUARANTOR expressly insists upon all demands, presentments, notices of protest and of dishonor, and notices of every kind or nature, including those of any action or non-action on the part of DEBTOR, ConocoPhillips, any co-guarantor (if applicable), or any creditor of DEBTOR. GUARANTOR expressly waives the right to require ConocoPhillips to proceed against DEBTOR, or any co-guarantor (if applicable) or to proceed against or apply any security ConocoPhillips may hold, and GUARANTOR waives the right to require ConocoPhillips to pursue any other remedy for the benefit of GUARANTOR, and agrees that ConocoPhillips may proceed against GUARANTOR for the amount hereby guaranteed without taking any action against DEBTOR, or any co-guarantor (if applicable) and without proceeding against or applying any security ConocoPhillips may hold.

7.   GUARANTOR agrees and acknowledges that any and all debts and obligations, present and future, of DEBTOR to GUARANTOR, or any of them are hereby postponed to the obligations of DEBTOR to ConocoPhillips, and all monies received by GUARANTOR or its representatives, successors or assigns thereon shall be held in trust for ConocoPhillips and shall be paid over to ConocoPhillips. Further, upon any liquidation or distribution of assets of DEBTOR, GUARANTOR agrees to assign to ConocoPhillips any and all claims on account of any and all such debts and obligations, and ConocoPhillips shall receive any and all dividends and payments on such debts and obligations until payment in full of any and all obligations of DEBTOR are paid to ConocoPhillips.

8.   GUARANTOR irrevocably waives, disclaims and relinquishes any and all claims against DEBTOR which GUARANTOR otherwise has or would have by virtue of having executed this Guaranty, specifically including, but not limited to, all rights of indemnity, contribution or exoneration. GUARANTOR expressly subordinates any and all claim(s) against DEBTOR upon any account whatsoever to any claim(s) that ConocoPhillips may have against DEBTOR at any time and for any reason.

9.   In the event DEBTOR is a partnership or other association, this Guaranty is to extend to the person or persons for the time being and from time to time carrying on the business now conducted by DEBTOR, notwithstanding any change or changes in the name or membership of DEBTOR.

10.   GUARANTOR agrees to pay any and all attorneys' fees, costs of suit and expenses incurred by ConocoPhillips in connection with this Guaranty or in the collection of any of said Indebtedness from DEBTOR or GUARANTOR. GUARANTOR WAIVES THE RIGHT TO A JURY TRIAL IN ANY LAWSUIT RELATED TO THIS GUARANTY OR THE INDEBTEDNESS, OR BOTH.

11.   GUARANTOR waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim, setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the DEBTOR, GUARANTOR, or both.

12.   This Guaranty is a general guaranty and is assignable, and when so assigned the GUARANTOR shall be bound as above to the assignees without in any manner affecting GUARANTOR's liability hereunder on any part of DEBTOR's obligations to ConocoPhillips.

13.   This Guaranty shall inure to the benefit of and bind the heirs, administrators, executor, successors and assigns of ConocoPhillips and each of GUARANTOR's, and if more than one entity is GUARANTOR then this Guaranty shall be construed as the joint and several obligation of each of the GUARANTORs. Where there is more than one DEBTOR named herein, reference herein to "DEBTOR" shall mean all and any one or more of them and the words used herein in the singular shall be deemed to have been used in the plural where the contexts and construction so require.

‎Field Code Changed

12/12/2002

14.    This Guaranty shall be construed in accordance with the laws of the State of Washington without regard to its choice of law rules. Notice of acceptance of the Guaranty is hereby waived. This Guaranty contains the entire guaranty agreement between ConocoPhillips and GUARANTOR. GUARANTOR declares that this is a voluntary and unconditional guaranty and GUARANTOR does not rely in whole or in part on any oral representation of any kind whatsoever which may be made by any representative of ConocoPhillips in the execution of this Guaranty.

15.    GUARANTOR authorizes ConocoPhillips to obtain a credit report on GUARANTOR.

16.    Any married person who signs this Guaranty hereby expressly agrees that recourse may be made against both his or her separate property and community property interest for all obligations under this Guaranty and represents and warrants that this transaction is being entered into for the benefit of GUARANTOR's marital community.

17.    This Guaranty contains the entire agreement between the parties relating to the subject matter hereof, and all prior agreement relative thereto are hereby terminated as of the Effective Date referred to above. This Guaranty may not be amended, revised, waived, discharged, released or terminated orally but only by a written instrument or instruments executed by the party against which enforcement of the amendment, revision, waiver, discharge, release or termination is asserted.

IN WITNESS WHEREOF, GUARANTOR does hereby execute this Guaranty as of the Effective Date first referenced above.

GUARANTOR

Witness: _____    (1) _____
                                         Jagdeep Sidhu
                                         JAGDEEP  SIDHU
                                         Print Name

                                     (2) _____
                                         Spouse, If applicable

                                         _____
                                         Print Name

                                     (1) _____
                                         Saeed Ghafoori
                                         Saeed Ghafoori
                                         Print Name

                                     (2) _____
                                         Spouse, If applicable

                                         _____
                                         Print Name

                                                                 Field Code Changed

                                                        12/12/2002

# EXHIBIT H

# PURCHASE AND SALE AGREEMENT OF REAL PROPERTY

This Purchase and Sale Agreement (the "Agreement") is made as of October 14, 2006, (the "Effective Date"), by and between Milestone Pacific Properties, LLC, a California limited liability company (the "Seller"), and Copeland Creek Apartments, LLC, a California limited Liability Company (the "Buyer").

## RECITALS

**A.**  Seller is the owner of certain real property and business located in the City of Vallejo, County of Solano, State of California, and the related improvements, appurtenances, and fixtures attached to the Property (collectively, the Property and its improvements, appurtenances and fixtures are referred to as the "Property").

**B.**  Seller desires to sell and Buyer desires to purchase the Property.

**C.**  Seller desires to sell and Buyer desires to purchase the gas service station business, convenience store, and three commercial leases located at the Property and commonly known as **Milestone Pacific Properties, LLC** which is sold concurrent herewith pursuant to a separate written agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants, agreements, representations and warranties contained in this Agreement, the parties agree as follows:

## AGREEMENT OF SALE

1.  <u>Purchase and Sale</u>.  For good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Seller agrees to sell and Buyer agrees to purchase the Property under the terms and conditions of this Agreement.

2.  <u>Description of the Property</u>.  The Property purchased under this Agreement consists of the following:

A.  <u>Property</u>.  The term "Property" shall refer to that certain real property commonly known as **199 Lincoln Road, West Vallejo** in Solano County, California and more particularly described in Exhibit A attached hereto.

- 1 -

Purchase and Sale Agreement for Real Property

10/18/2008 14:38 FAX   925 935 7845           CHICAGO TITLE                            ☑002/020

B.    Appurtenances.  All privileges, rights, easements appurtenant to the Property, including without limitation all minerals, oil, gas, and other hydrocarbon substances on and under the Property; all development rights, air rights, water, water rights, and water stock relating to the Property; all right, title, and interest of Seller in and to any streets, alleys, passages, water and sewer taps, sanitary or storm drain capacity or reservations and rights under utility agreements, and other easements and other rights-of-way included in, adjacent to or used in connection with the beneficial use and enjoyment of the Property (collectively, the "Appurtenances").

C.    Improvements.  All buildings, structures, fences, parking areas, or improvements located upon the Property, including fixtures, systems, and equipment attached to the Property or Improvements and used in connection with the operation or occupancy of the Property (such as heating and air conditioning systems, refrigeration, ventilation, garbage disposal, or utility conduits).

### PURCHASE PRICE

3.    Amount.  The total purchase price (the "Purchase Price") for the Property is $7,500,000, and is payable in accordance with this Agreement.

4.    Deposits.

A.    Initial Deposit.  Within three (3) Business Days after the Effective Date, as a deposit against the Purchase Price, Buyer must deposit $100,000, (the "Initial Deposit") into an escrow (the "Escrow") to be opened with Chicago Title Company, 1646 North California Boulevard, Walnut Creek, California (the "Escrow Holder").

B.    Requirements for Deposit.  Buyer may make the Initial Deposit in cash, by check payable to the Escrow Holder, or by electronic transfer of funds.  The Escrow Holder shall hold the Deposit in an escrow account at a bank and invest in investments approved by Buyer, with interest accruing for the benefit of Buyer.  On the Closing Date the Deposit shall be credited against the Purchase Price and paid to Seller.  If this Agreement terminates for any reason except Buyer's default, the Escrow Holder shall refund the Deposit to Buyer.  If such refund is made before the Contingency Date, the Escrow Holder may rely on the Buyer's sole written demand for such refund.  If such refund is made after the Contingency Date, the Escrow Holder must receive the written instructions of both Seller and Buyer.

5.    Payment of Balance.  Buyer agrees to pay the balance of the Purchase Price to Seller through the Escrow by depositing cash or a cashier's check payable to the Escrow Holder, or by electronic transfer of federal funds, which shall be delivered to the Escrow Holder at least two (2) business days before the Closing Date.

6.    Paid Debts of Seller.  As part of the Purchase Price, Buyer may assume existing debts of the Seller secured by the Property.  Assumption of any Seller debts, by the Buyer, shall be a dollar for dollar credit against the Purchase Price. *SELLER DEBT INCLUDES $500,000 SELF AMORTIZING LOAN FROM CONOCO-PHILLIPS.*

- 2 -

## BUYER'S CONTINGENCIES

7.    <u>Seller's Delivery of Documents</u>.  Buyer's obligation to purchase the Property is expressly conditioned on Seller making all documents in his possession listed below (collectively, the "Preliminary Documents") available to Buyer within ten (10) days of the Effective Date, for inspection and copying by Buyer or his agents or representatives.

A.    <u>Preliminary Report</u>.  A preliminary report (the "Preliminary Report") dated no earlier than ten (10) days before the Effective Date covering the Property and issued by Chicago Title Company (the "Title Company"), together with a legible copy of all exceptions to title shown in the Preliminary Report.

B.    <u>Agreements</u>.  Copies of all written easements, covenants, restrictions, agreements, service contracts, and other documents that affect the Property.

C.    <u>Licenses and Permits</u>.  Copies of any licenses, permits, or certificates required by governmental authorities in connection with construction or occupancy or use of the Property, appurtenances and improvements, including without limitation building permits, conditional use permits, certificates of completion, certificates of occupancy, and environmental permits and licenses, and any correspondence related to the Property, appurtenances and improvements.

D.    <u>Plans</u>.  Copies of any existing construction drawings, as-built plans, and specifications for the Property.

E.    <u>Insurance Policies</u>.  Copies of all fire, liability, and casualty insurance policies carried by Seller for the Property.

F.    <u>Materials Related to Condition of the Property</u>.  Any environmental impact reports, "Phase I" or "Phase II" reports, or environmental site assessments concerning hazardous materials on the Property, complaints or notices of the presence, whether actual or suspected, of hazardous materials on the Property, geological surveys, soil tests, engineering reports, inspection results, complaints, or notices received regarding the safety of the Property.  Buyer, his agents, and representatives shall have access to the Property upon reasonable notice for sampling, testing or evaluation.

G.    <u>Litigation Materials</u>.  All materials related to pending or threatened litigation, or litigation that was pending or threatened during the last five (5) years of Seller's ownership of the Property or all court orders, settlements, and judgments from any period of time affecting the Property.

- 3 -

Purchase and Sale Agreement for Real Property

H.    Other Documents.  All other material data, correspondence, documents, agreements, waivers, notices, applications, and other records regarding the Property relating to transactions with taxing authorities, governmental agencies, utilities, vendors, tenants, neighbors, and others with whom Buyer may be dealing from and after the Closing Date.

I.    All ADA Compliance Documentation.

8.    Buyer's Approval of Preliminary Documents.  Buyer's obligation to purchase the Property is expressly condition on its approval, in its sole discretion, of the matters disclosed in the Preliminary Documents.  Buyer shall have the period from the date of Seller's delivery of or access to all Preliminary Documents until the date that is 30 (thirty) days after such date of delivery of or access to all Preliminary Documents (the "Contingency Date") to review the Preliminary Documents and to enter and investigate the Property, including drilling, sampling, and testing and to decide whether to approve the matters disclosed in the Preliminary Documents.  On or before the Contingency Date, Buyer shall deliver written notice to Seller either accepting the matters disclosed in the Preliminary Documents or terminating this Agreement.  If Buyer gives notice of acceptance on or before the Contingency Date, Buyer shall be deemed to have accepted the matters disclosed in the Preliminary Documents.  By his acceptance Buyer shall be deemed to have acknowledged that (a) Seller has provided Buyer with access within the time required to the Property and the Preliminary Documents and (b) Buyer has had ample opportunity to review and inspect the Preliminary Documents and to make such independent factual, physical and legal examinations and inquiries as Buyer deems necessary or desirable with respect to matters disclosed in the Preliminary documents.

9.    Approval of Title.  Buyer's obligation to purchase the Property is expressly conditioned on Buyer's approval of the condition of title of the Property in accordance with the following procedure:

A.    Permitted Exceptions.  The following exceptions shown on the Preliminary Report (the "Permitted Exceptions") are approved by Buyer: (a) exceptions for a lien for local real estate taxes and assessments not yet due or payable, (b) the standard preprinted exceptions and exclusion of the Title Company which Buyer does not object to by written notice to Seller within five (5) days after delivery of the Preliminary Report (the "Buyer's Title Notice") or as otherwise provided in the terms of this Agreement.  All exceptions on the Preliminary Report other than the Permitted Exceptions will be Title Objections.  If Buyer fails to deliver Buyer's Title Notice within the time specified in this Section 9, Buyer shall be deemed to have objected to each title exception shown in the Preliminary Report that is not otherwise a Permitted Exception.

B.    Title Objections.  With respect to any Title Objection arising or resulting from any act or omission of Seller, Seller shall have five (5) days after delivery of Buyer's Title Notice (or Buyer's deemed objection to all exceptions), to specify the manner in which it will remove or cure such Title Objection.  With respect to any Title Objection that did not arise or result from any act or omission of Seller, Seller shall have ten (10) days after delivery of Buyer's Title Notice, to give notice

- 4 -

Purchase and Sale Agreement for Real Property

to Buyer in writing (the "Seller's Title Notice"), stating either (a) the manner in which Seller will remove or cure such Title Objection, or (b) that Seller shall not remove or cure such Title Objection. If Seller fails to deliver Seller's Title Notice within the time specified in this Section 9, Seller shall be deemed to have elected not to cure such Title Objection. Despite the foregoing, Seller agrees to remove all liens securing the payment of money that encumber the Property.

      C.    Seller Elects Not To Cure. If Seller elects not to cure or remove a Title Objection (or is deemed to have so elected), then Buyer shall have five (5) days after delivery of the Seller's Title Notice to deliver a written notice to Seller (the "Buyer's Election Notice") of Buyer's election either to (a) proceed with the purchase of the Property, waive such Title Objection, and accept the exception shown in the Preliminary Report as a Permitted exception, or (b) terminate this Agreement. If Buyer fails to deliver Buyer's Election Notice within the time specified in this Section 9, Buyer shall be deemed to have elected to terminate this Agreement.

      D.    Non-Monetary Cure. If Seller is obligated or elects to cure or remove a Title Objection, but the method specified for removing or curing the Title Objection is other than the payment of a specific sum of money, then Buyer shall have five (5) days after delivery of the Seller's Title Notice to deliver Buyer's Election Notice specifying whether it elects to (a) proceed with the purchase of the Property, subject to Seller's removal of the Title Objection, or (b) terminate this Agreement. If Buyer fails to deliver Buyer's Election Notice within the time specified in this Section 9, Buyer shall be deemed to have elected to terminate this Agreement.

      E.    Additional Encumbrances. If any encumbrance or other exception to title arises or is discovered after the delivery of the Preliminary Report (an Additional Encumbrance), the party discovering such Additional Encumbrance shall promptly give written notice to the other. No later than five (5) days after delivery of the notice of such Additional Encumbrance, Buyer shall deliver a new Buyer's Title Notice to Seller specifying whether the Additional Encumbrance is a Title Objection or a Permitted Exception. If Buyer objects to the Additional Encumbrance, the parties shall proceed in the same manner as set forth above for Title Objections arising from the Preliminary Report. If Buyer fails to deliver Buyer's Election Notice within the time specified in this Section 9, Buyer shall be deemed to have elected to terminate this Agreement.

      F.    Seller's Failure To Remove Title Objection. If Seller is obligated or elects to cure or remove a Title Objection and fails to do so at least five (5) days before the Closing Date, or fails to show that it will be able to do so on Closing, then Seller shall be in default under this Agreement, and Buyer shall have all their rights and remedies provided by this Agreement.

    10.    Review of Preliminary Documents and Physical Condition.

      A.    Due Diligence. Buyer's obligation to purchase the Property is expressly conditioned on his approval, in his sole discretion, of the condition of the Property and all other matters concerning the Property, including without limitation economic, financial, and accounting matters relating to or affecting the Property or its value, and the physical and environmental condition of the

- 5 -

Property. Buyer shall have until the Contingency Date to conduct such investigations as Buyer may choose (Due Diligence) to determine, in his sole discretion, whether this contingency is met. On or before the Contingency Date, Buyer shall deliver written notice to Seller accepting the Property, or terminating this Agreement. If Buyer fails to give such notice on or before the Contingency Date, Buyer shall be deemed to have elected to terminate this Agreement.

B.    Access to Property. As part of their Due Diligence, Buyer may investigate economic, financial, and accounting matters, including but not limited to gallonage and retail sales reports relating to or affecting the Property or its value, and conduct inspections, tests, and studies with respect to the physical and environmental condition of the Property. Buyer and Buyer's consultants, agents, engineers, inspectors, contractors, and employees (Buyer's Representatives) shall be given reasonable access to the Property and all documents of Seller relating to the Property during regular business hours for the purchase of performing such Due Diligence. Buyer shall undertake the Due Diligence at his sole cost and expense. Buyer shall indemnify, defend with counsel reasonably acceptable to Seller, and hold Seller harmless from all claims (including claims of lien for work or labor performed or materials or supplies furnished), demands, liabilities, losses, damages, costs, fees, and expenses, including Seller's reasonable attorney fees, costs, and expenses, arising from the acts or activities of Buyer or Buyer's Representatives in, on, or about the Property during or arising in connection with Buyer's inspections of the Property.

C.    Assumption of Risk. Subject to the other provisions of this Agreement, Buyer agrees that by his acceptance or waiver of the contingency in this Section 10, he assumes the risk that an adverse condition of the Property may not have been revealed by his own Due Diligence. On Buyer's acceptance or waiver of the contingency in this Section 10, Seller shall have no obligation to repair, correct, or compensate Buyer for any condition of the Property, including defects in the improvements, noncompliance with applicable laws and regulations, including without limitation zoning laws, building codes, and the Americans with Disabilities Act, whether or not such condition of the Property would have been disclosed by Buyer's Due Diligence.

11.    Termination for Failure of a Contingency. If this Agreement is terminated or deemed to be terminated by failure of a contingency, then immediately on written notice from Buyer, Escrow Holder must refund the Deposit and/or return any Letter of Credit to Buyer, without offset for any charges or claims. Any cancellation fee or other costs of the Escrow Holder or the Title Company resulting from this termination for failure of a contingency, shall be borne equally by Seller and Buyer, and each party shall pay its own expenses.

## SELLER'S PRECLOSING COVENANTS

12.    No Amendment or Agreements. On or after the Effective Date, Seller shall not (a) amend or waive any right under any Preliminary Document or (b) enter into any lease or other agreement of any type affecting the Property that would survive the Closing Date, without Buyer's prior

- 6 -

10/18/2006 14:37 FAX  925 935 7645        CHICAGO TITLE                    ☑007/020

written consent. Before the Contingency Date, Buyer may not unreasonably withhold his consent under this Section 12; after the Contingency Date, however, Buyer shall have sole discretion in all such matters.

13. **Insurance.** Through the Closing Date, Seller must maintain or cause to be maintained in full force and effect comprehensive general liability casualty and other insurance on the Property in an amount equal to the full replacement cost of the Improvements.

14. **Access to Property.** Buyer and Buyer's representatives, agents, and designees shall have the right at all reasonable times until Closing to enter the Property as provided in this Agreement.

15. **Notification.** Seller shall promptly notify Buyer of any material change in any condition and respect to the Property or of any material event or circumstance that makes any representation or warranty of Seller under this Agreement untrue or misleading.

## REPRESENTATIONS AND WARRANTIES

16. **Seller's Representations and Warranties.** Despite anything to the contrary in this Agreement, Seller warrants and represents as of the Effective Date that:

A. **Organization; Authority.** This Agreement and the performance of Seller's obligations under it and all documents executed by Seller that are to be delivered to Buyer at the Closing are, or on the Closing Date shall be, duly authorized, executed, and delivered by Seller and are, or at the Closing Date shall be, legal, valid, and binding obligations of Seller, and do not and on the Closing Date shall not, violate any provision of any agreement or judicial order to which Seller are a party or to which Seller or the Property is subject. No consent of any partner, shareholder, creditor, investor, judicial or administrative body, government agency, or other party is required for Seller to enter into and/or to perform Seller's obligations under this Agreement, except as has already been obtained or disclosed under this Agreement.

B. **No Violation of Law.** Except as disclosed in this Agreement, to Seller's knowledge, there are and have been no violations of any federal, state, county, or municipal law, ordinance, order, regulation, or requirement affecting the Property.

C. **Litigation.** Except as set forth in Exhibit "C" to this Agreement, to Seller's knowledge, Seller has not received any written notice of any existing or threatened litigation or arbitration involving the Property that have previously been disclosed to Buyer.

D. **Preliminary Documents.** To Seller's knowledge, the Preliminary Documents constitute all material books, records, documents, agreements, contracts, reports, and other materials related to the Property that are in Seller's possession. To Seller's knowledge, the Preliminary Documents are true, correct, and complete copies of what they purport to be.

- 7 -

Purchase and Sale Agreement for Real Property

17.   Buyer's Representations and Warranties.  Buyer hereby warrants and represents that, as of the Effective Date, this Agreement and the performance of Buyer's obligations under it and all the documents executed by Buyer that are to be delivered to Seller at the Closing are, or on the Closing Date shall be, duly authorized, executed, and delivered by Buyer and are, or at the Closing Date shall be, legal, valid, and binding obligations of Buyer, and do not, and on the Closing Date shall not, violate any provisions of any agreement, law, regulation or judicial order to which Buyer is a party or to which Buyer is subject.  No consent of any partner, shareholder, creditor, investor, judicial or administrative body, government agency, or other party is required for Buyer to enter into or to perform Buyer's obligations under this Agreement, except as has already been obtained.

18.   · Effect of Representations and Warranties.  Each representation and warranty in this Section (a) is material and being relied on by the party to which the representation and warranty is made; (b) is true in all respects as of the Effective Date; (c) shall be true in all respects on the Closing Date; and (d) shall survive the Closing, except as otherwise provided in this Agreement.

19.   Survival of Seller's Representations and Warranties and Limitation on Liability.  The parties agree that (a) Seller's warranties and representations in this Agreement and in any document (including any estoppel or other certificate) executed by Seller under this Agreement with respect to the Property shall survive for three (3) years after the Closing Date, and (b) if Buyer fails to provide written notice to Seller of any breach of such warranties or representations within three (3) years after the Closing Date, Buyer shall be deemed to have waived all claims for breach of any representations and warranties with respect to the Property.

## INDEMNIFICATION

20.   Not applicable

21.   Environmental Matters.  For purposes of this Agreement, "Environmental Law" means any applicable law, order, regulation, decree, permit, license, ordinance or other federal, state, county, provincial, local or foreign governmental requirements in effect as of the date hereof and/or the Closing Date relating to pollution, the protection of human health and the environment, or the release, spill or disposal of Hazardous Substance into the environment.  Environmental Laws include, but are not limited to, the following statutes (and their implementing regulations):  Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. 9601, et seq.), the Resource Conservation and Recovery Act (42 U.S.C. 6901, et seq.), the Federal Water Pollution Control Act (33 U.S.C. 1251, et seq.), the Clean Air Act (42 U.S.C. 7401, et seq.), the Toxic Substance Control Act (15 U.S.C. 2601, et seq.), the Emergency Planning Community Right To Know Act (42 U.S.C. 11001, et seq.), and Occupational Safety and Health Act of 1970.  "Hazardous Substance" means any petroleum, petroleum by-products, polychlorinated biphenyls and any other chemicals, materials, substances or wastes which are currently defined or regulated as "hazardous substances," "hazardous materials," "hazardous wastes," "extremely hazardous wastes," "restricted hazardous wastes," "toxic substances," "toxic

- 8 -

pollutants," "toxic air pollutants," "hazardous air pollutants," "pollutants," or "contaminants" under any Environmental Law.

A. <u>Environmental Indemnification.</u> Not withstanding any other provision in this Agreement, and without limitation as to time, Seller agrees to forever indemnify, defend, protect and hold harmless, Buyer and any of its agents free and harmless from and against all demands, claims, actions, liabilities, damages, losses, judgments, assessments, costs and expenses (including without limitation interest, penalties and attorneys' fees costs and expenses) asserted against, resulting from, imposed upon or paid for or incurred by Buyer, arising out of or resulting from: any breach or violation of Environmental Law or the cost of cleanup, the installation of monitoring wells, underground storage tanks and any other conceivable cost or expense associated with the remediation of the Real Property or the cost of persons or entities associated therewith.

B. <u>General Indemnification of Buyer.</u> Further, Seller agrees to and shall indemnify, defend, protect and hold harmless Buyer and its officers, directors, shareholders, employees and agents free from and against  all demands, claims, actions, liabilities, damages, losses, judgments, assessments, costs and expenses, including without limitation interest, penalties and attorneys' fees costs and expenses  asserted against, resulting from, imposed upon or paid or incurred by Buyer, directly or indirectly, and arising out of or resulting from:

    (1)    a breach of any representation, warranty, covenant or agreement made or to be performed by Seller under this Agreement; or

    (2)    any Claims arising out of the ownership of the Property prior to the date of transferring title to the Buyer.

C. <u>General Indemnification of Seller.</u> Excluding the Environmental Matters set forth in Section A above, Buyer agrees to and shall indemnify, defend, protect and hold harmless the Seller and its officers, directors, shareholders, employees and agents free from and against all demands, claims, actions, liabilities, damages, losses, judgments, assessments, costs and expenses, including without limitation interest, penalties and attorneys' fees costs and expenses asserted against, resulting from, imposed upon or paid or incurred by Seller, directly or indirectly, and arising out of or resulting from:

    (1)    a breach of any representation, warranty, covenant or agreement made or to be performed by Buyer under this Agreement; or

    (2)    any Buyer Claims arising out of the use and possession of the Property after the date of transferring title to Buyer.

## CLOSING CONDITIONS

22. <u>Buyer's Closing Conditions.</u> All obligations of Buyer under this Agreement are subject to the full performance, before or at the Closing, of each of the following conditions ("Buyer's Closing

- 9 -

Conditions"). Buyer's Closing Conditions are solely for Buyer's benefit and any or all of the Buyer's Closing Conditions may be waived in writing by Buyer in whole or in part without prior notice.

      A.    **Title and Survey**. It is a Buyer's Closing Condition that, on the Closing Date, Seller conveys to Buyer marketable fee simple title to the Property by execution and delivery of a grant deed and cause to be delivered to Buyer from the Title Company an ALTA Owner's Extended Coverage Policy of Title Insurance with liability in the full amount of the Purchase Price, insuring title to the Property in Buyer, subject only to the Permitted Exceptions, together with such endorsements described below or as may be reasonably requested by Buyer (the Title Policy). The Title Policy must also include such endorsements or guaranties as Buyer may request. Seller must deliver to the Title Company such instruments, documents, releases, and agreements and must perform such other acts as Title Company may reasonably require in order to issue the Title Policy. Indemnification of the Title Company to induce it to insure any otherwise unpermitted exception to title shall not be allowed except with Buyer's prior written consent after full disclosure to Buyer of the nature and substance of such exception and indemnity, which consent shall not be unreasonably withheld by Buyer for Exceptions not material to marketable title to the Property. Should Buyer elect to obtain a survey at Buyer's expense, then Buyer's obligation to purchase is expressly conditioned upon Buyer's approval of the survey, such approval not to be unreasonably withheld, and such approval to occur on or before the Contingency Date, or Buyer shall be deemed to have approved any such survey.

      B.    **Seller's Representations, Warranties, and Covenants**. The representations and warranties of Seller in this Agreement must be true in all material respects on and as of the Closing Date with the same effect as if such representations and warranties had been made on and as of the Closing Date. Seller must have performed and complied with all covenants, agreements, and conditions required by this Agreement to be performed or complied with by it before or on the Closing Date.

      C.    **Closing Documents**. Seller must have delivered to Escrow the documents and funds it is required to deliver through Escrow at Closing.

      D.    **Physical Condition**. The physical condition of the Property must be substantially the same on the Closing Date as on the Effective Date, reasonable wear and tear excepted.

      E.    **ADA Compliance**. Seller's representations and warranties about the property meet requirements of the ADA Act.

    23.    **Seller's Closing Conditions**. Seller's obligation to sell the Property is expressly conditioned on the performance of each condition precedent at or before the Closing (Seller's Closing Conditions). Seller's Closing Conditions are solely for Seller's benefit and any of Seller's Closing Conditions may be waived in writing by Seller in whole or in part without prior notice.

      A.    **Approval of Contingencies**. It is a Seller's Closing Condition that Buyer must have acknowledged its approval or waiver of all contingencies as required under this Agreement.

- 10 -

Purchase and Sale Agreement for Real Property

10/18/2006 14:33 FAX  925 935   45          CHICAGO TITLE                        ☒011/020

B.   Purchase Price.  Buyer must have delivered the Purchase Price to Escrow.

C.   Underground Storage Tanks.  Buyer and Seller acknowledge that the Property is being sold to Buyer with underground storage tanks ("USTs") in place.  Information about the tanks shall be given to Buyer prior to the Closing Date.  On or before the Closing, Buyer shall have obtained all permits and other governmental authorizations that are required by any applicable governmental regulations or standards to own and operate all UST's at the Property.  At the Closing, Buyer shall deliver copies of all such permits and authorizations to Seller.

D.   Buyer's Representations, Warranties, and Covenants.  The representations and warranties of Buyer in this Agreement must be true in all material respects on and as of the Closing Date with the same effect as if such representations and warranties had been made on and as of the Closing Date.  Buyer must have performed and complied with all covenants, agreements, and conditions required by this Agreement to be performed or complied with by it before or on the Closing Date.

24.   Termination for Failure of a Condition.  If Buyer's Closing Conditions or Seller's Closing Conditions, as the case may be, have not been previously approved or waived, this Agreement may be terminated by the party in whose favor the Closing Condition runs by written notice to the other.  If this Agreement is so terminated, the parties shall have no further obligation or liability under this Agreement, except as provided in this Agreement.  Subject to Buyer's obligations and covenants under the terms of this Agreement, on such termination, Escrow Holder must return the Deposit to Buyer.  Any cancellation fee or other costs of the Escrow Holder and Title Company shall be borne equally by Seller and Buyer and each party shall pay its own expenses.

## CLOSING

25.   Escrow and Escrow Instructions.  The Escrow shall be opened with the Escrow Holder on the execution of this Agreement.  Buyer and Seller may deliver a copy of this Purchase and Sale Agreement as "Joint Escrow Instructions" and shall promptly on the Escrow Holder's request execute such additional escrow instructions as are reasonably required to consummate the transaction contemplated by this Agreement and are not inconsistent with this Agreement.

26.   Closing Definitions.

A.   Definition.  The "Closing" means the exchange of money and documents as described in this Section, and shall be deemed to have occurred when Seller's Deed to Buyer has been recorded, the Escrow Holder holds and can record and deliver any documents necessary to Close Escrow remaining, the Title Company is irrevocably and unconditionally committed to issue a Title Policy, and Buyer has delivered the Purchase Price in immediately available funds to Escrow Holder.

B.   Closing Date.  Seller and Buyer agree that the Closing shall occur on the

- 11 -

Purchase and Sale Agreement for Real Property

"Closing Date." The Closing Date shall be a date mutually agreeable to Buyer and Seller that is no later than December 15, 2006. If the Closing has not occurred by December 15, 2006 then subject to the terms of this Agreement either party may elect to terminate this Agreement, the deposit shall be returned to Buyer, and neither party shall have any obligations to the other except on account of any breach of this Agreement. The Closing shall be at the offices of Escrow Holder or such other place as the parties may agree.

27.    Seller's Deposit of Documents and Funds. Seller must deposit into Escrow the following documents duly executed by Seller in form and substance reasonably satisfactory to Buyer:

A.    Deed. The duly executed and acknowledged Deed conveying the Property to Buyer subject only to the Permitted Exceptions;

B.    Additional Documents. Such additional documents as may be necessary or desirable to convey the Property in accordance with this Agreement.

28.    Buyer's Deposit of Documents and Funds. Buyer must deposit into Escrow funds and documents duly executed by Buyer in form and substance reasonably satisfactory to Seller:

A.    Purchase Price. The Purchase Price in accordance this Agreement;

B.    Conveyance Documents. Such documents, including instruments of assignment and transfer of all property, any UST documentation pursuant to the terms of this Agreement, and written Escrow instructions consistent with this Agreement, as may be necessary or desirable for conveyance of the Property in accordance with this Agreement.

29.    Closing. When the Escrow Holder receives all documents and funds identified in this Agreement, and the Title Company is ready, willing, and able to issue the Title Policy, then, and only then, the Escrow Holder shall close Escrow by:

A.    Recording the Deed;

B.    Issuing the Title Policy to Buyer;

C.    Delivering to Buyer copies of all recorded documents related to the transfer or encumbering of the Property, and a copy of Seller's Escrow instructions; and

D.    Paying the Purchase Price to Seller.

E.    Thereafter, Escrow Holder shall deliver signed closing statements showing all receipts and disbursements to buyer and Seller and shall file with the Internal Revenue Service (with copies to Buyer and Seller) the reporting statement required under Internal Revenue Code Section 6045(e).

Purchase and Sale Agreement for Real Property

30.    Prorations.  All receipts and disbursements of the Property shall be prorated as of 11:59 p.m. on the day immediately preceding the Closing Date and the Purchase Price shall be adjusted on the following basis:

A.    Property Taxes.  All real and personal property ad valorem taxes and special assessments, if any, whether payable in installments or not, including without limitation all supplemental taxes attributable to the period before the Closing Date for the calendar year in which the Closing occurs shall be prorated to the Closing Date, based on the latest available tax rate and assessed valuation.

B.    Utility Charges.  Charges for utilities, including water, sewer, electric, and gas, shall be prorated within thirty (30) days after the Closing Date based on the then most recent bills for such services.  Seller shall pay for all utility services to the Property for all periods before the Closing and Buyer shall pay for all utility services to the Property for the Closing Date and all periods thereafter.

31.    Closing Costs.  Closing costs shall be allocated as follows:

A.    Escrow costs shall be shared equally by Seller and Buyer;

B.    Seller shall pay the cost of the Title Policy;

C.    Buyer shall pay the cost of recording the Deed;

D.    The documentary transfer tax and any municipal transfer tax shall be paid in accordance with the custom and practice in the county in which the property is located.

32.    Broker's Commission: Indemnity.  Excluding a 3% commission payable to GHK Pacific, Inc. upon the close of escrow based upon the actual selling price, neither party has had any contact or dealings regarding the Property, or any communication in connection with the subject matter of this transaction, through any licensed real estate broker or person who can claim a commission or finder's fee as a procuring cause of the sale contemplated in this Agreement.  If any broker or finder perfects a claim for a commission or finder's fee based on any contract, dealings, or communication with a party (the Indemnifying Party), then the Indemnifying Party shall indemnify, defend, and hold the other party (the Nonindemnifying Party) harmless from all costs and expenses (including reasonable attorney fees and costs of defense) incurred by the Nonindemnifying Party in connection with such claim.

33.    Possession.  Seller shall deliver exclusive right of possession of the Property to Buyer on the Closing Date.

- 13 -

## REMEDIES FOR DEFAULT

34.  <u>Buyer's Default</u>.  Buyer shall be deemed to be in default under this Agreement if Buyer fails, for any reason other than Seller's default under this Agreement or the failure of a condition precedent to Buyer's obligation to perform under this Agreement, to meet, comply with, or perform any covenant, agreement, or obligation required on its part within the time limits and in the manner required in this Agreement, or a material breach shall have occurred of any representation or warranty (made by Buyer) by reason of Buyer's actual fraud or intentional misrepresentation; provided, however, that no such default shall be deemed to have occurred unless and until Seller has given Buyer written notice of such default, describing the nature of the default, and Buyer have failed to cure such default within five (5) days after the receipt of such notice (but in any event before the Closing Date, unless such default occurs after Closing).

35.  <u>Remedies For Buyer's Default and Liquidated Damages</u>.  If the Closing fails to occur because of Buyer's default under the terms of this Agreement, Buyer shall be responsible for all cancellation charges required to be paid to Escrow Holder and any escrow charges.  In addition, this Agreement and the rights and obligations of the parties shall terminate, $25,000 shall be immediately delivered by Escrow Holder to Seller on Seller's request.  This amount shall be deemed Liquidated Damages for Buyer's nonperformance as Seller's sole and exclusive remedy against Buyer (including, without limitation, Seller's rights to seek specific performance of this Agreement and to receive damages) for Buyer's failure to purchase the Property, which sum shall be presumed to be a reasonable estimate of the amount of actual damages sustained by Seller due to Buyer's breach of its obligation to purchase the Property.  From the nature of this transaction, it is impracticable and extremely difficult to fix the actual damages that Seller would sustain if Buyer breaches such obligation.  The impracticability and difficulty of fixing actual damages is caused by, without limitation, the fact that the Property is unique.  Given the foregoing facts, among others, Buyer and Seller agree that Liquidated Damages are particularly appropriate for this transaction and agree that said Liquidated Damages shall be paid in the event of Buyer's breach of its obligation to purchase the Property, despite any words or characterizations previously used or contained in this agreement implying any contrary intent.  The payment of such amount as Liquidated Damages is not intended as a forfeiture or penalty within the meaning of California Civil Code Section 3275 or Section 3369 but is intended to constitute Liquidated Damages to Seller under California Civil Code Sections 1671, 1676, and 1677.

We acknowledge this Liquidated Damages provision:

Seller's initials: _____

Buyer's initials _____

36.  <u>Seller's Default</u>.  Seller shall be deemed to be in default under this Agreement if Seller fails, for any reason under this Agreement or the failure of a condition precedent to Seller's obligation to perform under this Agreement, to meet, comply with, or perform any covenant, agreement, or obligation required on its part within the time limits and in the manner required in this Agreement, or a

- 14 -

Purchase and Sale Agreement for Real Property

material breach shall have occurred of any representation or warranty because of Seller's actual fraud or intentional misrepresentation; provided, however, that no such default shall be deemed to have occurred unless and until Buyer have given Seller written notice of the default, describing its nature, and Seller have failed to cure such default within ten (10) days after receipt of such notice (but in any event before the Closing Date, unless such default occurs after closing). If Seller fails for any reason to execute the deed, fails to deliver the deed to the Property or any other documents necessary to close escrow for the sale of the Property, the Solano County Superior Court shall order specific performance of this contract, upon application of the Buyer.

## MISCELLANEOUS

37.   _Notices._ Any notices relating to this Agreement shall be given in writing and shall be deemed sufficiently given and served for all purposes when delivered personally, by generally recognized overnight courier service, or three (3) days after deposit in the United States mail certified or registered, return receipt requested, with postage prepaid, addressed as follows:

      SELLER:        Paul Ghafoori
                        Milestone Pacific Properties, LLC
                        1800 Sutter Steet #175
                        Concord, CA 94520

      BUYER:        Jack Yanoff
                        Copeland Creek Apartments, LLC
                        60 E. Sir Francis Drake Blvd. #200
                        Larkspur Ca. 94939

      ESCROW HOLDER: Chicago Title Company
                        1646 North California Boulevard
                        Walnut Creek, CA 94596

Either party may change its address by written notice to the other given in the manner set forth above.

38.   _Tax-Deferred Exchange._ Seller acknowledges the Buyer is completing a tax-deferred exchange under Internal Revenue Code Section 1031. Seller agrees to accommodate Buyer in effective such tax-deferred exchange, provided Closing is not delayed, and Seller incurs no costs or delays resulting from such tax-deferred exchange Seller agrees to execute such additional escrow instructions, deeds, documents, agreements, or instruments to effect this exchange, provided that Seller shall incur no additional costs, expenses, or liabilities in this transaction as a result of or in connection with this exchange. Buyer agrees to hold Seller harmless of any liability, damages, or costs, including reasonable attorney fees, which may arise from Seller's participation in such exchange.

39.   _Entire Agreement._ The terms of this Agreement are intended by the parties as a final

- 15 -

Purchase and Sale Agreement for Real Property

expression of their agreement with respect to such terms as are included in this Agreement and may not be contradicted by evidence of any prior or contemporaneous agreement. This Agreement specifically supersedes any prior written or oral agreements between the parties. The language in all parts of this Agreement shall be construed as a whole in accordance with its fair meaning and without regard to California Civil Code Section 1654 or similar statutes.

40.    <u>Amendments and Waivers</u>. No addition to or modification of this Agreement shall be effective unless it is made in writing and signed by the party against whom the addition or modification is sought to be enforced. The party benefited by any condition or obligation may waive the same, but such waiver shall not be enforceable by another party unless it is made in writing and signed by the waiving party.

41.    <u>Invalidity of Provision</u>. If any provision of this Agreement as applied to either party or to any circumstance is adjudged by a court of competent jurisdiction to be void or unenforceable for any reason, this fact shall in no way affect (to the maximum extent permissible by law) any other provision of this Agreement, the application of any such provision under circumstances different from those adjudicated by the court, or the validity or enforceability of this Agreement as a whole.

42.    <u>No Merger</u>. This Agreement, each provision of it, and all warranties and representations in this Agreement shall survive the Closing and shall not merge in any instrument conveying title to Buyer. All representations, warranties, agreements, and obligations of the parties shall, despite any investigation made by any party to this Agreement, survive Closing, and the same shall inure to the benefit of and be binding on the parties' respective successors and assigns.

43.    <u>References</u>. Unless otherwise indicated, (a) all article and section references are to the articles and sections of this Agreement, and (b) except where otherwise stated, all references to days are to calendar days. Whenever under the terms of this Agreement the time for performance of a covenant or condition falls on a Saturday, Sunday, or California state holiday, such time for performance shall be extended to the next business day. "Business Days" means days other than Saturday, Sunday, and California State holidays. The headings used in this Agreement are provided for convenience only and this Agreement shall be interpreted without reference to any headings. The date of this Agreement is for reference purposes only and is not necessarily the date on which it was entered into.

44.    <u>Governing Law</u>. This Agreement shall be governed by the laws of the State of California applicable to contracts made by residents of the State of California and to be performed in California.

45.    <u>Confidentiality and Publicity</u>. Before the Closing, the parties shall at all times keep this transaction and any documents received from each other confidential, except to the extent necessary to (a) comply with applicable law and regulations or (b) carry out the obligations set forth in this Agreement. Any such disclosure to third parties shall indicate that the information is confidential and should be so treated y the third party. Prior to the Closing, no press release or other public disclosure

- 16 -

Purchase and Sale Agreement for Real Property

may be made by either party or any of its agents concerning this transaction without the other party's prior written consent.

46.    Time. Time is of the essence in the performance of the parties' respective obligations under this Agreement.

47.    Attorneys' Fees. In the event of any action or proceeding to enforce a term or condition of this Agreement, any alleged disputes, breaches, defaults, or misrepresentations in connection with any provision of this Agreement or any action or proceeding in any way arising from this Agreement, including any interpleader of the Deposit by the Escrow Holder, the prevailing party in such action shall be entitled to recover its reasonable costs and expenses.

48.    Assignment. This Agreement shall inure to the benefit of and be binding on the parties to this Agreement and their respective successors and assigns. Buyer shall have the right to assign all or any portion of its interest in this Agreement, provided that Buyer gives written notice of such assignment to Seller before the Closing Date.

49.    No Third Party Beneficiaries. Nothing in this Agreement, express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any person other than the parties to it and their respective permitted successors and assigns, nor is anything in this Agreement intended to relieve or discharge any obligation of any third person to any party to this Agreement or give any third person any right of subrogation or action over against any party to this Agreement.

50.    Remedies Cumulative. The remedies set forth in this Agreement are cumulative and not exclusive to any other legal or equitable remedy available to a party.

51.    Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective

SELLER:                              BUYER:

Date: 10/15/06                       Date: 10/4/06

By:                                  By:
Paul Ghafoori for Milestone Pacific  Jack Vanoff for Copeland Creek
Properties, LLC                      Apartments, LLC

- 17 -

Purchase and Sale Agreement for Real Property

10/18/2003 14:40 FAX  925 935 ...5        CHICAGO TITLE                               @019/020

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective

SELLER1:                                              SELLER2:

Date: 10 | 15 | 06                                    Date: 10.18.06

By: _____                           By: _____
Paul Ghafoori for Milestone Pacific                   Jagdeep Sidhu for Milestone Pacific
                                                       Properties, LLC
Properties, LLC


BUYER:

Date: 10 | 14 | 06

By: _____
Jack Vanoff for Copeland Creek
Apartments, LLC


- 19 -

PAGE 19/21                    MILESTONE                    9256957778        10/18/2006 05:14

10/18/2006 14:10 FAX  925 935  5          CHICAGO TITLE                    @020/021

LETTER OF INTENT TO SELL

CONOCO PHILLIPS COMPANY

Milestone Pacific Properties LLC is going to sell its assets located at 199 Lincoln Road
West to Copland creek LP for a sum of $7,500,000.00

Signed

_____     10/15/06

Paul Ghafoori

*Jagdeep G. Sidhu*   10.18.06

Jagdeep Sidhu

10/18/2006 16:03 FAX  925 935  45          CHICAGO TITLE                    ☑002/002

## CONSENT OF ESCROW HOLDER

Chicago Title Company (the Escrow Holder) accepts the foregoing Purchase and Sale Agreement and Joint Escrow Instructions as escrow instructions, agrees to act as escrow holder and agrees to be bound by their provisions applicable to it as Escrow Holder.

SIGNATURE

JUANITA VILLASENOR
NAME

ESCROW OFFICER
TITLE

- 18 -

Purchase and Sale Agreement for Real Property

# EXHIBIT I

# BILL OF SALE

FOR GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, the undersigned MAGAZINE CONVENIENCE CENTER, INC., a California corporation, MILESTONE PACIFIC PROPERTIES, LLC, a California limited liability company (collectively referred to herein as "Seller"), does hereby grant, bargain, sell, transfer, assign, convey and deliver to BPG PACIFIC, LLC, a California limited liability company, all of Seller's right, title and interest in and to all personal property, equipment, supplies, fixtures, and all personal property used in the ownership, operation, management, maintenance and/or repair of that certain real property commonly known as 199 Lincoln Road West, Vallejo ("Personal Property").

TO HAVE AND TO HOLD the Personal Property unto the grantee and its successors and assigns forever.

Seller warrants that it owns good and marketable title to the Personal Property and will defend title to the Personal Property against all persons claiming a prior right thereto to the extent that such prior right is alleged to exist on or before the date of this Bill of Sale.

IN WITNESS WHEREOF, Seller has executed this Bill of Sale as of the 14th day of December, 2006.

MAGAZINE CONVENIENCE CENTER, INC.
a California corporation

By: _____
    Paul Ghafoori, its President

MILESTONE PACIFIC PROPERTIES, LLC,
a California limited liability company

By: _____
    Paul Ghafoori, its Manager

51888\69202v1                                1

# EXHIBIT J

## COMMERCIAL LEASE WITH OPTION TO PURCHASE

**AGENCY RELATIONSHIP CONFIRMATION.** The following agency relationship is hereby confirmed for this transaction and supersedes any prior agency election (if no agency relationship, insert "NONE"):

LISTING AGENT: _____ N/A _____ is the agent of (check one):
(Print Firm Name)

☒ the Lessor exclusively; or ☐ both the Lessee and the Lessor.

SELLING AGENT: _____ N/A _____ (If not the same as the Listing Agent) is the agent of (check one):
(Print Firm Name)

☐ the Lessee exclusively; or ☐ the Lessor exclusively; or ☐ both the Lessee and the Lessor.

*Note: This confirmation DOES NOT take the place of the AGENCY DISCLOSURE form which may be required by law.*

RECEIVED FROM _____ BPG Pacific, LLC _____ hereinafter referred to as LESSEE, the sum of
$_____ (_____ dollars),
evidenced by _____ as a deposit which will belong to Lessor and will be applied as follows:

|  | TOTAL | RECEIVED | BALANCE DUE PRIOR TO OCCUPANCY |
|---|---|---|---|
| Non-refundable option consideration . . . . . . . . . . . . . . . . . . . . . | $_____ | $_____ | $_____ |
| Rent for the period from _____ to _____ . . . . | $_____ | $_____ | $_____ |
| Security deposit (not applicable toward last month's rent) . . . . . . | $_____ | $_____ | $_____ |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $_____ | $_____ | $_____ |
| TOTAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $_____ | $_____ | $_____ 0.00 |

### LEASE

In the event this Lease is not accepted by the Lessor **within ___5___ days**, the total deposit received will be refunded.

Lessee offers to lease from Lessor the premises situated in the City of _____ Vallejo _____ County of _____
State of _____ CA _____, commonly known as _____ 199 Lincoln Road West, Vallejo, CA 94590 _____
consisting of approximately _____ square feet, upon the following terms and conditions:

1. **TERM.** The term will commence on (date) _____ December 14, 2006 _____, and end on (date) _____ December 13, 2032 _____

2. ~~**RENT.** The base rent will be $_____ 1.69 _____ per month payable on the _____ day of each month.~~
~~After the first 12 months the rent will be adjusted as follows: effective upon the first day of the month immediately following the expiration of 12 months from date of commencement of the term, and upon the expiration of each 12 months thereafter, in accordance with changes in the U.S. Consumer Price Index for ☒ All Urban Consumers (1982-84 = 100); or ☐ (other index) See Addendum No. 1~~
~~("CPI"). The base rent will be increased to an amount equal to the monthly rent, multiplied by a fraction, the numerator of which is the CPI for the second calendar month immediately preceding the adjustment date, and the denominator of which is the CPI for the second calendar month preceding the commencement of the Lease term; provided however, that the monthly rent will not be less than that immediately preceding the adjustment.~~

All rents will be paid to Lessor or his or her authorized agent, at the following address 336 Bon Air Center PMB 297, Greenbrae, CA 94904 _____ or at such other places as may be designated by Lessor from time to time. In the event rent is not received by Lessor **within ___5___ days** after due date, Lessee agrees to pay a **late charge** of $_____ plus interest at _____ % per annum on the delinquent amount. Lessee further agrees to pay $_____ 25.00 for each dishonored bank check. The late charge period is **not** a grace period, and Lessor is entitled to make written demand for any rent if not paid when due.

3. **COMMON AREA EXPENSES.** If checked ☒ Lessee agrees to pay, in addition to the base monthly rental set forth in item 2, ___100___ % of common area operating expenses, including utility and service costs, insurance and real property taxes. Tenant's monthly share of said expenses at the commencement of the term is $_____ 100% _____

4. **USE.** The premises are to be used for the operation of _gas station, convenience center, auto repair and other related gas station services_ and for no other purpose, without prior written consent of Lessor. Lessee will not commit any waste upon the premises, or any nuisance or act which may disturb the quiet enjoyment of any tenant in the building.

5. **USES PROHIBITED.** Lessee will not use any portion of the premises for purposes other than those specified. No use will be made or permitted to be made upon the premises, nor acts done, which will increase the existing rate of insurance upon the property, or cause cancellation of insurance policies covering the property. Lessee will not conduct or permit any sale by auction on the premises.

6. **ASSIGNMENT AND SUBLETTING.** Lessee will not assign this Lease or sublet any portion of the premises without prior written consent of the Lessor, which will not be unreasonably withheld. Any such assignment or subletting without consent will be void and, at the option of the Lessor, will terminate this Lease.

Lessee [ _____ ] [ _____ ] and Lessor [ _____ ] [ _____ ] have read this page.

**CAUTION: The copyright laws of the United States forbid the unauthorized reproduction of this form by any means including scanning or computerized formats.**

FORM 106-C.1 (11-2003)   COPYRIGHT BY PROFESSIONAL PUBLISHING, NOVATO, CA   (415) 884-2164

Form generated by: **TrueForms**™ from **REVEAL** SYSTEMS, INC. 800-499-9612

**PROFESSIONAL PUBLISHING**

Property Address _____ 199 Lincoln Road West, Vallejo, CA 94590 _____

7. **ORDINANCES AND STATUTES.** Lessee will comply with all statutes, ordinances, and requirements of all municipal, state and federal authorities now in force, or which may later be in force, regarding the use of the premises. The commencement or pendency of any state or federal court abatement proceeding affecting the use of the premises will, at the option of the Lessor, be deemed a breach of this Lease.

8. **MAINTENANCE, REPAIRS, ALTERATIONS.** Unless otherwise indicated, Lessee acknowledges that the premises are in good order and repair. Lessee will, at his or her own expense, maintain the premises in a good and safe condition, including plate glass, electrical wiring, plumbing and heating and air conditioning installations, and any other system or equipment. The premises will be surrendered, at termination of the Lease, in as good condition as received, normal wear and tear excepted. Lessee will be responsible for all repairs required during the term of the lease, except the following which will be maintained by Lessor: roof, exterior walls, structural foundations (including any retrofitting required by governmental authorities) and: _____

_____

Lessee ☒ will, ☐ will not maintain the property adjacent to the premises, such as sidewalks, driveways, lawns, and shrubbery, which would otherwise be maintained by Lessor.

   No improvement or alteration of the premises will be made without the prior written consent of the Lessor. Prior to the commencement of any substantial repair, improvement, or alteration, Lessee will give Lessor at least **two (2) days written notice** in order that Lessor may post appropriate notices to avoid any liability for liens.

9. **ENTRY AND INSPECTION.** Lessee will permit Lessor or Lessor's agents to enter the premises at reasonable times and upon reasonable notice for the purpose of inspecting the premises, and will permit Lessor, at any time **within sixty (60) days** prior to the expiration of this Lease, to place upon the premises any usual "For Lease" signs, and permit persons desiring to lease the premises to inspect the premises at reasonable times.

10. **INDEMNIFICATION OF LESSOR.** Lessor will not be liable for any damage or injury to Lessee, or any other person, or to any property, occurring on the premises. Lessee agrees to hold Lessor harmless from any claims for damages arising out of Lessee's use of the premises, and to indemnify Lessor for any expense incurred by Lessor in defending any such claims.

11. **POSSESSION.** If Lessor is unable to deliver possession of the premises at the commencement date set forth above, Lessor will not be liable for any damage caused by the delay, nor will this Lease be void or voidable, but Lessee will not be liable for any rent until possession is delivered. Lessee may terminate this Lease if possession is not delivered within _____ days of the commencement term in Item 1.

12. **LESSEE'S INSURANCE.** Lessee, at his or her expense, will maintain plate glass, public liability, and property damage insurance insuring Lessee and Lessor with minimum coverage as follows: _____ $1,000,000 each occurrence and $2,000,000 aggregate _____.
   Lessee will provide Lessor with a Certificate of Insurance showing Lessor as additional insured. The policy will require **ten (10) day's written notice** to Lessor prior to cancellation or material change of coverage.

13. **LESSOR'S INSURANCE.** Lessor will maintain hazard insurance covering one hundred percent (100%) actual cash value of the improvements throughout the Lease term. Lessor's insurance will not insure Lessee's personal property, leasehold improvements, or trade fixtures.

14. **SUBROGATION.** To the maximum extent permitted by insurance policies which may be owned by the parties, Lessor and Lessee waive any and all rights of subrogation against each other which might otherwise exist.

15. **UTILITIES.** Lessee agrees that he or she will be responsible for the payment of all utilities, including water, gas, electricity, heat and other services delivered to the premises, except: _____ No exceptions. _____.

16. **SIGNS.** Lessee will not place, maintain, nor permit any sign or awning on any exterior door, wall, or window of the premises without the express written consent of Lessor, which will not be unreasonably withheld, and of appropriate governmental authorities.

17. **ABANDONMENT OF PREMISES.** Lessee will not vacate or abandon the premises at any time during the term of this Lease. If Lessee does abandon or vacate the premises, or is dispossessed by process of law, or otherwise, any personal property belonging to Lessee left on the premises will be deemed to be abandoned, at the option of Lessor.

18. **CONDEMNATION.** If any part of the premises is condemned for public use, and a part remains which is susceptible of occupation by Lessee, this Lease will, as to the part taken, terminate as of the date the condemnor acquires possession. Lessee will be required to pay such proportion of the rent for the remaining term as the value of the premises remaining bears to the total value of the premises at the date of condemnation; provided, however, that either party may, at his or her option, terminate this Lease as of the date the condemnor acquires possession. In the event that the premises are condemned in whole, or the remainder is not susceptible for use by the Lessee, this Lease will terminate upon the date which the condemnor acquires possession. All sums which may be payable on account of any condemnation will belong solely to the Lessor; except that Lessee will be entitled to retain any amount awarded to him or her for his or her trade fixtures and moving expenses.

Lessee [ ___ ] and Lessor [ ___ ] [ ___ ] have read this page.

**CAUTION: The copyright laws of the United States forbid the unauthorized reproduction of this form by any means including scanning or computerized formats.**
Page 2 of 5
FORM 106-C.2 (11-2003)    COPYRIGHT BY PROFESSIONAL PUBLISHING, NOVATO, CA    (415) 884-2164

**PROFESSIONAL PUBLISHING**

Form generated by: TrueForms™ from REVEAL ® SYSTEMS, Inc. 800-499-9612

Property Address _____ 199 Lincoln Road West, Vallejo, CA 94590 _____

19. **TRADE FIXTURES.** Any and all improvements made to the premises during the term will belong to the Lessor, except trade fixtures of the Lessee. Lessee may, upon termination, remove all his or her trade fixtures, but will pay for all costs necessary to repair any damage to the premises occasioned by the removal.

20. **DESTRUCTION OF PREMISES.** In the event of a partial destruction of the premises during the term, from any cause except acts or omission of Lessee, Lessor will promptly repair the premises, provided that such repairs can be reasonably made within sixty (60) days. Such partial destruction will not terminate this Lease, except that Lessee will be entitled to a proportionate reduction of rent while such repairs are being made, based upon the extent to which the making of such repairs interferes with the business of Lessee on the premises. If the repairs cannot be made **within sixty (60) days,** this Lease may be terminated at the option of either party by giving written notice to the other party **within the sixty (60) day period.**

21. **HAZARDOUS MATERIALS.** Lessee will not use, store, or dispose of any hazardous substances upon the premises, except the use and storage of such substances that are customarily used in Lessee's business, and are in compliance with all environmental laws. Hazardous substances means any hazardous waste, substance or toxic materials regulated under any environmental laws or regulations applicable to the property. Lessee will be responsible for the cost of removal of any toxic contamination caused by lessee's use of the premises.

22. **INSOLVENCY.** The appointment of a receiver, an assignment for the benefits of creditors, or the filing of a petition in bankruptcy by or against Lessee, will constitute a breach of this Lease by Lessee.

23. **DEFAULT.** In the event of any breach of this Lease by Lessee, Lessor may, at his or her option, terminate the Lease and recover from Lessee: (a) the worth at the time of award of the unpaid rent which had been earned at the time of termination; (b) the worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of the award exceeds the amount of such rental loss that the Lessee proves could have been reasonably avoided; (c) the worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that the Lessee proves could be reasonably avoided; and (d) any other amount necessary to compensate Lessor for all the detriment proximately caused by the Lessee's failure to perform his or her obligations under the Lease or which in the ordinary course of things would be likely to result therefrom, including, but not limited to, that portion of any leasing commission paid by lessor and applicable to the unexpired term of the lease.

    Lessor may, in the alternative, continue this Lease in effect, as long as Lessor does not terminate Lessee's right to possession, and Lessor may enforce all of Lessor's rights and remedies under the Lease, including the right to recover the rent as it becomes due under the Lease. If said breach of Lease continues, Lessor may, at any time thereafter, elect to terminate the Lease.

    These provisions will not limit any other rights or remedies which Lessor may have.

24. ~~**SECURITY.** The security deposit will secure the performance of the Lessee's obligations. Lessor may, but will not be obligated to, apply all or portions of the deposit on account of Lessee's obligations. Any balance remaining upon termination will be returned to Lessee. Lessee will not have the right to apply the security deposit in payment of the last month's rent.~~

25. ~~**DEPOSIT REFUNDS.** The balance of all deposits will be refunded within three (3) weeks (or as otherwise required by law), from date possession is delivered to Lessee or his or her authorized agent, together with a statement showing any charges made against the deposits by Lessor.~~

26. **ATTORNEY FEES.** In any action or proceeding involving a dispute between Lessor and Lessee arising out of the execution of this Lease, hether for tort or for breach of contract, and whether or not brought to trial or final judgment, the prevailing party will be entitled to receive from the other party a reasonable attorney fee, expert witness fees, and costs to be determined by the court or arbitrators).

27. **WAIVER.** No failure of Lessor to enforce any term of this Lease will be deemed to be a waiver.

28. **NOTICES.** Any notice which either party may or is required to give, will be given by mailing the notice, postage prepaid, to Lessee at the premises, or to Lessor at the address shown in Item 2, or at such other places as may be designated in writing by the parties from time to time. Notice will be effective **five (5) days after mailing,** or on personal delivery, or when receipt is acknowledged in writing.

29. **HOLDING OVER.** Any holding over after the expiration of this Lease, with the consent of Owner, will be a month-to-month tenancy at a monthly rent of $ __150%__ , payable in advance and otherwise subject to the terms of this Lease, as applicable, until either party will terminate the tenancy by giving the other party **thirty (30) days written notice.**

30. **TIME.** Time is of the essence of this Lease.

31. **HEIRS, ASSIGNS, SUCCESSORS.** This Lease is binding upon and inures to the benefit of the heirs, assigns, and successors of the parties.

32. **TAX INCREASE.** In the event there is any increase during any year of the term of this Lease in real estate taxes over and above the amount of such taxes assessed for the tax year during which the term of this Lease commences, Lessee will pay to Lessor an amount equal to __100__ % of the increase in taxes upon the land and building in which the leased premises are situated. In the event that such taxes are assessed for a tax year extending beyond the term of the Lease, the obligation of Lessee will be prorated. Lessee will not be responsible for any tax increase occasioned solely by a sale or transfer of the premises by Lessor.

Lessee [ _____ ] and Lessor [ _____ ] [ _____ ] have read this page.

**CAUTION: The copyright laws of the United States forbid the unauthorized reproduction of this form by any means including scanning or computerized formats.**

Page 3 of 5
FORM 106-C.3 (11-2003)    COPYRIGHT BY PROFESSIONAL PUBLISHING, NOVATO, CA   (415) 884-2164

**PROFESSIONAL PUBLISHING**

Form generated by: **TrueForms**™ from **REVEAL** SYSTEMS, Inc. 800-499-9612

Property Address _____ 199 Lincoln Road West, Vallejo, CA 94590 _____

## OPTION

33. **OPTION.** So long as Lessee is not in default in the performance of any term of this Agreement, Lessee will have the option to purchase the real property described herein for a PURCHASE PRICE OF $_____ (_____ _____ dollars), upon the following TERMS and CONDITIONS: See that certain Option Agreement dated December 14, 2006 ("Option Agreement"), a copy of which is attached hereto and incorporated herein by this reference.

_____
_____
_____
_____
_____

34. **DISCLAIMER.** The parties acknowledge that the availability of financing and other purchase costs can not be ascertained with certainty. The parties agree that these items will not be conditions of performance of this Agreement, and the parties agree they have not relied upon any representations or warranties by Brokers, Lessor, or other parties which are not set forth in this Agreement.

35. ~~FIXTURES. All items permanently attached to the property, including light fixtures and bulbs, attached floor coverings, all attached window coverings, including window hardware, windows and door screens, storm sash, combination doors, awnings, TV antennas, burglar, fire and smoke alarms (except leased systems), pool and spa equipment, solar systems, attached fireplace screens, electric garage door openers with controls, outdoor plants and trees (other than in movable containers), are included in the purchase price free of liens, EXCLUDING:~~ See Option Agreement. _____

_____

36. ~~PERSONAL PROPERTY. The following personal property, on the premises when inspected by Lessee, is included in the purchase price and will be transferred to Lessee free of liens and properly identified by a Bill of Sale at close of escrow. Unless itemized here, personal property is not included in the option. No warranty is made as to the condition of the personal property.~~ _____

37. ~~EXAMINATION OF TITLE. Lessor will convey title to the property subject only to: [1] real estate taxes not yet due; and [2] covenants, conditions, restrictions, rights of way and easements of record, if any, which do not materially affect the value or intended use of the property.~~
~~Within three (3) days from exercise of the Option to Purchase, Lessee will order a Preliminary Title Report and copies of CC&Rs if applicable. Within ten (10) days of receipt, Lessee will report to Lessor in writing any valid objections to title contained in such report (other than monetary liens to be paid upon close of escrow). If Lessee objects to any exceptions to the title, Lessor will use due diligence to remove such exceptions at his or her own expense before close of escrow. If such exceptions cannot be reasonably removed before close of escrow, this Agreement will terminate, unless Lessee elects to purchase the property subject to such exceptions. In the event there is a bond or assessment which has an outstanding principal balance and is a lien upon the property, such principal will be assumed by Lessee without credit toward the purchase price, EXCEPT AS FOLLOWS:~~ _____

38. ~~EVIDENCE OF TITLE, in the form of a CLTA or ALTA policy of Title Insurance, issued by _____, paid by _____. NOTE: In addition to coverage under a CLTA policy, the ALTA policy may offer additional coverage for a number of unrecorded matters. Lessee should discuss the choice of a CLTA or ALTA policy with the title company of his or her choice at the time escrow is opened.~~

39. ~~CLOSING COSTS. Escrow fees, if any, and other closing costs will be paid in accordance with local custom, except as otherwise provided herein.~~

40. ~~CLOSE OF ESCROW. Within _____ days from exercise of the Option to Purchase, both parties will deposit with an authorized escrow holder, to be selected by the Lessee, all funds and instruments necessary to complete the sale in accordance with the terms of this Agreement.~~

41. ~~PRORATIONS. Rents, taxes, and other expenses of the property will be prorated as of the date of recordation of the deed. Security deposits, advance rentals or considerations involving future lease credits will be credited to Lessee.~~

42. ~~EXPIRATION OF OPTION. This Option to Purchase may be exercised at any time after (date) _____ and will expire at midnight (date) _____. Upon expiration Lessor will be released from any obligation to sell property to Lessee.~~

43. ~~EXERCISE OF OPTION. The Option to Purchase will be exercised by mailing or delivering written notice to the Lessor prior to the expiration of this Option and by an additional payment, on account of the purchase price, in the amount of $_____ (_____ dollars) for account of Lessor to the authorized escrow holder within 10 days after the exercise of the Option to Purchase.~~

Lessee [✗] [_____] and Lessor [_____] [✗] have read this page.

CAUTION: The copyright laws of the United States forbid the unauthorized reproduction of this form by any means including scanning or computerized formats.
Page 4 of 5
FORM 106-C.3 (11-2003)  COPYRIGHT BY PROFESSIONAL PUBLISHING, NOVATO, CA  (415) 884-2164

**PROFESSIONAL PUBLISHING**

Form generated by: **TrueForms**™ from REVEAL⬡ SYSTEMS, Inc. 800-499-9612

Property Address _____ 199 Lincoln Road West, Vallejo, CA 94590 _____

~~Notice, if mailed, will be by certified mail, return receipt requested, to the Lessor at the address set forth in Item 2, and will be deemed to have been given on the date shown on receipt or upon the third day following deposit in the U.S. Mail, whichever is earlier.~~

~~In the event the Option to Purchase is exercised, the consideration paid for the Option and _____ % from the rent paid by Lessee prior to the exercise of the Option to Purchase will be credited toward the purchase price.~~

44. **ENTIRE AGREEMENT.** The foregoing constitutes the entire agreement between the parties and may be modified only in writing signed by all parties. The following exhibits are a part of this Agreement:

Exhibit A: _Option Agreement_ _____
Exhibit B: _Addendum No. 1_ _____

~~The undersigned Lessee hereby acknowledges that he or she has thoroughly read and approved each of the provisions contained in this Offer, and agrees to the terms and conditions specified.~~     *Glenn Larsen, President of GHK Pacific, Inc, Manager*

Lessee _____ Date _12/14/2006_    Lessee _____ Date _____
BPG Pacific, LLC

Receipt for deposit acknowledged by _____ Date _____

## ACCEPTANCE

The undersigned Lessor accepts the foregoing Offer and grants the Option to Purchase set forth above.

~~NOTICE: The amount or rate of real estate commissions is not fixed by law. They are set by each broker individually and may be negotiable between the Seller and Broker.~~

~~45. COMMISSION. Upon execution, the Lessor agrees to pay to _____ N/A _____, the Broker in this transaction, _____ % of the option consideration for securing the Option plus the sum of $ _____ + _____ dollars) for leasing services rendered and authorizes Broker to deduct this sum from the deposit received from Lessee. In the event the Option is exercised, the Lessor agrees to pay Broker the additional sum of $ _____ + _____ dollars) from sale proceeds at close of escrow. This Agreement will not limit the rights of Broker provided for in any listing or other agreement which may be in effect between Lessor and Broker. In any action for commission the prevailing party will be entitled to reasonable attorney fees, whether or not the action proceeds to trial or final judgment.~~

Lessor acknowledges that he or she has read and understands the provisions of this Agreement, agrees to the terms and conditions specified, and acknowledges receipt of a copy.

Lessor _____ Lessor _____
(Signature)                    (Signature)

_Copeland Creek Apartments, LLC_ _____
(Please Print Name)                        (Please Print Name)

Date _12/14/2006_ Time _____    Date _____ Time _____

Lessor's Address _336 Bon Air Center PMB 297_    Lessor's Address _____

_Greenbrae, CA 94904_ _____

Lessor's Telephone _415.461.7333_    Lessor's Telephone _____

Lessor's Fax _415.461.7269_    Lessor's Fax _____

Lessee acknowledges receipt of a copy of the accepted Lease on (date) _12/14/2006_ [ _____ ]
(initials)

CAUTION: The copyright laws of the United States forbid the unauthorized reproduction of this form by any means including scanning or computerized formats.

Page 5 of 5
FORM 106-C.5 (11-2003)    COPYRIGHT BY PROFESSIONAL PUBLISHING, NOVATO, CA    (415) 884-2164

Form generated by: **TrueForms**™ from REVEAL⊙ SYSTEMS, Inc. 800-499-9612

**PROFESSIONAL PUBLISHING**

## ADDENDUM NO. _____    1

To Agreement dated _____December 14, 2006_____, between _____Copeland Creek Apartments, LLC_____,
and _____BPG Pacific, LLC_____, concerning property located at
_____199 Lincoln Road West, Vallejo, CA 94590_____    _____Vallejo, CA 94590_____

The parties agree as follows:
1. This is a tiple-net lease.
2. Lessee has the right of use and the removal of tanks for the duration of the lease.
3. Lessor on request of Lessee shall enter into a nondisturbance agreement with any sublessee of Lessee who
requests the Lessor to enter into such agreement, provided that Lessor is satisfied with the sublessee's integrity and
financial stability.
4. The base rent for the first 24 months of this Lease is $1.00, receipt of which is hereby acknowledged. After the
first 24th months the rent will be adjusted as follows: effective upon the first day of the month immediately following
the expiration of the 24 months from the date of commencement of the term, and upon expiration of each 12 months
thereafter, in accordance with changes in the U.S. Consumer Price Index for All Urban Consumers (1982-84 =100)
("CPI"). The initial base rent for purposes of rent adjustments in accordance with the CPI is $49,583.00. The base
rent will be increased to an amount equal to the monthly rent, multiplied by a fraction, the numerator of which is the
CPI for the second calendar month immediately preceding the adjustment date, and the denominator of which is the
CPI for the second calendar month preceding the commencement of the Lease term; provided however, that the
monthly rent will not be less than that immediately preceding the adjustment.

This Addendum, upon its execution by both parties, is made a part of the above Agreement.
If checked ☐ this Addendum is of no force or effect unless executed by all parties and delivered prior to
(date) _____ (time) _____ ☐a.m. ☐p.m., to _____
                                                                  (Name of Party)

Seller/Lessor _____    Date 12/14/2006
              Copeland Creek Apartments, LLC

Seller/Lessor _____    Date 12/14/2006

Buyer/Lessee _____    Date
              BPG Pacific, LLC

Buyer/Lessee ___Glenn Leasen, President of___    Date
              GHK Pacific, Inc., Manager

CAUTION: The copyright laws of the United States forbid the unauthorized reproduction of this form by any
means including scanning or computerized formats.

| Rev. by_____ |
| Date_____ |

FORM 101-B (03-2000) COPYRIGHT BY PROFESSIONAL PUBLISHING, NOVATO, CA   (415) 884-2164
Form generated by: TrueForms™ from REVEAL© SYSTEMS, Inc. 800-499-9612

**PROFESSIONAL PUBLISHING**

# OPTION AGREEMENT

THIS OPTION AGREEMENT ("Agreement") is made as of **December 14, 2006,** by and between **Copeland Creek Apartments, LLC,** a California limited liability company ("Owner"), and, **BPG Pacific, LLC,** a California Limited Liability Company ("Optionee").

## ARTICLE 1 – GRANT OF OPTION

Section 1.01 Grant of Option.  For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Owner hereby grants to Optionee the exclusive right to purchase **that certain real property ("Property") known as AP #0062-071-310 and 0062-061-340 in Vallejo, CA, commonly known as 199 Lincoln Road West, Vallejo, CA 94590,** and more particularly described on Exhibit "A" attached hereto, on the terms and conditions set forth in this Agreement (the "Option").  Optionor also hereby agrees to give Optionee a master lease covering the Property for the period of the Option for one dollar ($1.00) receipt of which is hereby acknowledged.

Section 1.02 Time of Exercise.  The Option may be exercised by Optionee at any time between **December 14, 2006 and December 14, 2008** by giving written notice of exercise to Owner.  If Optionee gives notice of exercise of the option but fails to close the purchase, the Option shall continue and Optionee shall have the right to exercise the option at a future time, until its expiration on **December 14, 2008.**

## ARTICLE 2 – OPTION PURCHASE TERMS

Section 2.01 Purchase Upon Option.  Upon exercise of the option, Owner will sell and Optionee will purchase the Property on the closing date and on the terms and conditions set forth in this Article.

Section 2.02 Purchase Price.  The purchase price ("Purchase Price") shall be equal to **Seven Million and No/100 Dollars ($7,000,000.00), plus an inflation factor equal to Forty Nine Thousand Five Hundred Eighty Three and 00/100 Dollars ($49,583.00) multiplied by the number of months (including a fractional number if applicable) elapsed between the date of this Agreement and the closing date of the option purchase.**  The full Purchase Price shall be paid in cash, in lawful money of the United States of America, upon the close of escrow.

Section 2.03 Closing Date.  The close of escrow shall occur on a date selected by Optionee not less than 10 nor more than 90 days after Optionee gives its notice of exercise.

Section 2.04 Escrow Holder; Costs and Prorations.  The escrow company shall be selected by Optionee.  The optionee shall pay closing costs, costs of title insurance, and transfer taxes.  All taxes, insurance premiums and rental income shall be prorated.

Section 2.05 Title Exceptions.  Owner shall convey title to the Property subject only to those exceptions to title existing as of the date Owner obtains title to the property, unless Optionee has approved in writing any other exceptions.

Section 2.06 Tax Deferred Exchange.  Upon purchase of the Property hereunder, Optionee and Owner each agree to cooperate with the other, upon request, in order to accomplish a section 1031 tax deferred exchange at the requesting party's cost.

Section 2.07  Real Estate Commissions.  Each party represents and warrants the other that no real estate commissions are owing on account of this agreement.

## ARTICLE 3 – RIGHTS TO CURE

Section 3.01  Right to Cure.  In addition to all other rights conveyed to Optionee hereunder, Owner hereby grants Optionee the right to take any steps reasonably required to preserve and protect Optionee's rights under this Agreement, including, but not limited to, any of the following:

a.  In the event of a default under a deed of trust, mortgage or other lien prior to this Option, Optionee shall have the right (but not the obligation) to immediately make any payment or do any act that may be appropriate to cure the default or protect the interest of Optionee under this Agreement.

b.  In the event of any governmental action that affects or would affect the Property, to appear at any hearing/or address or petition to the governmental authority as if Optionee were the owner of the Property.

c.  In the event of any loss or damage to the Property, to adjust the loss with any insurance carrier.

Owner hereby irrevocably appoints Optionee its attorney in fact to accomplish any act specified in this Section and agrees that this power is coupled with an interest and cannot be revoked.

## ARTICLE 4 – ASSIGNMENT

Section 4.01  Assignment.  Optionee may at any time assign this Agreement.  Any such assignment shall be effective only upon written notice of the assignment by Optionee to Owner.

## ARTICLE 5 – MISCELLANEOUS

Section 5.01  Memorandum.  A recordable form Memorandum of this Option Agreement may be executed and acknowledged by the parties and recorded at Optionee's option and cost.

Section 5.02  Notices.  All notices required or permitted under this Agreement shall be in writing and shall be deemed to have been duly given if delivered in person, or transmitted via facsimile machine to the facsimile number stated below with a confirmation copy mailed, or mailed, via first class U.S. Mail with postage prepaid, to the address designated below, for the party to whom the notice is made.  Notices that are mailed shall be deemed given on the third business day following deposit in the U.S. Mail.  The names and addresses for notice may be changed at any time by any party upon written notice to the others.  The parties' addresses for notices as of the date of this Agreement are:

Owner:    **Copeland Creek Apartments, LLC**
**Attn: Jack Yanoff, President of Enterprise Properties, Inc., Manager**
**336 Bon Air Center PMB 297**
**Greenbrae, CA. 94904**
**Telephone: (415) 461-7333**
**Facsimile: (415) 461-7269**

Optionee: **BPG Pacific, LLC**
**Attn: Glenn Larsen, President of GHK Pacific, Inc., Manager**
**60 E. Sir Francis Drake Blvd. Suite 200**
**Larkspur, Ca. 94939**
**Telephone: (415)464-2070x119**
**Facsimile: (415)464-2072**

Section 5.03  Attorneys' Fees.  If any legal action or proceeding arising out of or relating to this Agreement is brought by either party to this Agreement, the prevailing party shall be entitled to receive from the other party, in addition to any other relief that may be granted, the reasonable attorneys' fees, costs, and expenses incurred in the action or proceeding by the prevailing party.

Section 5.04  Binding Effect.  This Agreement shall be binding on and inure to the benefit of the parties to this Agreement and their heirs, personal representatives, successors, and assigns.

Section 5.05  Entire Agreement.  This Agreement is the only agreement between the parties pertaining to an option to purchase the Property and no other agreements or representations, written or oral, are effective.  All amendments to this Agreement shall be in writing and signed by all parties; any other attempted amendment shall be void.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date set forth below.

**OWNER:**

Copeland Creek Apartments, LLC
By: Enterprise Properties, Inc., its Manager

Dated: December 14, 2006

_____
Jack Yanoff, its President

**OPTIONEE:**

BPG Pacific, LLC
By: GHK Pacific, Inc., its Manager

Dated: December 14, 2006

By: _____
Glenn Larsen, its President

Title No. 06-66404314-PS
Locate No. CACTI7748-7707-2380-0066404314

**LEGAL DESCRIPTION**

**EXHIBIT "A"**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF VALLEJO, COUNTY OF SOLANO, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

PARCEL ONE:

BEGINNING AT A POINT ON THE EASTERN LINE OF LOT 74, AS SAID LOT IS SHOWN ON THAT CERTAIN MAP ENTITLED: "CARQUINEZ SUBDIVISION, UNIT NO. 3, FILED FOR RECORD IN THE OFFICE OF THE COUNTY RECORDER OF SOLANO COUNTY, CALIFORNIA, IN BOOK 9 OF MAPS ON PAGE 49", DISTANT THEREON SOUTHERLY 13 FEET FROM THE NORTHEASTERN CORNER THEREOF, RUNNING THENCE S 83 DEGREES 42' EAST 39.35 FEET; THENCE N 5 DEGREES 43' E 38.50 FEET; THENCE N 61 DEGREES 18' E 6 FEET; THENCE S 83 DEGREES 42' E 92.60 FEET; THENCE N 6 DEGREES 18' E 13.10 FEET; THENCE S 83 DEGREES 42' E 62.59 FEET, MORE OR LESS, TO THE WESTERN LINE OF U.S. HIGHWAY NO. 40, AT A POINT DISTANT NORTHERLY ALONG SAID HIGHWAY 98.2 FEET, FROM THE INTERSECTION THEREOF WITH THE NORTHERN LINE OF LOT 91 AS SAID LOT IS SHOWN ON THE MAP HEREINABOVE DESCRIBED, THENCE ALONG SAID HIGHWAY NORTHERLY 81.8 FEET TO THE BEGINNING OF A CURVE TO THE LEFT WITH A RADIUS OF 20 FEET; THENCE ALONG SAID CURVE TO THE LEFT A DISTANCE OF 31.42 FEET; THENCE N 81 DEGREES 44'35" W ALONG THE SOUTHERN LINE OF MAGAZINE STREET, 180 FEET TO THE NORTHEAST CORNER OF LOT 77, THENCE SOUTHERLY ALONG THE EASTERN LINE OF LOT 77, 76, 75 AND 74, AS SAID LOTS ARE SHOWN ON THE MAP HEREINABOVE DESCRIBED, 163 FEET TO THE POINT OF BEGINNING.

EXCEPTING THEREFROM ALL THAT PORTION CONVEYED TO THE STATE OF CALIFORNIA IN THE DEED RECORDED MAY 28, 1956, IN BOOK 831 OF OFFICIAL RECORDS, PAGE 375, AS RECORDER'S INSTRUMENT NO. 9820.

PARCEL TWO:

BEGINNING AT THE NORTHEAST CORNER OF PARCEL NO. 1, AS SAID PARCEL IS DESCRIBED IN THE DEED FROM ARTHUR T. ANDREWS, ET UX, TO WALTER SUCHORSKI, ET UX, RECORDED MARCH 12, 1965 IN BOOK 1329 OF OFFICIAL RECORDS, PAGE 205 INSTRUMENT NO. 8087, SAID POINT BEING THE NORTHWEST CORNER OF THE LAND DESCRIBED IN DEED FROM HARRY R. GOMEZ, ET AL., TO THE STATE OF CALIFORNIA RECORDED December 1, 1955, IN BOOK 802 OF OFFICIAL RECORDS , PAGE 341, INSTRUMENT NO. 23481; THENCE RUNNING ALONG THE NORTHERLY LINE OF SAID SUCHORSKI PARCEL NORTH 83 DEGREES 42' WEST 20.11 FEET MORE OR LESS TO AN ANGLE POINT IN SAID NORTH LINE; THENCE RUNNING SOUTH 6 DEGREES 18' WEST 13.10 FEET TO AN ANGLE POINT IN SAID SUCHORSKI PARCEL; THENCE RUNNING SOUTH 83 DEGREES 42' EAST TO A POINT IN THE WEST LINE OF SAID PARCEL CONVEYED TO THE STATE OF CALIFORNIA; THENCE RUNNING NORTHERLY ALONG SAID WEST LINE TO THE POINT OF BEGINNING.

PARCEL THREE:

LOTS 75, 76,77 AS THE SAME IS SHOWN ON THAT CERTAIN MAP ENTITLED: "CARQUINEZ SUBDIVISION, UNIT NO. 3, SOLANO COUNTY CALIFORNIA", WHICH MAP WAS FILED FOR RECORD IN THE OFFICE OF THE COUNTY RECORDER OF SOLANO COUNTY, CALIFORNIA, September 18, 1940 IN BOOK 9 OF MAPS, PAGE 49.

PARCEL FOUR:

ALL THAT PORTION OF THAT CERTAIN 60 FOOT WIDE STREET KNOWN AS MAGAZINE STREET, VALLEJO, SOLANO COUNTY, ABANDONED BY RESOLUTION RECORDED November 14, 1956, IN BOOK 856 OFFICIAL RECORDS, PAGE 407, INSTRUMENT NO. 20317 PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT LYING IN THE CENTER OF ABOVE SAID MAGAZINE STREET, SAID POINT ALSO LYING N. 65 DEGREES 21'45" W., 106.36 FEET FROM A POINT MARKING THE NORTHEAST CORNER OF LOT 77, CARQUINEZ SUBDIVISION UNIT NO. 3, MAP RECORDED September 18, 1940 IN BOOK 9 OF MAPS, PAGE 49, SOLANO COUNTY RECORDS; THENCE FROM SAID POINT OF BEGINNING, N. 70 DEGREES 58'51" EAST. 65.46 FEET TO A POINT IN THE NORTH LINE OF SAID MAGAZINE STREET; THENCE ALONG LAST SAID NORTH LINE, S. 81 DEGREES 41'35" E., 174.15 FEET; THENCE, S. 21 DEGREES 49'35" E., 26.62 FEET; THENCE ALONG A CURVE CONCAVE TO THE SOUTHWEST HAVING A RADIUS OF 92.00 FEET THROUGH AN ANGLE OF 24 DEGREES 22'00", A DISTANCE OF 39.13 FEET TO A POINT MARKING THE INTERSECTION OF THE SOUTH LINE OF MAGAZINE STREET WITH THE WEST LINE OF STATE HIGHWAY, ROAD X-SOL-7-F; AS SAID STATE

2

EXHIBIT "A" (continued)                                    Title No. 06-66404314-PS
                                                  Locate No. CACTI7748-7707-2380-0066404314

HIGHWAY EXISTED September 19, 1956; THENCE ALONG LAST SAID SOUTH LINE N. 81 DEGREES 44'35" 2.,
256.00 FEET; THENCE, N. 5 DEGREES 10'58" E., 30.04 FEET TO THE POINT OF BEGINNING.

PARCEL FIVE:

ALL THAT PORTION OF THAT CERTAIN PARCEL OF LAND DESCRIBED IN DEED TO STATE OF CALIFORNIA
DATED MARCH 28, 1951 AND RECORDED June 11, 1951, IN BOOK 582 OF OFFICIAL RECORDS, PAGE 467,
SOLANO COUNTY RECORDS, WHICH LIES SOUTHERLY OF A LINE DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE CENTER OF THAT CERTAIN 60 FOOT WIDE STREET KNOWN AS MAGAZINE
STREET AS SHOWN AND DELINEATED ON THAT MAP ENTITLED, "CARQUINEZ SUBDIVISION UNIT NO. 3,"
RECORDED IN BOOK 9 OF MAPS, PAGE 49, SOLANO COUNTY RECORDS; SAID POINT LYING N. 86 DEGREES
44'33" E., 150.29 FEET FROM A POINT MARKING THE NORTHEAST CORNER OF LOT NO. 77 OF SAID
SUBDIVISION UNIT NO. 3; THENCE FROM SAID POINT OF BEGINNING FROM A TANGENT THAT BEARS N 16
DEGREES 56'11" W., BY A CURVE CONCAVE TO THE SOUTHWEST HAVING A RADIUS OF 92.00 FEET
THROUGH AN ANGLE OF 4 DEGREES 53'24", A DISTANCE OF 7.85 FEET; THENCE, N 21 DEGREES 49'35" W.,
77.96 FEET; THENCE ALONG A CURVE CONCAVE TO THE SOUTH HAVING A RADIUS OF 30.00 FEET THROUGH
AN ANGLE OF 87 DEGREES 11'34", A DISTANCE OF 45.65 FEET; THENCE, S 70 DEGREES 58'51" W., 187.75
FEET TO A POINT IN THE CENTER OF SAID MAGAZINE STREET, SAID POINT LYING N. 65 DEGREES 21'45"
W., 106.36 FEET FROM SAID NORTHEAST CORNER OF SAID LOT NO. 77.

EXCEPTING THEREFROM ANY PORTION OF PARCEL FIVE LYING WITHIN THE BOUNDARIES OF PARCEL FOUR
HEREABOVE DESCRIBED

APN: 0062-061-310, 0062-061-340

3

# EXHIBIT K

## ASSIGNMENT AND ASSUMPTION OF SERVICE CONTRACTS, WARRANTIES, GUARANTIES, PERMITS AND OTHER INTANGIBLE PROPERTY

THIS ASSIGNMENT AND ASSUMPTION OF SERVICE CONTRACTS, WARRANTIES, GUARANTIES, PERMITS AND OTHER INTANGIBLE PROPERTY (this "Assignment") is made as of December 14, 2006, by and between MILESTONE PACIFIC PROPERTIES, LLC, a California limited liability company ("Assignor"), and COPELAND CREEK APARTMENTS, LLC, a California limited liability company ("Assignee").

WHEREAS, Assignor is contemporaneously herewith selling pursuant to that certain Purchase and Sale Agreement of Real Property, by and between Assignor and Assignee, dated as of October 14, 2006 (the "Purchase Agreement"), that certain real property located in the City of Vallejo, State of California, and improvements thereon. Terms used in this Assignment and not otherwise herein defined shall be given the meanings defined in the Purchase Agreement.

WHEREAS, Assignor desires to assign its interest in and to the following to Assignee as of the date on which title to the Property is vested in Assignee (the "Transfer Date"):

    (a)    All service contracts (the "Contracts");

    (b)    All "Warranties and Guaranties" (hereinafter defined);

    (c)    All "Names and Marks" (hereinafter defined);

    (d)    All "Intangible Property" (hereinafter defined);

    (e)    All "Permits" (hereinafter defined); and

    (f)    The "Starbucks Lease" (hereinafter defined).

WHEREAS, Assignee desires to accept such assignment as of the Transfer Date and assume the obligations of Assignor under the Contracts arising with respect to the period from and after the Transfer Date.

NOW, THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

    1.    As of the Transfer Date, Assignor hereby assigns and transfers unto Assignee all of its right, title, claim and interest in, to and under the (a) Contracts; (b) Warranties and Guarantees; (c) Names and Marks; (d) Intangible Property; (e) Permits; and (f) Starbucks Lease (collectively the "Assigned Interests"). Assignee hereby accepts such assignment as of the Transfer Date and assumes the obligations of Assignor under the Contracts and Starbucks Lease arising with respect to the period from and after the Transfer Date. Assignor hereby agrees to indemnify, defend and hold harmless Assignee from and against any and all cost, liability, loss, damage or expense, including, without limitation, reasonable attorneys' fees and expenses (collectively, "Losses and Liabilities"), arising out of or in any way related to any default by Assignor under any of the Contracts or the Starbucks Lease arising with respect to the period prior to the Transfer Date. Assignee hereby agrees to indemnify, defend and hold harmless

Assignor from and against any and all Losses and Liabilities arising out of or in any way related to any default by Assignee under any of the Contracts or the Starbucks Lease arising with respect to the period from and after the Transfer Date.

2.    The following terms shall have the following meanings:

(a)    The term "Warranties and Guaranties" as used herein shall mean and include all warranties and guarantees to the extent assignable, whether or not written, for all or any portion of the Property, including without limitation the improvements thereon and the tangible personal property, including without limitation construction warranties from contractors and subcontractors.

(b)    The term "Names and Marks" as used herein shall mean and include all patents, licenses, trademarks, service marks and names used in connection with the operation of the Property, and all symbols, emblems and logos used in connection with the ownership or operation of the Property, whether in black and white or in color, and irrespective of size, and all of Assignor's right, title and interest in and to all goodwill associated therewith, including, without limitation, the name "Magazine Convenience Center".

(c)    The term "Intangible Property" as used herein shall mean and include all intangible property relating to or used in connection with the Property.

(d)    The term "Permits" as used herein shall mean and include all governmental permits and approvals relating to the construction, operation, use or occupancy of the Property.

(e)    The term "Starbucks Lease" shall mean that certain lease dated August 15, 2005, by and between Starbucks Corporation, a Washington corporation, and Milestone Pacific Properties, LLC, a California limited liability company.

3.    This Assignment shall be binding on and inure to the benefit of Assignee and Assignor, and their respective heirs, executors, administrators, successors-in-interest and assigns.

4.    This Assignment shall be governed by and construed in accordance with the laws of the State of California.

5.    Nothing contained herein shall be deemed or construed as relieving the Assignor or Assignee of their respective duties and obligations under the Purchase Agreement.

6.    This Assignment may be executed in any number of counterparts, each of which shall be deemed to be an original, but any number of which, taken together, shall be deemed to constitute one and the same instrument.

### [SIGNATURES CONTINUES ON NEXT PAGE]

/////

IN WITNESS WHEREOF, Assignor and Assignee have executed this Assignment as of the date first above written.

ASSIGNEE:                                    ASSIGNOR:

                                             MILESTONE PACIFIC PROPERTIES, LLC
COPELAND CREEK APARTMENTS, LLC               a California limited liability company
a California limited liability company
By: Enterprise Properties, Inc., its Manager

By: _____               By: _____
    Jack Yanoff, its President                   Paul Ghafoori, its Manager

# EXHIBIT L

# Milestone Pacific Properties, LLC

1800 Sutter Street; Suite 620
Concord, CA 94520
Tel (925) 969-7777   Fax (925) 969-7778

January 17, 2008

**VIA U.S. MAIL and E-MAIL**

William Brasher
P.O. Box 2550
Livermore, CA 94551

CONOCOPHILLIPS: ConocoPhillips Company
P.O. Box 2197
Houston, TX 77252-2197
Attn: Marketing Contract Administration Department TR-1036A

RE:              Notice of Termination
Property:    199 Lincoln Road West, Vallejo, CA

To Whom It May Concern:

With regard to the above-referenced property, we regret to inform you are hereby
notified that Milestone Pacific Properties, LLC ("Milestone") is terminating that
certain Union 76 Branded Agreement ("Agreement"), effective January 17, 2008,
due to the failure to sell gas at competitive prices with the surrounding gas stations
Please also be advised that this letter shall in no way be construed as any waiver,
estoppel, and release of any claims, actions, defenses, offsets, etc., or be construed as
any admission(s) or ratification of the Agreement by Milestone or any member
thereto or any other entity, including but not limited to, Magazine Convenience
Center, Inc. This letter is merely to notify you that Milestone shall cease purchasing
and selling ConocoPhillips 76 gasoline and is terminating the Agreement, effective
January 21, 2008.

*Paul Ghafoori*
**Milestone Pacific Properties, LLC**